IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-00951

ANDREA LOCKHART; AMITABH AGRAWAL; LEAH M. ROWAN; SCOTT R.
ROBERTSON; THE THOMAS A LA COUR REVOCABLE LIVING TRUST; THE LANEZ
C LA COUR REVOCABLE LIVING TRUST; ANGELA TALIAFERRO; MICHAEL
TALIAFERRO; YUNAN ZHANG; LINGLING LIU; HEIDI JAROS; JEFFREY NG;
JENNIFER JENKINS; LON LICATA; AMY LICATA; WESLEY VO; NHU LE; THOMAS
JAMES DAY; JULIA DAY; CHRISTOPHER R. MOYER; FRANCES M. MOYER; and
LAURA S. SKLADZINSKI,

        Plaintiffs,

   v.

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF JEFFERSON,
COLORADO, as successor in interest to the Jefferson County Airport Authority,

        Defendant.

---

**DEFENDANT'S NOTICE OF REMOVAL
BASED ON FEDERAL QUESTION JURISDICTION**

---

**TO THE CLERK OF THE COURT, PLAINTIFFS, AND THEIR ATTORNEYS OF
RECORD:**

    PLEASE TAKE NOTICE that Defendant THE BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF JEFFERSON, COLORADO ("Defendant" or the
"County"), by and through undersigned counsel, hereby removes this case from the District Court
of Boulder County, Colorado to this Court pursuant to 28 U.S.C. §§ 1331, 1441, and 1446; the
Airport and Airway Improvement Act, 49 U.S.C. § 47101, *et seq.* ("AAIA"); and the Airport Noise
and Control Act, 49 U.S.C. § 47521, *et seq.* ("ANCA").  Removal is authorized because the claims
for inverse condemnation raised in the Complaint: (1) arise under federal law in light of the federal

1

government's pervasive control over aircraft noise regulation and the requirement that leaded fuel be available for general aviation aircraft until a safe and certified unleaded fuel is approved by the Federal Aviation Administration ("FAA"); and (2) also are completely preempted by the AAIA and the ANCA, as well as the regulations promulgated and enforced by the FAA to administer, implement, and enforce those statutes. The Complaint alleges that Plaintiffs are negatively impacted by the normal operation of the Rocky Mountain Metropolitan Airport ("RMMA" or the "Airport"), a federally funded commercial passenger, cargo, and general aviation airport that is owned and operated by the County. Like the related case filed by the same Plaintiffs' counsel and currently pending before this Court—*Drew Phillip Fuller, et al. v. Jefferson County, Colorado*; Case No. 1:24-cv-00157-DDD-STV (the "Fuller Case")—Plaintiffs are using their Complaint and this action to force the Airport to cease or severely curtail its operations. This includes a prohibition against the use of leaded fuel: "Unless and until planes using leaded fuel stop operating at the Airport, leaded fuel particulates will continue to invade the Properties," **Exhibit 1**, State Court Complaint and Jury Demand ("Complaint"), ¶ 75, despite the fact that federal law prohibits such a ban on leaded fuel. Federal law also does not allow the County to restrict the noise caused by aircraft operating at the Airport as Plaintiffs are demanding.

This Notice of Removal is timely under 28 U.S.C. § 1446 because it is filed within 30 days of the Complaint being filed in state court, which occurred on March 21, 2024.

## STATEMENT OF FACTS

On March 21, 2024, Plaintiffs filed their Complaint in the Boulder County, Colorado District Court, Case No. 2024CV30251. Plaintiffs claim damages for inverse condemnation based on, among other things, the Airport's provision of leaded fuel and the noise and vibrations

emanating from the Airport operations.  The claims are the same as those made by other clients of the same Plaintiffs' counsel in the Fuller Case.  Defendant intends to file a motion to consolidate this case with the Fuller Case.

**The Rocky Mountain Metropolitan Airport**

According to the Complaint, the "Airport is the third-busiest airport in the state of Colorado."  Complaint ¶ 4.  "In 2022 (the most recent year for which such data is publicly available), on average, the Airport experienced a takeoff or landing every two minutes."  *Id.*  "There Airport serves commercial, private, military, and medical flights."  *Id.* at ¶ 62.  "The Airport Operations also include jet airplanes, including 'public charter' services such as JSX, which began flying 30 passenger jets out of the Airport in the Summer of 2022 and which has been steadily increasing its destinations and number of flights since that time."  *Id.* at ¶ 63.

Plaintiffs assert that, "[i]n addition to these flights, the Airport has contracted with four flight schools whose pilots operate repeated training loops through the Homeowners' Airspace and conduct 'touch and go' takeoff and landing training operations in a racetrack pattern over the Properties at all hours of the day and night."  *Id.* at ¶ 64.

**Plaintiffs' Claims Against Leaded Fuel and Airport-Generated Noise**

Plaintiffs claim to own properties "generally located northwest of the Airport, following in a direct line from the runways at the Airport."  *Id.* at ¶ 33.  The Complaint purports to seek "just compensation" for the homeowners who claim to "have been substantially deprived of the use and enjoyment of their homes and properties (collectively, 'Properties') because of Defendant's ongoing airport operations."  *Id.* at ¶ 1.  Plaintiffs allege that "increased Airport Operations have caused excessive noise, vibrations, fuel pollution, and other airplane-created impacts (collectively,

3

'Airport Impacts'), which directly and substantially interfere with the Homeowners' use and enjoyment of their Properties and that significantly affect the marketability and value of the Properties." *Id.* at ¶ 12.

**Plaintiffs' Objection to the Use of Leaded Fuel at the Airport**

The Complaint alleges that flights operating at the Airport "drop lead particulates found in the aviation fuel used by small planes directly onto the Properties, causing an ongoing physical occupation of the Properties, raising serious health concerns, and again directly and substantially interfering with the Homeowners' use and enjoyment of their Properties and significantly affecting the marketability and value of the Properties." *Id.* at ¶ 13.

Under the heading "***The Airport Operations Cause Lead Particulates from Aviation Fuel to Invade and Contaminate the Properties***," the Plaintiffs assert, among other things:

- "According to the FAA, aviation gasoline is 'the aviation fuel most commonly used in piston-engine aircraft,' and 'remains the only transportation fuel in the United States to contain lead.'" *Id.* at ¶ 67 (citing FAA, *Aviation Gasoline*, https://tinyurl.com/4448d8p8).

- "The Airport provides leaded fuel to airplanes and accepts incoming aircraft operating on leaded fuel coming from other destinations." *Id.* at ¶ 69.

- "The low-altitude flights from the Aircraft Operations result in leaded fuel emissions onto the Properties." *Id.* at ¶ 70.

- "Unless and until planes using leaded fuel stop operating at the Airport, leaded fuel particulates will continue to invade the Properties." *Id.* at ¶ 75.

- "The physical occupation of the Properties by airplanes invading the Homeowners' Airspace, as well as by lead particulates occupying the Properties, substantially impairs Homeowners' use and enjoyment of the Properties and constitutes a taking of property rights within the Properties." *Id.* at ¶ 118.

CORE/3530173.0006/188350712.2

**Plaintiffs' Objection to Noise and Vibrations Emanating from the Airport**

Under the heading "***The Airport Operations Cause Excessive Noise and Vibrations***," the

Plaintiffs assert, among other things:

- "Planes flying in and within the vicinity of the Homeowners' Airspace and Properties often exceed more than 90 and have exceeded 100 decibels; numerous flights create noise in excess of 60 decibels at the ground level." *Id.* at ¶ 81.

- "In addition to the noise and vibrations caused by flights taken by commercial, private, military, and medical aircrafts, the flight schools put pilots on repetitive 'touch-and-go' routes where airplanes engage in a lopping takeoff and landing flight training, which can include multiple planes flying in the same racetrack pattern over the Properties." *Id.* ¶ 82.

- "These ''touch-and-go' training flights also operate overnight, with many flights occurring between midnight and 5:100 am and with noise exceeding 70-80 decibels at time.  Airport Operations also routinely and dramatically increase starting at 5:00 am." *Id.* at ¶ 83.

- "Airport Operations cause Airport Impacts, including deafening, disturbing, and frightening noise and vibrations on the Properties day and night." *Id.* at ¶ 84.

- "Noise from these Airport Operations makes it difficult for Homeowners to sleep, work, study, converse, take work and personal phone calls, concentrate, entertain, spend time in their front or back yards, read, listen to radio or television, or otherwise peacefully enjoy and use their Properties." *Id.* at ¶ 85.

- "Science has developed over the past two decades to show that consistent exposure to noise causes deleterious health effects.  Noise and vibrations also negatively affect property values, including the value of the Properties." *Id.* at ¶ 131(3).

**Federal Control Over Aviation and Airports**

Taken together, the practical impact of Plaintiffs' allegations—as well as their demand

from the County—would be to shut down the Airport or significantly reduce its operations.  But

although property owners such as Plaintiffs often dislike the practical realities of choosing a home

proximate to an airport, the law has developed to protect the operation of airports from undue

CORE/3530173.0006/188350712.2

interference resulting from such parochial interests.  Specifically, the federal government enjoys plenary power over air transportation.  As Justice Jackson famously observed:

> Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. **They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands.** The moment a ship taxies onto a runway it is caught up in an elaborate and detailed system of controls. **It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights, and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government.**

*Nw. Airlines v. State of Minn.*, 322 U.S. 292, 303 (1944) (Jackson, J., concurring) (emphasis added).  As a practical matter, if the "Not in My Backyard" argument was successful, this country would have far fewer operational airports.  Moreover, an airport sponsor such as the County is not responsible for deciding which aircraft will serve it, or where those airplanes fly to or from.  These are decisions that cannot be attributed to the County.

**<u>The Airport and Airway Improvement Act</u>**

Many of our nation's airports, including the Rocky Mountain Metropolitan Airport, are federally funded through grants or other payments, *see* Complaint ¶ 36, which relieves local taxpayers and airport patrons from having to pay all of the considerable expenses that exist to construct, maintain, and operate an airport.  The FAA gives these grants to airport sponsors so that they can build and improve airports to "maintain a safe and efficient nationwide" airport system. 49 U.S.C. §§ 47104(a), 47105(a); *see also id. at* § 47102(26) (defining "sponsor" as, among other things, "a public agency").

Such funding comes with strings attached.  Among other things, airports must comply with certain federal "Grant Assurances," including the obligation to make the airport "available for

public use on reasonable conditions and without unjust discrimination."  49 U.S.C. § 47107(a)(1); *see also* Airport Improvement Program (AIP) Grant Assurances, 79 Fed. Reg. 18,755, 18,755 (Apr. 3, 2014) (listing the FAA's current grant assurances at https://www.faa.gov/airports/aip/grant_assurances).

In 1982, Congress passed the Airport and Airway Improvement Act of 1982, 49 U.S.C. §§ 47101-47134, which established the current Airport Improvement Program ("AIP") and the National Plan of Integrated Aviation System.  The AIP encompassed an explicit set of regulations and requirements for the dispersal of the Aviation Trust Fund, and sought to expand the benefactors of those funds to a larger number of airports.

In 1996, the FAA established a specific regulatory procedure for airport tenants and users to submit complaints of noncompliance, accord 14 C.F.R. Part 16), which has generated a body of administrative decisions that elaborate upon the Grant Assurances' requirements.  The FAA also routinely generates letters to airports and their state/local government sponsors (*e.g.*, Jefferson County), setting forth its interpretation of the Grant Assurances.  The FAA may enforce an airport's Grant Assurance obligations by several methods, but the most effective is the threat or actual withholding of other AIP grants.  *See* 49 U.S.C. § 47111.  The FAA also can request an injunction in federal court and, if the misuse of revenue is at issue, pursue civil penalties of up to three times the diverted funds (in addition to reimbursement) as well as request that the U.S. Department of Transportation withhold all federal transportation grants from the airport's sponsor. *See* 49 U.S.C. § 46106.

Grant Assurance 5 requires that the airport sponsor retain all rights and powers necessary to ensure the continued operation of the airport consistent with its Federal obligations.  *Platinum*

*Aviation v. Bloomington-Normal Airport Auth.*, 16-06-09, 2007 WL 9666187 (F.A.A.), *2 (June 4, 2007).  Grant Assurance 22(a) requires sponsors to "make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities."  *Palm Beach County v. FAA*, 53 F. 4th 1318, 1321 (11th Cir. 2022).   This means that airports must be reasonably available to aeronautical activities and may not unjustly discriminate against one type of aeronautical activity.

**The Current Requirement to Provide and Use Leaded Fuel for General Aviation Aircraft**

Aviation gasoline (avgas) is the aviation fuel most commonly used in piston-engine aircraft within the general aviation community. Avgas remains the only transportation fuel in the United States to contain lead.  More than 222,600 registered piston-engine aircraft can operate on leaded avgas. The most common and reliable type of avgas is 100 octane Low Lead, also known as 100LL. This leaded fuel contains tetra-ethyl-lead ("TEL"), which is an additive used to prevent engine damage at higher power settings.  Although the FAA does not have direct regulatory responsibility for aviation fuels, it provides the initial certification approval of the aircraft with the fuel it operates on, and it oversees aircraft operators to ensure use of the correct fuel.  *See* FAA.gov, https://www.faa.gov/about/initiatives/avgas#:~:text=Avgas%20remains%20the%20only%20transportation,Lead%2C%20also%20known%20as%20100LL (last accessed Apr. 2, 2024).  In other words, unless and until the FAA certifies general aviation aircraft engines to use unleaded fuel, those aircraft are required to operate with leaded fuel.

"[The] FAA is working with critical government and industry partners to develop a multi-layered strategy to reduce and ultimately eliminate lead and its potential harmful effects from fuel for piston-engine aircraft . . . ."  *See* FAA.gov,

https://www.faa.gov/about/initiatives/avgas#:~:text=Avgas%20remains%20the%20only%20transportation,Lead%2C%20also%20known%20as%20100LL (last accessed Apr. 2, 2024).  In the meantime, however, the FAA has made it clear that airports cannot unilaterally refuse to offer or otherwise allow fueling of aircraft with leaded fuel:

> What authorities does the FAA have to ensure airports continue serving/offering leaded avgas? Under what circumstances can airports decide to unilaterally stop selling leaded avgas? The FAA ensures that airports continue offering avgas through Grant Assurance 22, Economic Nondiscrimination. **A ban or restriction on the sale or use of 100LL avgas at a federally obligated airport is inconsistent with Grant Assurance 22, Economic Nondiscrimination (49 USC 47107(a)(1)) and conflicts with the self-service provision.**  Any restriction on the sale or dispensing of any type of fuel, when there is demand/need or a fuel provider willing to provide the fuel, must be approved in advance by the FAA. Any such proposed restriction must be supported by a valid, FAA approved justification.  Such justification cannot be unreasonable or unjustly discriminatory.

*See* FAA, Unleaded Fuel Development FAQs and Definitions, available at https://www.faa.gov/sites/faa.gov/files/FAQs_FAA_UL_Fuel_Development.pdf (last accessed Apr. 2, 2024) (emphasis added).

In sum, the County cannot unilaterally refuse to allow the sale of leaded fuel at the Airport.

**The Airport Noise and Capacity Act**

In 1973, the Supreme Court held that the pervasive scope of federal regulation of the airways implied a congressional intention to preempt municipal aircraft noise restrictions based upon the police power. *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 638-40 (1973) (upholding injunction barring municipal aircraft crews as subject to federal preemption).

The ANCA, 49 U.S.C. §§ 47521–34, generally prohibits "airport noise and access restrictions on the operation of stage 2 and stage 3 aircraft" unless those restrictions meet stringent statutory requirements.  *See* 49 U.S.C. § 47524.  The ANCA also mandates that restrictions on

Stage 3 aircraft be "reasonable, nonarbitrary, and nondiscriminatory."   49 U.S.C. § 47524(c)(2)(A).  Section 47524(c) states:

> **(c) Stage 3 aircraft.--(1)** Except as provided in subsection (d) of this section, an airport noise or access restriction on the operation of stage 3 aircraft not in effect on October 1, 1990, may become effective only if the restriction has been agreed to by the airport proprietor and all aircraft operators or has been submitted to and approved by the Secretary of Transportation after an airport or aircraft operator's request for approval as provided by the program established under this section. Restrictions to which this paragraph applies include—
>
> > **(A)** a restriction on noise levels generated on either a single event or cumulative basis;
> >
> > **(B)** a restriction on the total number of stage 3 aircraft operations;
> >
> > **(C)** a noise budget or noise allocation program that would include stage 3 aircraft;
> >
> > **(D)** a restriction on hours of operations; and
> >
> > **(E)** any other restriction on stage 3 aircraft.

The FAA implements the ANCA through 14 C.F.R. Part 161, which sets out the process for analyzing and approving new noise restrictions, *see* 14 C.F.R. §§ 161.101–.417, and the penalties for failure to comply with the ANCA.  *See* 14 C.F.R. §§ 161.501–.505.

The County is subject to the ANCA—both as a general matter and because of its Grant Assurance obligations.  Grant Assurance 1(a) is titled "General Federal Requirements."  Grant Assurance 1(a) requires sponsors to "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance and use of Federal funds for [a] project including but not limited to . . . Title 49, U.S.C., subtitle VII, as amended."  *Id.* at 2.  *See Palm Beach Cnty. v. FAA*, 53 F. 4th 1318, 1337-38 (11th Cir. 2022) (upholding the FAA determination that airport's restrictions on aircraft noise violated

CORE/3530173.0006/188350712.2

Grant Assurances).  Significantly, ANCA established the ceiling on aircraft noise even though it does not specifically apply to piston aircraft.

One practical impact of the above-referenced statutory and regulatory environment is that a federally-funded airport such as RMMA cannot (1) impose restrictions on noise levels outside of what is permitted under the ANCA; or (2) ban the use of leaded fuel for piston aircraft.

## APPLICABLE STANDARD

The threshold requirement for removal under 28 U.S.C. § 1331 and 28 U.S.C. § 1441 is a finding that a contains a cause of action that is within the original jurisdiction of the district court. The key question is whether a complaint contains a claim that "aris[es] under the Constitution, laws, or treaties of the United States." 28 U.S.C. §§ 1331, 1441.

The Supremacy Clause of the U.S. Constitution provides that the laws of the United States "shall be the supreme law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. Art. VI, cl. 2.  Pursuant to this provision, Congress has the power to enact statutes that preempt state law.  *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989).   Congressional intent to preempt state law can be either express or implied. *See, e.g., Air Transp. Ass'n of Am. v. Cuomo,* 520 F.3d 218, 220-21 (2d Cir. 2008) (per curiam).  Express preemption is present when "a federal statute expressly directs that state law be ousted." *Id.* at 220 (internal citation omitted). Implied preemption comes in two varieties, known as field preemption and conflict preemption. Conflict preemption arises when state law "actually conflicts with federal law," *id.* at 220, such that it is not possible to comply with both and "state law stands as an obstacle to the accomplishment" of the congressional objective.

*Hillsborough Cnty. v. Automated Med. Labs. Inc.,* 471 U.S. 707, 713 (1985) (internal citation omitted).

## **ARGUMENT**

**I.      REMOVAL IS PROPER BECAUSE OF THE PERVASIVE FEDERAL INTEREST IN THE REGULATION OF NOISE AND THE AVAILABILITY OF LEADED FUEL AT FEDERALLY-FUNDED AIRPORTS.**

The first reason why federal question jurisdiction exists in this Court is the fact that the federal government pervasively regulates the attempt to restrict noise and the availability of leaded fuel at federally-funded airports such as RMMA.

Under the Supremacy Clause, federal law preempts state law when Congress expressly or impliedly indicates an intention to displace state law, or when state law actually conflicts with federal law. *Wardair Can. v. Fla. Dep't of Revenue,* 477 U.S. 1, 6 (1986). Removal of the case is appropriate under Section 1441(a) because this Court would have had original subject matter jurisdiction over Plaintiffs' claim pursuant to 28 U.S.C. section 1331 had Plaintiffs elected to file the action initially in federal court.   This is because of the pervasive regulation of airport operations under the AAIA and ANCA, and the fact that if the County modifies its operation of the Airport pursuant to the demands of Plaintiffs, the County will violate federal Grant Assurances. Stated simply, a state court may not apply state inverse condemnation law to prohibit or significantly restrict airport operations in a manner that violates the airport sponsor's legal requirements under the AAIA and ANCA.

In *City of Burbank v. Lockheed*, the Supreme Court, referencing the Supremacy Clause, concluded that "the pervasive nature of the scheme of federal regulation of aircraft noise" had completely preempted the states' traditional police power to regulate noise in that area.  411 U.S.

at 633.  The Court reasoned that "pervasive control vested in [federal agencies] under the 1972 [Noise Control] Act seems to us to leave no room for local curfews or other local controls."  *Id.* at 638; *see also id*. at 633 ("It is the pervasive nature of the scheme of federal regulation of aircraft noise that leads us to conclude that there is preemption").

In *City of Tipp City v. City of Dayton*, the court denied a motion to remand a case that challenged airport noise.  The court stated:

> **In light of the federal government's extensive control over aircraft noise regulation, . . . the federal interest in this case is substantial.**  The Court, therefore, concludes that a *prima facie* showing has been made that Plaintiffs' nuisance claim, although stated in terms of state law, "arises under" federal law, and that this Court has subject matter jurisdiction over same.

204 F.R.D. 388, 396 (S.D. Ohio 2001) (emphasis added).

Similarly here, the pervasive control vested in the FAA with regard to lead in fuel and airport/aircraft noise—as well as the Grant Assurance obligation not to restrict Airport access to aircraft operations—leaves no room for the use of state and local laws to interfere with the federal regulation of fuel, noise, and aircraft service at the Airport.  The federal interest in this case is substantial, and, although Plaintiffs' claims are presented in terms of state law, they arise under federal law and, therefore, removal is appropriate.

"[I]n certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues."  *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005) (citing *Hopkins v. Walker*, 244 U.S. 486, 490-91 (1917)).  Having federal jurisdiction lie over such issues "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law," to promote the uniformity a federal forum offers.  *Id.*

Other courts faced with similar circumstances have found removal to be proper.  In *Tipp City*, *supra*, the court found that the state law nuisance claim based on failure to implement FAA tower orders regarding noise abatement at the airport was not completely preempted by the Airline Deregulation Act [an argument not being made by Defendant here].  *See* 204 F.R.D. at 394.  The court held that the nuisance claim arose out of federal law, which afforded subject matter jurisdiction, as resolution of the state law claim would require resolution of a substantial question of law of whether defendant was in compliance with federal requirements.  *See id.*

In *Metropolitan Life Ins. Co. v. Taylor*, a former employee filed suit against his former employer and insurer alleging state law claims for breach of contract, retaliatory discharge and wrongful termination of disability benefits.  481 U.S. 58, 60-61 (1987).  The Supreme Court held that removal was proper because the state law contract and tort claims were preempted by ERISA and were removable under the well-pleaded complaint rule.  *See id.* at 66-67.  The Supreme Court stated:

> As we have made clear today in *Pilot Life Ins. Co. v. Dedeaux*, [481 U.S. 41, 54 (1987)], "**[t]he policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law** that Congress rejected in ERISA."

*Id.* at 64-65 (emphasis added).  The Court added that the suit, "though it purports to raise only state law claims, is necessarily federal in character by virtue of the clearly manifested intent of Congress," and therefore "'arise[s] under the . . . laws . . . of the United States,' 28 U.S.C. § 1331, and is removable to federal court by the defendants, 28 U.S.C. § 1441(b)."  *Id.* at 67.

Similarly here, the policy choices contained in the AAIA and ANCA and their implementing regulations relating to operation of aircraft and airports would be completely

undermined if homeowners such as Plaintiffs, unhappy to be next to an airport, are able to use state inverse condemnation law to force RMMA to either shut down or significantly reduce operations.

In *Brown v. Alaska Air Grp., Inc.*, No. CV-11-0091-WFN, 2011 WL 2746251, at *5 (E.D. Wash. Jul. 14, 2011), the court denied a motion to remand a case that had been removed because the plaintiff's claim for discrimination was preempted by the Air Carrier Access Act ("ACAA"), 49 U.S.C. § 41705, *et seq.*   The plaintiff in *Brown* alleged that the air carrier unlawfully discriminated against her by failing to provide a requested wheelchair.   Among other things, the plaintiff alleged that her treatment by the airline violated Washington's law against discrimination, specifically R.C.W. 49.60.215.   The *Brown* court held that removal was proper because the plaintiff's claim for violation of the Washington state law against discrimination fell within an area so pervasively regulated by federal law that preemption conferred removal jurisdiction. Significantly, the court rejected the plaintiff's argument that there was "no federal jurisdiction because there is no federal remedy under the ACAA," stating:

> Plaintiff fails to acknowledge the ACAA's administrative remedy scheme that includes contacting a complaint resolution officer for immediate remedies, filing a complaint with the Secretary of Transportation who can initiate an investigation and enforce actions, and appealing any decision to federal court.

*Id.* (citing 14 C.F.R. §§ 382.151–153; 49 U.S.C. §§ 41705 & 46101; 14 C.F.R. § 382.159; and 49 U.S.C. § 46110).

Similarly here, Plaintiffs' claims for inverse condemnation are preempted by the AAIA and ANCA, which pervasively regulate the manner in which airports may operate, including the provision of leaded fuel and the lack of local restrictions on aircraft noise.   *See, e.g., Friends of the E. Hampton Airport, Inc., v. Town of E. Hampton*, 841 F.3d 133, 147-54 (2d Cir. 2016) (airport users seeking preliminary injunction barring enforcement of town's local laws, which placed limit

on weekly flights and established curfews prohibiting aircraft from using town's airport during nighttime hours, were likely to succeed on their preemption claim); *Pirolo v. City of Clearwater,* 711 F.2d 1006, 1008 (11th Cir. 1983) (preempting local ordinances "prohibiting night operations" and "prescribing air traffic patterns"); *San Diego Unified Port Dist. v. Gianturco,* 651 F.2d 1306, 1308, 1312 (9th Cir.1981) (preempting "curfew on aircraft flights"); *Price v. Charter Twp. of Fenton,* 909 F. Supp. 498, 505 (E.D. Mich.1995) (preempting ordinance that "limit[ed] the frequency of flights of certain [noisy] airplanes"); *Blue Sky Ent., Inc. v. Town of Gardiner,* 711 F. Supp. 678, 695 (N.D.N.Y.1989) (preempting town law which, among other things, "attempted to regulate the noise generated by aircraft taking-off and landing at the airports"); *United States v. City of Blue Ash,* 487 F. Supp. 135, 135, 137 (S.D. Ohio 1978) (preempting ordinance requiring departing planes to make "Noise Abatement Turns").

The pervasive nature of federal control over airport operations is demonstrated clearly by the FAA's decision in *Aircraft Owners & Pilots Ass'n ("AOPA") v. City of Pompano Beach, Fla*, No. 16-04-01, 2005 WL 32722717 (F.A.A Dec. 15, 2005) (Director's Determination). There, the FAA ruled that the operator of the Pompano Beach Air Park airport **violated Grant Assurance 22 by failing to make the airport available to be used for, among other things, touch-and-go operations**. *See* 2005 WL 32722717, at \*8. This decision stands for the arguments that it is the FAA, not local law, decides what is safe to occur at an airport, and that an airport violates federal obligations if it prohibits touch-and-go operations without a sufficient basis for doing so. The FAA is the decider of what safety requires—not the airport operator via city ordinance. The FAA stated that it

> **considers it inappropriate to provide federal assistance to improve airports where the benefits of such improvements will not be fully realized due to inherent restrictions on aeronautical activities**. . . .  The owner of any airport developed with federal assistance is required to operate the airport for the use and benefit of the public and to make the airport available to all types, kinds, and classes of aeronautical activity on fair and reasonable terms and without unjust discrimination.

*Id.* (Emphasis added).

Although "an airport may limit any given type, kind, or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public," when "this is the case, **the FAA will make the final determination on the reasonableness of restrictions that deny or restrict use of the airport**." *Id*. (Emphasis added).  "Restrictions imposed for safety and/or efficiency should have supporting justification from FAA Flight Standards and Air Traffic offices.   It may be appropriate for FAA to initiate a safety analysis to assess any safety issues and to conduct an airspace study to determine the efficiency and utility of the airport when considering a proposed restriction."  *Id*. at *9.

"The FAA is the final authority in determining what constitutes a compromise of safety. In addition, FAA will make the final determination on the reasonableness of an airport owner's restrictions that deny or restrict use of the airport." *Id.*  "In making a final determination on safety, [the] FAA must determine whether or not the aeronautical activity being restricted can be safely accommodated on the airport and, therefore, whether the proposed restriction meets the statutory requirements and/or the terms of surplus property deeds of conveyance. It may be necessary for FAA to address whether it is possible to accommodate an aeronautical activity with fewer restrictions than are contemplated."  *Id.*; *see also id.* at *18 ("Restrictions based on safety and/or efficiency require supporting justification from the appropriate Flight Standards and/or Air Traffic

Offices"); *Luther Kurtz, et al. v. City of Casa Grande*, No. 16-16-01, 2017 WL 11438603, at \*21 (F.A.A. Dec. 21, 2017) ("By prohibiting use of an on-airport Parachute Drop Zone, the Respondent has unjustly discriminated against the Complainant and other aeronautical users.").

In *AOPA*, the airport operator asserted that the prohibition on stop-and-go operations and intersection take-offs prevented inconsistent and potentially dangerous aircraft operations and ensured that pilots have sufficient runway length to complete their take-offs.   *See* 2005 WL 32722717, at \*18.   However, the FAA found that "the administrative record does not include supporting justification from FAA Flight Standards and/or Air Traffic to confirm that stop-and-go operations and intersection take-offs pose an inherent safety hazard or interfere with efficiency." *Id*. at \*19.  The FAA added:

> Without supporting justification from FAA Flight Standards and/or FAA Air Traffic, the FAA Airports Office cannot approve the access restrictions for either stop-and-go operations or intersection take-offs based on safety or efficiency reasons as being consistent with the terms and conditions of the 1947 and 1948 quitclaim deeds. FAA Flight Standards found no basis to restrict stop-and-go operations or intersection take-offs for safety reasons. The administrative record contains neither the evidence to support a restriction based on efficiency nor sufficient detail to justify requesting an airspace study from Air Traffic at this time."

*Id*. at \*20.   As a result, the FAA found that "the restrictions on stop-and-go operations and intersection take-offs are not justified and cannot be enforced as safety and efficiency restrictions." *Id*.

More recently, the FAA has stated:

> **It is inappropriate for an airport sponsor or manager to negotiate or impose conditions or flight patterns beyond the Federal requirements, or to assign personnel to conduct oversight and safety evaluations despite the FAA having determined that the operator is conducting its operations in accordance with applicable Federal regulations. If the operation does not meet FAA safety standards, Okaloosa's exclusive remedy is to continue to bring that conduct to**

**the attention of the FAA Regional Office or local FSDO, which will take the appropriate action.** The record also showed no similar operational flight restrictions imposed on other similarly situated aeronautical operations or commercial operators that use DTS facilities.

Therefore, Okaloosa's actions imposing local flight operational requirements on Timberview beyond what is federally required is unreasonable. This action is in addition to the Director's findings of unreasonable access restrictions and practices identified in Sub-Issue 1. The Director further finds that Okaloosa is applying discriminatory terms and conditions in its lease terms and minimum standards against Timberview as well as unfair practices against other aeronautical users at the Airport. Therefore, the Director finds Okaloosa is in violation of Grant Assurance 22, *Economic Nondiscrimination*.

*Timberview Helicopters, Inc. v. Okaloosa Cnty.*, No. 16-21-14, 2023 WL 2239104, at *17 (F.A.A. Feb. 21, 2023) (Director's Determination) (emphasis added); *see also HTX Helicopters, LLC v. Rhode Island Airport Corp.*, No. 16-21-10, 2022 WL 1719308, *1 (F.A.A.) (May 19, 2022) (Director's Determination) ("The Director finds the Respondent in violation of Grant Assurance 22" because "the application of the indemnification clause by RIAC for a noise/nuisance lawsuit is unreasonable and unjustly denies [the aeronautical services provider] access to the Airport."). Here, federal jurisdiction is necessary to alleviate the unfair situation being imposed on Jefferson County by Plaintiffs: either violate state law or violate the Grant Assurances.

An additional reason why removal is necessary is the fact that Plaintiffs assert that the court handling this matter cannot consider any factors other than "issues relating to the just compensation owed for governmental use of private property and cannot address collateral issues that change the scope of the proceedings." Complaint ¶ 2 (citing *Ossman v. Mountain States Tel. & Tel. Co.*, 520 P.2d 738, 742 (Colo. 1974); *Dep't of Transp. v. Auslaender*, 94 P.3d 1239, 1241 (Colo. App. 2004)). This means that if the case proceeds in state court there is a very real danger

that the County will be prohibited from introducing the arguments as to why Plaintiff's claims are fundamentally inconsistent with the County's obligations under the AAIA and ANCA.

## II.   PLAINTIFFS' INVERSE CONDEMNATION CLAIMS ARE ALSO COMPLETELY PREEMPTED BY FEDERAL LAW.

The second and independent basis for removal to this Court is the fact that federal law completely preempts Plaintiffs' claims for inverse condemnation.  One "corollary of the well-pleaded complaint rule developed in the case law . . . is that Congress may so completely preempt a particular area that any civil complaint raising this select group of claims is necessarily federal in character."  *Metropolitan Life, supra*, at 63-64.  "In such a case, even if the only claim in a complaint is a state law claim, if that claim is one that is 'completely preempted' by federal law, federal subject matter jurisdiction exists and removal is appropriate."  *Toumajian v. Frailey,* 135 F.3d 648, 653 (9th Cir.1998) (internal citation omitted); *see also Caterpillar Inc. v. Williams,* 482 U.S. 386, 393 (1987) (a federal statute's preemptive force may be "so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for the purposes of the well-pleaded complaint rule.") (cleaned up) (internal citation omitted).

Under the complete-preemption doctrine, "federal law does not merely preempt a state law to some degree; rather, it substitutes a federal cause of action for the state cause of action, thereby manifesting Congress's intent to permit removal.  Thus, if a plaintiff files suit in state court, ostensibly upon a state cause of action, and the defendant removes the case on the basis of complete preemption, the federal district court that is persuaded that plaintiff's claim is completely preempted will re-characterize the plaintiff's cause of action as a federal claim for relief, making removal proper on the basis of federal-question jurisdiction."  14C Fed. Prac. & Proc. Juris. § 3722.2 (Rev. 4th ed.)  "In this sense, the complete-preemption doctrine overrides

such fundamental cornerstones of federal subject-matter jurisdiction as the well-pleaded complaint rule and the principle that the plaintiff is master of the complaint. However, since a claim that truly is created by federal law does appear on the face of the well-pleaded complaint, the complete preemption rule often is regarded as a corollary of, rather than an exception to, the well-pleaded complaint rule, although some courts also have referred to it as an exception to that rule." *Id.*

The fact that Plaintiffs style their claim as one for inverse condemnation under state law does not change the fact that this case is completely preempted by federal law.  In *Illig v. Union Elec. Co.*, owners of servient estates filed a state court action alleging that a public utility lacked the right to install or use power lines on their properties after a railroad had abandoned its easement over the properties.  *See* 334 F. Supp. 2d 1151, 1152 (E.D. Mo. 2004).  The case was removed and the court denied the plaintiff's motion for remand. *Id.*  The court stated that the plaintiffs' arguments for remand were "belied by the Supreme Court holding that 'a case arose under' federal law where the vindication of a right under state law necessarily turned on some construction of federal law."  *Id.* at 1154 (citing *Franchise Tax Bd. of the State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9 (1983)).  The court added:

> Plaintiffs are seeking inverse condemnation or in the alternative ejectment, but this turns on whether defendant has a right to have its utility lines on their property. "Even though state law creates [a cause of action], its case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties."  Before plaintiffs can prevail on their state law claims, federal questions such as Trailnet's rights under the Trails Act and whether those rights include licensing to defendant must be answered. This court has original jurisdiction to hear and resolve those federal issues.

*Id.* (citing *Franchise Tax Bd.*, 463 U.S. at 13) (emphasis added).

Similarly here, Plaintiffs are seeking inverse condemnation but their "claimed right to relief under state law requires resolution of a substantial question of federal law," *accord Illig*, 334 F. Supp. 2d at 1154—namely, whether Plaintiffs can utilize inverse condemnation to pursue the federally unlawful objective of terminating or significantly reducing Airport operations by challenging the use of leaded fuel and the noise emanating from the Airport.

Plaintiffs' claims are completely preempted by federal law because of their effort to eliminate or significantly restrict the Airport operations relating to pilot training.  *See* Complaint ¶ 64.  It is widely known that there is a significant pilot shortage in the United States.  *See* "US airlines about to be hit with 'tsunami' of pilot retirements," CNN.com (April 19, 2023) (available at https://www.cnn.com/2023/04/19/business/pilot-shortage-retirement-tsunami/index.html) (last accessed Apr. 2, 2024); "Airlines are trying to combat the pilot shortage . . .," Business Insider (April 24, 2023) (available at https://www.businessinsider.com/airline-strategies-for-addressing-the-pilot-shortage-in-the-us-2023-4) (last accessed Apr. 2, 2024).  The only way that shortage can be cured is robust training opportunities for prospective pilots.  It is not enough for Plaintiffs to argue that student pilots can train at airports other than RMMA.  What if all airports in a community had that same policy?  The hugely negative impact on the FAA and national policy of recruiting and training more pilots would be fully expected and harmful.

Finally, the Complaint also creates a federal law legal conflict between FAA on the one hand and EPA on the other as to the lawfulness of leaded fuel, and the application of the Clean Air Act to the fuel issues raised by Plaintiffs.  *See* Complaint ¶ 72 ("The EPA recently released a regulatory announcement on lead emissions from aircrafts: 'Protecting children's health and reducing lead exposure are two of EPA's top priorities").

## **CONCLUSION**

While the Complaint's requested remedy is compensation for the alleged impact of noise and lead on their homes, the above case law makes clear that the County's ability to control noise, lead and aircraft operations (1) renders this case one that arises under federal law, and (2) separately, makes the case completely preempted by federal law. For those reasons, the County respectfully removes the case now pending in the Boulder County District Court to this Court.

### **Notice to Court and Parties**

Copies of all documents filed or served upon Defendant in the state court action are attached hereto as **Exhibits 1-16**, as 28 U.S.C. § 1446(a) requires. In addition, pursuant to D.C.COLO.LCivR 81.1(b), the County has attached as **Exhibit 17** the register of actions from the Colorado Courts' E-Filing System for the state court action.  After the filing of this Notice of Removal, pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal will be served on counsel for Plaintiffs and filed with the Clerk of the District Court, Boulder County, Colorado.

CORE/3530173.0006/188350712.2

Respectfully submitted this 9th day of April, 2024.

*/s/ M. Roy Goldberg*

M. Roy Goldberg
**STINSON LLP**
1775 Pennsylvania Avenue N.W., Suite 800
Washington, D.C. 20006
Telephone: (202) 728-3005
Email: roy.goldberg@stinson.com

Nathaniel T. Vasquez
**STINSON LLP**
1144 Fifteenth Street, Suite 2400
Denver, CO 80202
Telephone: (303) 376-8424
Email: nathaniel.vasquez@stinson.com

*Attorneys for Defendant Board of County*
*Commissioners of the County of Jefferson,*
*Colorado*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 9, 2024, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.  Any other counsel of record will be served in accordance with the Federal Rules of Civil Procedure.

*/s/ M. Roy Goldberg*
M. Roy Goldberg

25