DATE FILED: March 21, 2024 2:59 PM
FILING ID: 2D42092B7224A
CASE NUMBER: 2024CV30251

# EXHIBIT H

# Bench Trial Order
# dated December 23, 2021

<table>
<tr><td>

**DISTRICT COURT, COUNTY OF BOULDER,**
**STATE OF COLORADO**
1777 Sixth Street, Boulder, CO 80306
(303) 441-3750

</td><td>

DATE FILED: December 23, 2021 8:55 AM
CASE NUMBER: 2020CV30837

</td></tr>
</table>

| | |
|---|---|
| Plaintiff: **ROCK CREEK MASTER HOMEOWNERS ASSOCIATION, INC.**<br><br>v.<br><br>Defendant: **JEFFERSON COUNTY, COLORADO,** as successor in interest to the Jefferson County Airport Authority | |
| | **▲COURT USE ONLY▲** |
| *Attorney(s) for Plaintiff:* Mark Davis<br>*Attorney(s) for Defendant:* Eric Butler and Jason Soronson | Case Number: **2020CV30837**<br>Division: **COC**      Courtroom: **H** |
| **BENCH TRIAL ORDER** | |

On October 25-26, 2021, the following actions took place in the above captioned case. The Clerk is directed to enter these proceedings in the register of actions:

**COURT REPORTER:** FTR

**APPEARANCES:**

1. Diane Marsella, as representative for Rock Creek Master Homeowners Association, Inc. ("Plaintiff" or "HOA").
2. Mark Davis appears on behalf of Plaintiff.
3. Brian Bishop, as representative for Jefferson County, Colorado ("Defendant" or "County").
4. Eric Butler appears on behalf of Defendant.
5. Jason Soronson appears on behalf of Defendant.

**SWORN WITNESSES:**

1. Diana Marsella
2. Brian Bishop
3. Matt Sneddon
4. Troy Stover

**EXHIBITS:**

1

*Plaintiff's:* 1, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 17, 19, 21, 23, 25 (limited), 26, 27, 28, 29, 30, 32, 33, 36, 38, 43, 55

*Defendant's:* A, B, C, D, E, F, G, H, J, K, L, M, O, Q, R, S

## FINDINGS AND ORDERS

I.  *The Court's Findings on the History of the Case*

Jefferson County ("County") operates the Rocky Mountain Metropolitan Airport, formerly the Jefferson County Airport ("Airport").  County is the successor in interest of the Jefferson County Airport Authority which first opened the Airport in 1960 and owned and operated the Airport until 1998 when it was transferred to County.

Rock Creek Ranch ("Rock Creek") is a Planned Unit Development containing approximately 2,800 different residential units located in the Town of Superior, Boulder County, Colorado.  Each residential property owner in Rock Creek is a member of HOA.  Rock Creek is generally located west and northwest of the Airport.

Richmond Homes ("Developer") was the property owner and developer of Rock Creek.  No later than 1986, Developer[1]  began the process of developing the tract of land that would eventually become Rock Creek.  As part of development, Developer went through the process of having the land annexed into the Town of Superior, rezoned from agricultural property, and placed into a Planned Unit Development.

---

[1] It appears from Exhibit D that the rezoning request was made by "Rock Creek Ranch Partnership, et al."  There was no other evidence presented concerning Rock Creek Ranch Partnership, but the parties have referred to Richmond Homes as the party submitting the rezoning request and proposed development of the Rock Creek property, and the Avigation Easement Agreements received into evidence (Exhibits 1 and 6) identified the owner of the Rock Creek Ranch property as "Richmond Homes, Inc. I."  The Court concludes that Richmond Homes was either affiliated with, or a successor of, Rock Creek Ranch Partnership, and will refer to all such entities as Richmond Homes or "Developer."

Airport expressed several concerns to the Town of Superior about the proposed development.  One of the concerns identified by the Airport was that the proposed development fell entirely within the "Airport Influence Area." To address this concern, Airport requested that Developer be required to grant an Avigation Easement to the Airport over the entirety of the property to be developed into Rock Creek to "better inform future dwelling owners of the noise, vibration levels, nuisance and safety hazards that they can expect during the day and night from the overflight of aircraft."

The Final Development Plan for Rock Creek is dated January 22, 1987.  Paragraph 1.2 references the Airport as located 1.5 miles east of the southeast boundary of Rock Creek. The Final Development Plan states that the current data from the 1986 Master Plan "indicates that the 60 and 65 Ldn noise impact zones do not infringe upon the Rock Creek Ranch property at any point."

Paragraph 11 of the Final Development Plan begins: "The continued success and viability of the Jefferson County Airport will provide a positive effect on the development of Rock Creek Ranch into the future."  The Paragraph goes on to list several conditions to "insure [sic] that incompatible development does not occur adjacent to the Airport and that the health, safety, and welfare of the residents of Rock Creek Ranch are maximized."   Among the conditions listed is a restriction precluding residential uses on certain parcels without the consent of the Jefferson County Airport Authority, an agreement by Developer to abide by FAA regulations to determine if the uses proposed in the final plat were compatible with the Airport, and an agreement by Developer to grant an Avigation Easement over the entirety of the Rock Creek property.

The Town of Superior approved the Final Development Plan and rezoned the Rock Creek property in January 1987.[2]

An Airport Master Plan ("Master Plan") is a guiding document that serves a variety of purposes, including making recommendations for the development of the airport and surrounding property. An airport is required to create a Master Plan and provide updates thereto to secure FAA funding for airport development and improvements.

Airport published its updated Master Plans in 1988, 2000 and 2011, each of which was admitted as evidence. The Final Development Plan for Rock Creek refers to a 1986 Master Plan for the Airport that was not finalized. It appears the 1988 Master Plan is the finalized version of the 1986 Master Plan.

Per the requirement in the Final Development Plan, a series of Avigation Easements ("Easements") were entered into between Developer and the Airport beginning in 1991. The Easements are recorded with the Boulder County Clerk and Recorder, with Reception Numbers: 01085091, 01085092, 01085093, 01116214, 01116862, 01147931, 01151011, 01151012, 01154166, 01168504, 01168505, 01227934, 01323785, 01377920, 01531879, 01531880, 01531881, 01551661, 01551662, 01556192, 01556193, 01567720, 01578794. The parties stipulated that the operative provisions of the Easements are essentially identical.

---

[2] The date of the ordinance approving the Final Development Plan is earlier than the date of the Final Development Plan, but this discrepancy is immaterial to the issues in this case.

The parties negotiated the terms of the Easements, which differed significantly from the form avigation easement attached to the 1988 Master Plan.  The Easements granted by Rock Creek give the Airport the non-exclusive right for passage of aircraft in the airspace above Rock Creek, together with the right to cause "such noise, vibration and all other effects that may be caused by the operation of aircraft" at the Airport.

Paragraph 2 of the Easements states:

> Limitations. The Easement granted under Paragraph 1 shall remain in effect unless any of the following shall occur:
>
> a.      The Airport shall cease being used as a "General Aviation Reliever Airport" as those terms are defined, as of the date of this Agreement, by the Federal Aviation Administration Rules and Regulations or any rules or regulations which may later be enacted which are more strict than current rules and regulations.
>
> b.      The type and size of aircraft using the Airport as permitted under the Master Plan shall be changed or become inconsistent with such Master Plan, if there is an increase in passenger usage over that disclosed in the Master Plan, or the Airport is used for freight delivery.
>
> c.      The Authority shall lengthen the existing runways, build additional runways or increase the load capacity of such runways beyond the proposed limits currently contained in the Master Plan.

d.      The noise contours contained in the Master Plan are exceeded by the sustained operation of aircraft in the Airspace Easement.

e.      The noise, vibration and all other effects of aircraft operation on the Property exceeds 60 ldn.

If any of the above shall occur this Easement shall terminate without further notice.

II.  *The Court's Analysis of the Parties's Rights Under the Easements*

For purposes of clarity, this Order will refer to the above Easement Limitations as "Limitations" when referenced collectively, and to any specific Limitation using the letter designated in the Easement ("Limitation A," "Limitation B," and so on).

The Easements were intended to assure that people acquiring lots in Rock Creek would have notice that use of their lots would likely be impacted by Airport activity.  The Limitations were intended to limit increases in the impact of Airport activities on Rock Creek property owners. References in the Limitations to noise and vibration are particularly important in limiting the impact of Airport activity on Rock Creek property owners because  the greatest amount of aircraft noise and vibration is produced during takeoff, and  the primary flight path for Airport takeoffs is to the northwest of the Airport and therefore directly over parts of Rock Creek.

The Limitations refer to a "Master Plan," which is described  as "a master plan for the Airport dated January 1988, such plan having been prepared by Barnard Dunkelberg & Company URS Engineers." It is undisputed that this is the document received into evidence as the 1988 Master Plan.

HOA asserts that several limitation events have occurred and that the Easements have therefore terminated.  Avigation easements, including the Easements at issue, run with the land.  HOA brings this action on behalf of the common interests of its property owners, who are the real parties in interest, to address issues concerning the Easements.  HOA has standing to assert all claims made in this action.

The Easements were created by agreement and so are properly interpreted under the law of contracts.  To the extent ambiguities exist in the Easements, the Court must interpret the Easements to give effect to the intentions of the parties as shown by the evidence presented.  In this case, the description in the Limitations is brief and references the "Master Plan."  The Court finds there are ambiguities which require the Court to determine the intention of the parties from the extrinsic evidence presented.

The Court will address each of the Limitations in turn.

### A.  Limitation A

No issues have been raised by HOA concerning Limitation A.

B. *Limitation B*

HOA asserts several of the Limitation B events have occurred.  Initially,  HOA contends that Limitation B actually contains three different limitation events, any one of which would trigger termination of the Easements: (1) "the type and size of aircraft using the Airport as permitted under the [1988] Master Plan shall be changed or become inconsistent with such Master Plan"; (2) "there is an increase in passenger usage over that disclosed in the [1988] Master Plan"; and (3) "the Airport is used for freight delivery."  County contends that Limitation B is triggered only if the type and size of aircraft using the Airport is changed or becomes inconsistent with the 1988 Master Plan, either as a result of an increase in passenger usage over that disclosed in the 1988 Master Plan or as a result of the Airport being used for freight delivery.

The Court agrees with County's interpretation of Limitation B.

The interpretation urged by HOA would cause the Easements to lapse if there was a reduction in the size of aircraft using the Airport or if a new type of aircraft used at the Airport caused less noise and fewer vibrations.  Clearly the intent of Limitation B is to address changes in Airport usage likely to increase the impact of Airport activities on Rock Creek, which would be likely in the event of an increase in passenger usage of the Airport over that disclosed in the 1988 Master Plan or use of the Airport for freight delivery.  Admittedly, an increase in the size of aircraft or the introduction of a more intrusive type of aircraft could increase the impact of Airport activities on Rock Creek, but that language was not used in Limitation B.

Under the Court's interpretation of Limitation B, any change in the aircraft using the Airport is irrelevant unless there is also an increase in passenger usage of the Airport over that disclosed in the 1988 Master Plan or the Airport is used for freight delivery.

The term "passenger usage" is not defined in the 1988 Master Plan. The 1988 Master Plan states as an assumption that no air carrier service was contemplated in the planning period for the 1988 Master Plan, which was from 1987-2007. Otherwise, the 1988 Master Plan did not address passenger usage.

"ATADS" Reports are prepared by air traffic controllers to show the level of operations at an airport, and these Reports are used by airports and the FAA. An ATADS Report was admitted into evidence as Exhibit 36, which shows an increase in air carrier operations, primarily beginning in 2012, as well as an increase in air taxi operations beginning around 2000. The 2011 Master Plan reports that the overwhelming majority of operations at the Airport relate to General Aviation, air carrier operations were infrequent and related to charter activity, and commuter operations grew considerably starting in 1990. For a period of time beginning in 2006, there were daily commercial flights to Grand Junction, Colorado using aircraft with a 19-passenger capacity, which would be classified as a commuter carrier rather than an air carrier.[3] The 2011 Master Plan also states that the number of enplaned passengers grew from near zero in the 1990s to 2,700 in 2008, and that when enplanement levels reach 2,500 an airport is considered by the FAA to be a Non-Primary Commercial Service Airport rather than a General Aviation Airport.

---

[3] An air carrier has a capacity of more than 60 seats or a cargo payload capacity of more than 18,000 pounds and carries passengers or cargo for hire or compensation.

Troy Stover testified that he worked at the Airport from 1987-2005.  He said there were no commercial air carriers using the Airport during his employment, but that the Airport had numerous charter flights involving planes of all sizes.  He also testified that there are increased air carrier operations shown on ATADS Reports because the FAA changed the ATADS reporting requirements to include overflights to reflect the workload demands placed on air traffic controllers.  However, Mr. Stover provided no basis for any knowledge of the extent of passenger usage of the Airport after 2005.

The 1988 Master Plan forecasts that by 2007 the Airport would have 286,000 aircraft operations annually.  The 2011 Master Plan sets forth the historical operations of the Airport.  Although the 2011 Master Plan does not specifically provide data for every year after 1988, the highest number of Airport operations listed for any one year is 186,000. In 2019, the number of operations increased to 191,533, still far less than the 1988 Master Plan forecast.

The evidence establishes that, although the total number of annual operations was substantially less than the number of operations forecasted in the 1988 Master Plan, there has been an increase in passenger usage of the Airport over that disclosed in the 1988 Master Plan.

The parties disagree about whether the Airport has been used for "freight delivery" as that term is used in Limitation B .  HOA asserts that Limitation B precludes all use of the Airport for freight purposes, and that the evidence presented establishes that air taxi operations at the Airport include air freight activity.  County argues that the intent of Limitation B  is not to disallow aircraft from carrying any cargo because the majority of aircraft using the Airport are likely to carry some cargo.

Instead, County argues that the intention of Limitation B is to preclude commercial freight operations, such as FedEx or United Postal Service, from using the Airport.

The 1988 Master Plan discusses in detail the types of aircraft operating at the Airport but does not address freight or cargo in any way. The 1988 Master Plan also does not address use of the Airport by air taxis. Aircraft operations, including those occurring at the Airport prior to the execution of the Easements, would undoubtedly have involved some freight. For example, the 1988 Master Plan recognizes various types of aircraft using the Airport, including business jets. There is no reason to think business jets using the Airport would have avoided transporting any freight. Instead, the most reasonable interpretation of "freight delivery" in Limitation B is operations that primarily involved freight delivery. The 2011 Master Plan states that the Airport had such minimal air cargo operations that the Airport had no buildings dedicated to cargo operations. No evidence was presented of any change in freight operations since the preparation of the 2011 Master Plan. Accordingly, the Court concludes that the Airport has not been used for freight delivery as that term is used in Limitation B.

The finding that passenger usage increased over that disclosed in the 1988 Master Plan triggers a limitation event under Limitation B if the type and size of aircraft using the Airport changed or became inconsistent with the 1988 Master Plan. Limitation B's reference to "[t]he type and size of aircraft using the Airport" is directed at the physical characteristics of aircraft, not the purpose for which the aircraft are used, since it is the physical characteristics of the aircraft that are relevant to possible increases in impact on Rock Creek property owners from Airport activity.

Although Limitation B refers to the type and size of aircraft using the Airport as that permitted under the 1988 Master Plan, there is nothing in the 1988 Master Plan that could reasonably be read to restrict the operation of other types of aircraft at the Airport. The 1988 Master Plan identifies four categories of aircraft using the Airport, and it also refers to helicopter activity at the Airport. The evidence establishes that many types and sizes of aircraft have used the Airport since before the 1988 Master Plan or the Easements were created.  Furthermore, the 1988 Master Plan forecasts a gradual decrease in the percentage of Airport use by single engine planes and a gradual increase in the percentage of Airport use by other types of planes.  The Court finds that there has been some increase in larger planes' use of the Airport, which would be consistent with the forecast presented in the 1988 Master Plan, but that the general character of Airport use has not changed.[4]  Therefore, notwithstanding the increase in passenger use at the Airport, the limitation events set forth in Limitation B have not occurred and termination of the Easements has not been triggered under Limitation B.

### C.  Limitation C

The next issue raised by HOA concerns Limitation C, the restriction on lengthening the existing runways, building additional runways, or increasing the load capacity of the runways "beyond the proposed limits currently contained in the [1988] Master Plan."   HOA does not claim that a

---

[4] The 2011 Master Plan anticipated that the Airport's critical design aircraft, the largest aircraft with at least 500 operations in a year, would change by 2015 from a Type D-II aircraft to a type D-III aircraft.  A "Categorical Exclusion Form" submitted by the Airport to the FAA in 2013 set forth a proposal to strengthen the primary runway to provide adequate pavement strength for D-III aircraft and stated that the Airport had over 500 operations exceeding the D-II standard.  However, it is not clear that any one D-III aircraft had over 500 operations in a year as required to change the Airport's critical design aircraft.  In any event, such an increase is permitted under the 1988 Master Plan.

limitation event occurred because of any lengthening of existing runways[5] or any building of additional runways, but instead asserts that the strengthening of the Airport's primary and secondary runways constitutes a limitation event under Limitation C.

The 1988 Master Plan lists the existing length and weight-bearing capacities of the Airport's runways and proposes six different development alternatives featuring different runway lengths and locations.  None of the alternative development proposals addressed runway weight-bearing capacity. HOA is correct that the 1988 Master Plan contains no proposal to increase runway load capacity, but the 1988 Master Plan also contains no proposed limits on runway load capacity. Nothing in the 1988 Master Plan suggests that the reference to the existing load capacity should be treated as a proposed limit.  Therefore, the Court finds the Easements do not limit the load capacity of the runways.

The weight-bearing capacity of the primary runway reported in the 2000 and 2011 Master Plans is somewhat higher than that reported the 1988 Master Plan, but there is no evidence that any changes to the primary runway occurred during this time span.

The 2011 Master Plan recommends that the primary runway dual wheel capacity be increased from 75,000 pounds to 100,000 pounds.  The 2013 "Categorical Exclusion Form" submitted by the Airport to the FAA proposed a project to "rehabilitate the runway to extend its useful life and provide adequate runway pavement strength of 100,000 pounds dual wheel gear."  The proposal involved "removing 1.5 inches of existing asphalt and replacing it with 2 to 5.5 inches of new

---

[5] The secondary runway was extended in approximately 1994. This extension  apparently was completed consistent with a proposal provided in the 1988 Master Plan.

asphalt."  However, when runway renovation was undertaken in 2014, three inches of existing asphalt were removed and replaced with three inches of new asphalt.  As a result, in 2020 the Airport reported the primary runway as having a dual wheel weight capacity of 105,000 pounds.

The 1988 Master Plan reports the secondary runway as having a weight capacity of 12,000 pounds. An overlay of the secondary runway was completed sometime during 2015-2016.  In 2020, the Airport reported the secondary runway as having a dual wheel capacity of 61,000 pounds.[6]  Mr. Bishop testified that the reported increased strength of the runways was due to a change in the calculation methodology used to calculate runway strength.  However, Mr. Bishop provided no supporting documentation nor did he explain the change in methodology or say why the changed methodology would result in such an increase in weight capacity.

The Court concludes that most, if not all, of the increased weight capacity resulted from the refurbishing of the runways.  Runways need periodic refurbishing because over time they do not function as they initially had, and it is reasonable to expect that the refurbished runways would be stronger due to advancements in refurbishing technology over time.  The Court finds the work on the primary runway was limited to replacing the existing asphalt.  The work on the secondary runway was described as an overlay, but the Court was provided no further explanation of the scope or reason for this work.  Even if Limitation C intended to limit any increase in the load capacity of Airport's runways (which the Court has found is not the case because there is no load capacity limit in the 1988 Master Plan), Limitation C should not be construed to preclude replacing existing runway asphalt, even if replacement asphalt is of a higher quality capable of supporting

---

[6] The testimony discussed an increase in the reported capacity to 47,000 pounds, but it appears that capacity was the single wheel capacity.

more weight.  As previously stated, the purpose of the Limitations is to limit the impact of Airport

operations on Rock Creek property owners.  Increased weight capacity of the runway, by itself, is

not relevant to the consideration of the Airport's impact on Rock Creek.

### D.  Limitation D

The real crux of the dispute between the parties concerns the noise generated by Airport operations

and its impact on the Rock Creek property owners.  A limiting event under Limitation D takes

effect if the noise contours ("Contours") in the 1988 Master Plan are "exceeded by the sustained

operation of aircraft in the Airspace Easement."  A diagram included in the 1988 Master Plan

captioned "Existing Noise Contours" depicts the Airport and the immediately surrounding area. It

contains three Contour lines labeled Ldn 60, Ldn 65 and Ldn 70.  The 2000 and 2011 Master Plans

also contain Contour lines.

County objected before and during the trial to the admissibility of the Master Plans' Contours for

purposes of determining noise levels, claiming they constitute inadmissible hearsay and expert

testimony in violation of Rule 705, C.R.E.  The Contours contained in each of the Master Plans

were developed by third-party consultants under contracts with the Airport – Barnard Dunkelberg

& Company for  the 1988 and 2000 Master Plans; and Reynolds, Smith and Hills, Inc. for the  2011

Master Plan. County contends the Contours contained in these Master Plans are out-of-court

statements offered for the truth of the matter asserted.

The work of these third-party consultants was not limited to preparing the Contours, as the 1988,

2000, and 2011 Master Plans were prepared in their entirety by these consultants in their work

with the Airport.  As discussed previously, Master Plans are long-term strategic documents required by the FAA for an airport to receive federal funds to support airport development and improvements.  Airports generally hire third-party consultants to prepare planning studies used in the creation of Master Plans.  Master Plans are funded by the FAA and must be periodically updated.  The FAA provides detailed guidance for developing Master Plans.  The FAA's Advisory Circular provides that, for noise studies, the area of consideration in a Master Plan "may be set at the DNL 65dB contour."  Airport has received multiple substantial federal grants from the FAA based upon its 1988, 2000, and 2011 Master Plans, all of which were developed for and published by the Airport.

In addition to being used by airports to secure funding, the publication of Master Plans is intended to provide information to surrounding jurisdictions and property owners considering zoning and development issues.  For example, the 1988 Master Plan states that its recommended land use plan "is intended to present a clear, simple and concise statement of policy and recommendations regarding the development of land within the airports environs to developers, builders, homeowners and buyers, and representatives of the various entities having land use control within the airport environs."

The 1998 and 2011 Master Plans were made available to the public on the Airport and Jefferson County websites.  The absence of  the 2000 Master Plan from  the Jefferson County and Airport websites was apparently an oversight. Diana Marsella testified that the 2000 Master Plan was added to the websites in 2020 after she brought its absence to County's attention.  The 2000 and 2011 Master Plans were adopted and approved by the Jefferson County Commissioners.  The fact

that the 1988 Master Plan was on the Jefferson County website suggests that it may also have been approved by the County Commissioners, but there was no direct evidence to that effect. Furthermore, the Airport agreed to the Easements, stating that "the Authority has accepted, enacted and proposed a master plan for the Airport dated January 1988," and also agreed to the tying of limitation events to the Contours in the 1988 Master Plan. Therefore, the Airport agreed to have the Easements governed by the Contours in the 1988 Master Plan.

Rule 801 of the Colorado Rules of Evidence defines hearsay. C.R.E. 801(d)(2) says that an admission of a party opponent is not hearsay. The 1988, 2000, and 2011 Master Plans, including the Contours featured therein, were adopted, approved, and published by the Airport with the expectation that others would rely on them. Therefore, the Court finds these Contours are not hearsay under subsections (B), (C) and (D) of C.R.E. 801(d)(2).

HOA contends that the Contours are not hearsay because they are computer-generated reports and therefore are not statements of a person. However, the Court heard evidence that the Contours were measured and developed using numerous data inputs from human actors. The 1988 Master Plan describes a requirement for input "of the physical and operation characteristic of the airport," including runway coordinates, airport altitude, temperature, aircraft mix, flight tracks, and approach profiles, as well as optional departure profiles, approach parameters, and aircraft noise curves. This evidence shows the Contours constitute statements, so they cannot be admitted solely under the exception to the hearsay rule for computer-generated reports.

HOA also claims that the Contours are admissible under the business records and public records and reports exceptions to the hearsay rule under C.R.E. 803(6) and (8).  Having found that the Contours are not hearsay, the Court need not address these claims.

County also argues that the Contours are inadmissible under rules governing expert testimony. However, the case authority cited by County concerns the admissibility of expert opinions under the business records exception to the hearsay rule.  Since the Court found the Contours are not hearsay, this authority does not apply to the Court's evaluation in this case.

The next issue is whether the evidence demonstrates that a limitation event under Limitation D concerning the Contours has occurred. County argues that there is no evidence the Contours have been exceeded by the sustained operation of aircraft because the Contours only provide an estimation of noise levels at a particular point in time in the distant past, and there is no evidence that these noise levels were sustained over time.

As stated above, the 1988 Master Plan contains Contours labeled "Ldn 60," "Ldn 65," and Ldn 70."  The 2000 Master Plan contains Contours labeled "DNL 60," DNL 65," "DNL 70," and DNL 75." The only Contour found in the 2011 Master Plan is "DNL 65."

DNL and Ldn are different terms for the same sound measurement and refer to day-night sound level, so the Court will use them interchangeably.  The basic unit used to calculate DNL is the Sound Exposure Level ("SEL"), which is computed by adding the decibel level for each one-

second reading of a noise event above a certain threshold.  DNL is then computed by adding, weighting, and averaging the SELs over a one-year time period.

The 1988 Master Plan established its Contours using the Integrated Noise Model ("INM") Version 3.8, which is a large computer program developed by the FAA to plot noise contours for airports. The Contours in the 2000 Master Plan were developed using INM Version 6.  The INM calculation method was used by the airline industry at the time the Master Plans were developed.  There was no evidence presented that any serious flaw in the INM calculations exists.   Though it is not clear how the Contour for the 2011 Master Plan was developed, the 2011 Master Plan was accepted in its entirety by the FAA, which suggests an approved method for developing the Contour was used. The 1988 Master Plan states:

> the area between the 60 Ldn and 65 Ldn contour is an area within which most land uses are compatible but signifies that noise levels are such that some land use incompatibility may exist in the future and that the situation should be monitored. The Ldn 65 contour identifies areas of significant noise exposure where many types of land uses are normally unacceptable and where land use compatibility controls are recommended.

Appendix 12 to the 1988 Master Plan states that "the Ldn 60 contour is usually regarded as the critical contour at general aviation airports." The Court heard other testimony that the Ldn 65 contour is the critical contour.

The 1988 Master Plan provides that the Contours represent the most severe conditions for both present and future development of the Airport.   Mr. Bishop testified that the Contours were designed to represent noise levels that would never be exceeded. The existing 60 Ldn Contour and the proposed future 60 Ldn Contour provided in the 1988 Master Plan both extend beyond Airport property to the northwest but do not demonstrate an impact on Rock Creek property. The existing 65 Ldn Contour provided in the 1988 Master Plan appeared to be largely within Airport property.

The existing 60 DNL Contour provided in the 2000 Master Plan extends well beyond the existing and proposed future 60 Ldn Contour provided in the 1988 Master Plan, as well as beyond the entirety of the Rock Creek property. The existing 60 DNL Contour in the 2000 Master Plan covers approximately 39 acres of residential property, all of which appear to lie within Rock Creek.

"Sustained operation of aircraft" is not defined in Limitation D or anywhere else in the Easements. The evidence establishes that the Contours are computed using sound events accumulated over the course of a year.  Although the terminology used to describe the limitation event in Limitation D is quite vague, the most reasonable interpretation of "sustained operation," when used in a sentence that addresses the exceeding of Contours, is noise that produces Contours that exceed those provided in the 1988 Master Plan in a way that impacts Rock Creek.

Limitation D refers generally to "noise contours" rather than to any specific Contour.  It appears that at the time the 2000 Master Plan was prepared, Rock Creek was not impacted by noise represented by the Contour levels, other than that represented by the 60 DNL Contour.   The limitation event under Limitation D requires that there be "sustained operation of aircraft in the

Airspace Easement," which implies that any such sustained operation must impact use of the property below the Easement airspace.

The 1988 Master Plan recognizes the 60 Ldn Contour as the critical contour. Thus, the fact that the 60 Ldn Contour provided in the 2000 Master Plan exceeds the proposed future 60 Ldn Contour provided in the 1988 Master Plan is sufficient to trigger the limiting event under Limitation D because Rock Creek property falls within the 60 Ldn Contour provided in the 2000 Master Plan, but not within the 60 Ldn Contour provided in the 1988 Master Plan.

The Court recognizes that there may appear to be some inconsistency in finding that the limitation event in Limitation D was triggered by the sustained operation of aircraft when the number of total aircraft operations at the Airport is substantially less than forecasted in the 1988 Master Plan. However, the Court is bound by the language of the Easements, which renders the triggering of Limitation D independent of the number of Airport operations, except to the extent that these operations impact the Contours.

The trial brief filed by County argues that HOA's interpretation of the Easements is contrary to public policy and that HOA's claims are barred by its unreasonable delay in enforcing its rights. The County's argument about public policy relies on grant assurances which it was required to give the FAA to obtain funding. These grant assurances require the County to make the Airport available for public use without discrimination against any type of airport use.  The Court finds this argument does not apply to the noise issue of Limitation D, so it need not be addressed.  The Rock Creek Final Development Plan contains language which states: "The continued success and

viability of the Jefferson County Airport will provide a positive effect on the development of Rock Creek Ranch into the future." However, the Court has taken this public policy concern into account by only considering limitation events that substantially impact Rock Creek. As to latches, the only Rock Creek property owner who testified at trial did not own property for an extended period of time and was unaware of the existence of the Easements. There is no evidence as to what knowledge other Rock Creek property owners may have had that would have enabled them to previously terminate the Easements, and no evidence was presented that the Airport relied on the Rock Creek owners' inaction to its detriment. Therefore, latches does not apply.

County also argues that there was no evidence presented as to which, if any, of the approximately 20 Easements are affected by the sustained operation of aircraft at the Airport. The limitation event under Limitation D, as interpreted by the Court, only applies to property within the 60 DNL Contour of the 2000 Master Plan. Given that this 60 DNL Contour extends entirely beyond Rock Creek, although not as wide as Rock Creek, it appears likely that all Easements are impacted. However, the evidence presented is insufficient for the Court to make that finding. Under the circumstances, the Court will exercise its discretion to reopen the evidence for the limited purpose of determining which Easements are within the 60 DNL Contour provided in the 2000 Master Plan if the parties are unable to reach an agreement on this issue.

### E. Limitation E

The final limiting event in the Easements, Limitation E, refers to noise and other effects of aircraft operation on the property covered by the Easements exceeding 60 Ldn. Because Ldn is a noise calculation, the Court finds that effects other than noise do not apply to Limitation E. To the extent

that Limitation E requires a noise measurement, there has been no evidence presented of any such measurement, thus the Court finds a limitation event under Limitation E has not occurred. Finally, to the extent the noise level can be determined by Contours, limitation events triggered by noise levels have already been addressed in the preceding section of this Order, and the Court finds no further analysis is needed.

## CONCLUSION

WHEREFORE, the Court finds that the Contours of the 1988 Master Plan have been exceeded by the sustained operation of aircraft as shown by the Contours provided in the 2000 Master Plan, thus triggering a limiting event for at least some of the Easements. The Court orders the parties to contact the Court with available dates for a status conference within 14 days to address whether the parties are able to agree as to which Easements are within the 60 DNL Contour provided in the 2000 Master Plan and are therefore terminated, or if a hearing will be necessary to consider additional evidence on this issue. HOA's remaining claims are denied, and judgment is entered in favor of County and against HOA on those claims.

DATE: December 23, 2021

BY THE COURT:

_Stephen E Howard_

Stephen Enderlin Howard
Senior District Court Judge