DATE FILED: March 21, 2024 2:59 PM
FILING ID: 2D42092B7224A
CASE NUMBER: 2024CV30251

# EXHIBIT J

# Court of Appeals Opinion

22CA0602 Rock Creek v Jefferson 06-15-2023

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA0602
Boulder County District Court No. 20CV30837
Honorable Stephen E. Howard, Judge

---

Rock Creek Master Homeowners Association, Inc.,

Plaintiff-Appellant and Cross-Appellee,

v.

Jefferson County, Colorado, as successor in interest to the Jefferson County Airport Authority,

Defendant-Appellee and Cross-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE YUN
Navarro and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 15, 2023

---

Jachimiak Peterson Kummer, LLC, Mark R. Davis, Lakewood, Colorado, for Plaintiff-Appellant and Cross-Appellee

Kimberly Sorrells, County Attorney, Eric T. Butler, Deputy County Attorney, Jason Soronson, Assistant County Attorney, Golden, Colorado, for Defendant-Appellee and Cross-Appellant

¶ 1    The plaintiff, Rock Creek Master Homeowners Association, Inc. (Rock Creek), appeals the district court's judgment terminating nine of twenty-nine avigation easements[1] in favor of the defendant, Jefferson County, Colorado (the County), the successor-in-interest to the Jefferson County Airport Authority, following a bench trial. The County cross-appeals the admissibility of certain evidence.  We affirm the judgment of the district court.

## I.    Background

¶ 2    The Jefferson County Airport — now the Rocky Mountain Municipal Airport — opened in 1960 in Superior, Colorado.  In 1998, ownership of the airport transferred from the Jefferson County Airport Authority to the County.

¶ 3    Rock Creek is the homeowner's association for a neighborhood that lies just northwest of the airport and today includes about 2,800 homes.  In the late 1980s, the neighborhood was rezoned from agricultural to mixed residential, commercial, and residential use and annexed into the Town of Superior.  To address the

---

[1] An avigation or flight easement "permits free flights over the land in question."  *United States v. Brondum*, 272 F.2d 642, 645 (5th Cir. 1959).

airport's concerns that property owners in the neighborhood might complain about noise and vibration levels, the developer agreed, among other things, "to grant an Avigation Easement over the entire Rock Creek Ranch boundary."

¶ 4     Accordingly, between 1991 and 1996, the developer and other property owners granted twenty-nine avigation easements to the Jefferson County Airport Authority.  Each easement covers a discrete piece of land, but the parties agree that the terms of the easements are otherwise identical.  The easements give the airport the nonexclusive right to use the airspace above Rock Creek for the passage of aircraft, as well as the right to make "such noise, vibration and all other effects that may be caused by the operation of aircraft" at the airport.  Each easement states that it "shall remain in effect" until and unless any of five "limitation" events occurs.  The pertinent limitations are:

> [Limitation B] The type and size of aircraft using the Airport as permitted under the Master Plan shall be changed or become inconsistent with such Master Plan, if there is an increase in passenger usage over that disclosed in the Master Plan, or the Airport is used for freight delivery.
>
> . . . .

2

[Limitation D] The noise contours contained in the Master Plan are exceeded by the sustained operation of aircraft in the Airspace Easement.

[Limitation E] The noise, vibration and all other effects of aircraft operation on the Property exceeds 60 ldn.[2]

¶ 5    The easements identify the "Master Plan" as "a master plan for the Airport dated January 1988, such plan having been prepared by Barnard Dunkelberg & Company URS Engineers." The Federal Aviation Administration (FAA) requires airports to create master plans to receive funding, and these documents "serve[] a variety of purposes, including making recommendations for the development of the airport and surrounding property."

¶ 6    In October 2020, Rock Creek — on behalf of property owners in the neighborhood — sued Jefferson County as the successor-in-interest to the Jefferson County Airport Authority. Rock Creek argued that "[o]ne or more of the limitation events set forth in the avigation easements have occurred, and as a result

---

2 "Ldn" and "DNL" are abbreviations for the day-night sound level, a measure of the average sound level, in decibels, over a one-year time period.

the . . . avigation easements have all terminated pursuant to their terms."

¶ 7    The district court held a two-day bench trial in October 2021. Over the County's hearsay and CRE 705 objections, the court admitted the airport's 1988, 2000, and 2011 Master Plans.  Each Master Plan includes diagrams of "noise contours" around the airport, which were developed with modeling software to connect all the points on a map with a similar noise level.  According to the 1988 Master Plan, noise contours "appear similar to topographical contours and form concentric 'footprints' about [sic] a noise source."

¶ 8    The 1988 Master Plan includes 60, 65, and 70 Ldn noise contours based on the airport's physical characteristics — like the runway coordinates, airport altitude, and temperature — and its operational characteristics, like departure profiles, approach parameters, and aircraft noise curves.  The 1988 Master Plan states,

> The area between the 60 Ldn and 65 Ldn contour is an area within which most land uses are compatible but signifies that noise levels are such that some land use incompatibility may exist in the future and

that the situation should be monitored.  The
Ldn 65 contour identifies areas of significant
noise exposure where many types of land uses
are normally unacceptable and where land use
compatibility controls are recommended.

¶ 9     The 2000 Master Plan, in turn, includes 60, 65, 70, and 75

Ldn contours created using data from 1998 and a newer version of

the software used in 1988.  (The 2011 Master Plan, which was

prepared by different consultants, includes a 65 Ldn noise contour

based on 2009 data, but it is not clear what software the

consultants used.)

¶ 10    The assistant director of the airport, Brian Bishop, testified as

the County's representative.  Mr. Bishop said that the airport made

the Master Plans available to the public for "planning purposes."

Mr. Bishop also agreed with Rock Creek's counsel that, based on

the 1988 Master Plan, "the Ldn 60 contour is usually regarded as a

critical contour at general aviation airports" and that "anybody

developing in the area [should] use the 60 Ldn contour [for] the

development of residential property."  He added that the contours

were based on the "worst-case scenario" and the "most severe"

conditions — i.e., the noisiest that the airport thought it would get.

And Bishop said that the noise contours in the 2000 Master Plan

exceeded those in the 1988 Master Plan, which the County did not dispute.

¶ 11    Two months later, the court ruled that Limitation D had occurred but that it had insufficient evidence to determine which of the easements had been affected.  None of the other limitations, according to the court, had occurred.  So the court reopened the evidence, and the parties stipulated that, under the court's interpretation of Limitation D, nine of the twenty-nine easements had terminated.  The court then issued a supplemental order vacating those nine easements.

¶ 12    Rock Creek now appeals, and the County cross-appeals.

## II.    Analysis

¶ 13    Rock Creek challenges the district court's interpretation of the terms of the avigation easements, arguing that the court should have terminated all of them.  The County, in turn, argues that the court correctly interpreted the easements but reversibly erred by relying on inadmissible evidence — the Master Plans' noise contours — to find that Limitation D had occurred.  We begin by addressing the County's arguments about the admissibility of the

noise contours.  We then address Rock Creek's arguments about the meaning of the easements.

## A.    Evidentiary Issues

¶ 14    The County contends that the district court erred by overruling its objections to the admission of the noise contours in the 1988, 2000, and 2011 Master Plans.  After describing in more detail the admission of the Master Plans and defining the applicable standard of review, we address each of the County's evidentiary objections.

### 1.    Additional Background

¶ 15    The County objected to the admission of the Master Plans for the purpose of determining noise levels on the grounds that they (1) constituted inadmissibility hearsay and (2) contained improper expert testimony under CRE 702, 703, and 705.

¶ 16    The court began by acknowledging that the airport hired third-party consultants to prepare the 1988, 2000, and 2011 Master Plans: Barnard Dunkelberg & Company for the 1988 and 2000 Master Plans; and Reynolds, Smith and Hills, Inc., for the 2011 Master Plan.  But it noted that the consultants prepared the

Master Plans "in their entirety"; their work was not limited to the noise contours.

¶ 17    The court also found that (1) the FAA requires airports to prepare and update a Master Plan to secure funding, and it provides guidance for doing so; (2) the 1988 Master Plan states that it "is intended to present a clear, simple and concise statement of policy and recommendations regarding the development of land within the airport[']s environs to developers, builders, homeowners and buyers, and representatives of the various entities having land use control within the airport environs"; (3) the 1988, 2000, and 2011 Master Plans are available on the County's website; (4) the 2000 and 2011 Master Plans were adopted and approved by the Jefferson County Board of Commissioners[3]; and (5) by signing the easements, the Jefferson County Airport Authority (the County's predecessor-in-interest) had agreed that the noise contours in the 1988 Master Plan governed the easements.

---

[3] The district court noted that, because the 1988 Master Plan was on the County's website, it "may also have been approved by the County Commissioners," though the court found "no direct evidence to that effect."

¶ 18    Based on these findings, the court concluded that the 1988, 2000, and 2011 Master Plans — including the noise contours — "were adopted, approved, and published by the Airport with the expectation that others would rely on them."  The court thus concluded that they were admissions of a party opponent and not hearsay under CRE 801(d)(2).  Accordingly, the court did not address Rock Creek's alternative arguments for admitting the Master Plans, including that they were business records admissible under CRE 803(6).

¶ 19    Turning to the County's improper-expert-testimony argument, the court observed that the County had cited only authority concerning the business records hearsay exception, CRE 803(6). And because the court had concluded that the Master Plans were not hearsay under CRE 801(d)(2), it rejected that argument.

## 2.    Standard of Review

¶ 20    We review the district court's evidentiary rulings for an abuse of discretion.  *People v. Hamilton*, 2019 COA 101, ¶ 12.  In determining whether the court abused its discretion, we consider not only whether the court's ruling was manifestly arbitrary, unreasonable, or unfair, but also whether its ruling was contrary to

9

the law.  *People v. Dominguez*, 2019 COA 78, ¶ 13.  Thus, we review the court's decision on whether a statement constitutes hearsay — a legal conclusion — de novo.  *Dominguez*, ¶ 13; *Hamilton*, ¶ 12.

¶ 21    We may uphold the court's decision to admit evidence on any ground supported by the record, even if the court did not consider that ground.  *People v. Phillips*, 2012 COA 176, ¶ 63.

### 3.    Hearsay

¶ 22    The County contends that the district court erred by overruling its hearsay objections to the noise contours in the Master Plans.  We disagree.

### a.    Governing Law

¶ 23    Hearsay is a statement other than one made by the declarant while testifying that is offered to prove the truth of the matter asserted, and it is generally inadmissible.  *People v. Quillen*, 2023 COA 22M, ¶ 15 (citing CRE 801(c), 802).

¶ 24    A statement is not hearsay, however, if it is offered against a party and is "a statement of which the party has manifested an adoption or belief in its truth."  CRE 801(d)(2)(B); *see also People v. Quinn*, 794 P.2d 1066, 1069 (Colo. App. 1990) (a letter from an inmate to the defendant was the defendant's adopted admission

because the defendant "told the investigators that they could rely" on the letter and "thereby acknowledged the truth of the inmate's statements"); *cf., e.g.*, *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 259 (S.D.N.Y. 2003) ("An entity's printing, publishing and dissemination of a document or a report that contains statements that pertain in some way to the organization or company can constitute an adoptive admission" under Fed. R. Evid. 802(d)(2)(B).).

b.    Discussion

¶ 25    The County contends that, because third-party consultants created the noise contours, those contours "are inadmissible as hearsay to the extent Rock Creek offered them to demonstrate actual noise levels at the Airport."[4]  We agree with the district court,

---

[4] The County does not contest that the Master Plans "may be generally regarded as business records admissible under the exception found in CRE 803(6)."  But it asserts that, because third-party consultants prepared the noise contours, those contours are inadmissible "hearsay within hearsay."  We decline to address these issues because (1) the district court did not rule on whether the Master Plans were admissible as business records or whether the noise contours constituted another layer of hearsay and (2) despite Rock Creek's assertion on appeal that a proper foundation was laid to admit the Master Plans under CRE 803(6), it did not provide any record citations supporting its assertion.  *See* C.A.R. 28(e); *O'Quinn v. Baca*, 250 P.3d 629, 632 (Colo. App. 2010).

however, that the noise contours were admissible as the adopted admissions of the County under CRE 801(d)(2)(B).

¶ 26     Though third-party consultants prepared the three Master Plans, including the noise contours, they did so pursuant to contractual agreements with the County and guidelines from the FAA.  And as the district court found, the County posted all three Master Plans, including the noise contours, on its website. According to the testimony at trial, the County posted the Master Plans, including the noise contours, so that the public could rely on them for "planning purposes."  The court also found that the Jefferson County Board of County Commissioners had adopted and approved the 2000 and 2011 Master Plans.  Given this evidence, the court correctly determined that the County "manifested an adoption or belief in [the] truth" of the noise contours in the Master Plans.  CRE 802(d)(2)(B); *see also Quinn*, 794 P.2d at 1069; *Penguin Books U.S.A., Inc.*, 262 F. Supp. 2d at 259.

¶ 27     We acknowledge that the County did not own the airport when the 1988 Master Plan was issued (rather, the Jefferson County Airport Authority did).  But as the district court noted, the fact that the County put the 1988 Master Plan on its website suggests that

the Board of County Commissioners likely approved it.  More importantly, however, the easements expressly state that they are governed by the noise contours in the 1988 Master Plan, and when the County bought the airport, it succeeded to the Jefferson County Airport Authority's interests in the easements.  Thus, the noise contours in the 1988 Master Plan were not hearsay because they were not admitted for their truth — i.e., to show the actual noise levels at the airport — but, instead, as evidence of the terms of the parties' agreement.  *Cf. Gordon Neon Co. v. L.N. Crim*, 528 P.2d 950, 951 (Colo. App. 1974) (not published pursuant to C.A.R. 35(f)) (concluding that a contract on which the parties' settlement was based was not hearsay); *see also Deep Keel, LLC v. Atlantic Priv. Equity Grp., LLC*, 773 S.E.2d 607, 613 (S.C. Ct. App. 2015) ("Written contracts 'offered in court not for the truth of any facts stated in [them] but to prove the existence of a contractual right or duty' should not be excluded as hearsay.") (alteration in original) (citation omitted).

¶ 28    Accordingly, the court did not err by overruling the County's hearsay objections to the admissibility of the 1988, 2000, and 2011 Master Plans.

### 4.   Expert Testimony

¶ 29    Next, the County asserts that the noise contours constitute inadmissible expert testimony.  We decline to address this issue.

### a.   Additional Background

¶ 30    When the County moved to exclude the noise contours as inadmissible expert testimony, it did so based on authorities holding that the business records hearsay exception does not exempt third-party statements from the rules governing opinion testimony.  *See People v. N.T.B.*, 2019 COA 150, ¶ 26 ("Courts do not grant the . . . presumption of reliability to [third-party] statements [in business records] because the third party does not have a duty to the business to report the information accurately."); *see also United States v. Gwathney*, 465 F.3d 1133, 1141 (10th Cir. 2006) ("Any information provided by another person, if an outsider to the business preparing the record, must itself fall within a hearsay exception to be admissible."); *Van Der AA Invs., Inc. v. Comm'r of Internal Revenue*, 125 T.C. 1, 6 (2005) ("Like the Court of Claims in *Forward Communications Corp. v. United States*, 221 Ct.Cl. 582, 608 F.2d 485, 510 (1979), we do not view the business record rule found in Fed. R. Evid. 803(6) as overriding the

rules governing opinion testimony."); *Annett v. Univ. of Kansas*, 93 F. Supp. 2d 1135, 1139 (D. Kan. 2000) ("The memoranda are business records, but the declarations . . . they contain are hearsay within hearsay.").

¶ 31    And because the district court determined that the noise contours in the Master Plans were not hearsay — they were admissions of a party opponent — it concluded that the County's authorities did not apply to its analysis.

### b.    Discussion

¶ 32    In its reply brief on appeal, the County argues, for the first time, that a "party admission does not overcome the requirements of expert testimony."  Citing, among other authorities, *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 667-69 (10th Cir. 2006), and *Aliotta v. National Railroad Passenger Corp.*, 315 F.3d 756, 763 (7th Cir. 2003), the County's reply brief asserts that "[t]he requirements of Rules 702 and 705 should not be bypassed where a party seeks to use an alleged party admission against a government entity and where a third-party business created the alleged admission."

¶ 33    Because our review of the record indicates that the County did not present this argument to the district court or raise it in its opening brief, we decline to address it.  *Gold Hill Dev. Co., L.P. v. TSG Ski & Golf, LLC*, 2015 COA 177, ¶ 18; *see also Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 340 n.10 (Colo. 2004) ("Arguments not raised before the trial court may not be raised for the first time on appeal."); *Peña v. Am. Fam. Mut. Ins. Co.*, 2018 COA 56, ¶ 21 n.4 ("We do not . . . consider arguments raised for the first time in a reply brief.").

## B.    Terms of the Easements

¶ 34    Rock Creek argues that the district court erred in its interpretation of Limitation D, Limitation E, and Limitation B.  After describing the standard of review and the law governing the interpretation of easements, we address each limitation in turn.

### 1.    Standard of Review and Governing Law

¶ 35    The interpretation of the avigation easements presents a question of law that we review de novo.  *See Moeller v. Ferrari Energy, LLC*, 2020 COA 113, ¶ 13.

¶ 36    "The extent of an expressly created easement (i.e., the limits of the privileges of use authorized by the easement) is determined by

16

interpreting the conveyance instrument." *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1235 (Colo. 1998).  Our aim in interpreting the instrument is to ascertain the intentions of the parties.  *Id.*  To do so, we look at the language of the instrument in light of the surrounding circumstances.  *Id.* at 1235-36; *see also Hess v. Hobart*, 2020 COA 139M2, ¶ 13.  If the instrument is unambiguous, then we will presume that it expresses the intent of the parties and enforce its plain meaning as written.  *Hess*, ¶ 13; *see also Moeller*, ¶ 14.

¶ 37     In determining whether the instrument is ambiguous, we may look to extrinsic evidence and the circumstances surrounding its creation.  *Lazy Dog Ranch*, 965 P.2d at 1236-37 (citing *O'Brien v. Vill. Land Co.*, 794 P.2d 246, 249 n.2 (Colo. 1990); and Restatement (Third) of Prop.: Servitudes § 4.1 cmt. c (Am. L. Inst., Tentative Draft No. 4, 1994)).  But after determining the meaning of the language, we must "give effect to it, regardless of any contrary view reflected by extrinsic evidence."  *Id.* at 1237.  Thus, though extrinsic evidence may be useful to "explain and give context to the language" of an instrument, it may *not* be used to "contradict" the instrument's plain language.  *Id.*

¶ 38    Extrinsic evidence that may be relevant in interpreting the

language of an instrument conveying a servitude includes

> the location and character of the properties
> burdened and benefited by the servitude, the
> use made of the properties before and after
> creation of the servitude, the character of the
> surrounding area, the existence and contours
> of any general plan of development for the
> area, and consideration paid for the servitude.

*Id.* (quoting Restatement (Third) of Prop.: Servitudes § 4.1 cmt. c).

## 2.    Limitation D

¶ 39    Rock Creek contends that the district court misinterpreted the

term "sustained operations" in Limitation D.  We disagree.

### a.    Additional Background

¶ 40    Limitation D occurs if "[t]he noise contours contained in the

Master Plan are exceeded by the sustained operation of aircraft in

the Airspace Easement."

¶ 41    The district court concluded that "the most reasonable

interpretation of 'sustained operation,' when used in a sentence

that addresses the exceeding of Contours, is noise that produces

Contours that exceed those provided in the 1988 Master Plan in a

way that impacts Rock Creek."  The court tied the impact on Rock

Creek to the 60 Ldn contour line, noting that the 1988 Master Plan,

as well as the testimony at trial, identified the 60 Ldn contour as "the critical contour at general aviation airports."

¶ 42    According to the court, neither the existing 60 Ldn contour nor the proposed future 60 Ldn contour in the 1988 Master Plan impact Rock Creek.  The 60 Ldn contour in the 2000 Master Plan, however, "covers approximately 39 acres of residential property, all of which appear to lie within Rock Creek."  The court concluded that the fact "Rock Creek property falls within the 60 Ldn Contour provided in the 2000 Master Plan, but not within the 60 Ldn Contour provided in the 1988 Master Plan," means that the noise contours in the 2000 Master Plan exceeded those in the 1988 Master Plan such that Limitation D had been triggered.

¶ 43    After the parties stipulated that the 60 Ldn contour line in the 2000 Master Plan covered parts of nine of the twenty-nine easements, the court therefore terminated those easements.

b.    Discussion

¶ 44    Rock Creek argues that the court "unilaterally invent[ed] the requirement that, for a limitation event to take place, the easement area must be 'impacted,'" a term that does not appear in the easements.  Rock Creek asserts the fact that the noise contours in

19

the 2000 Master Plan exceeded those in the 1988 Master Plan established that a limitation event occurred in *all* the easements. But this argument ignores the plain language of Limitation D, under which a limitation event occurs if the noise contours in the 1988 Master Plan are "exceeded by the sustained operation of aircraft *in the Airspace Easement*." (Emphasis added.) Each easement describes different property, so the court was correct to consider them separately. Further, as we interpret the easements, Limitation D describes an event that occurs if the noise contours *in the airspace easement* exceed those in the 1988 Master Plan.[5] Thus, the court was correct to conclude that Limitation D had occurred for those easements located within the 60 Ldn noise

---

[5] We acknowledge that, arguably, the phrase "the sustained operation of aircraft in the Airspace Easement" refers to the operation of aircraft in a particular easement. Under that interpretation, an easement terminates if, due to "the sustained operation of aircraft" in that particular easement, the noise contours exceed the level forecast in the 1988 Master Plan. But neither side has argued that the parties intended this meaning, nor has either side presented evidence that any "sustained operation of aircraft" has occurred in any given easement and that such operation caused noise exceeding the noise counters in the 1988 Master Plan. Further, when read in context with its reference to noise contours, the better interpretation of Limitation D is that an easement terminates if the noise contours in that easement exceed those in the 1988 Master Plan.

contour in the 2000 Master Plan but not for those easements that remain outside that noise contour.

¶ 45     Even so, Rock Creek contends that, as a matter of logic, "contour lines would stretch out to the 50, 40, and 30 Ldn contours whether they are depicted on a noise contour map or not," and when the 60, 65, and 70 Ldn noise contours expanded outward, these lower-level contours necessarily did, too.  As a result, the argument goes, the court's finding that only the 60 Ldn contour shows "impact" on Rock Creek lacks record support.  But Rock Creek's public policy arguments about the "significant and impactful" noise pollution from airports fail to acknowledge that it is the language of the easements that controls their meaning. Limitation D speaks specifically of the noise contours in the 1988 Master Plan, the lowest of which is the 60 Ldn contour, which is accepted as the "critical contour" for airports.  And even if we were to accept that lower-level noise contours exist, nothing in the record shows where they were situated in 1988 or where they might lie now.  Because the record does not show where these lower-level noise contours are, we cannot discern, for any given easement lying outside the 60 Ldn contour, whether the noise contour in that

easement has been exceeded.  By contrast, because the 1988 and 2000 Master Plans show where the 60 Ldn noise contour is, we can determine which easements were outside that contour (and necessarily within a lower-level contour) in 1988 but now lie within that contour.  For those easements, the noise contours set in 1988 have been exceeded.  Thus, the court did not err by not considering evidence of the negative impacts of noise levels below 60 Ldn.

¶ 46      Finally, Rock Creek argues that the court's interpretation of Limitation D conflates it with Limitation E, which occurs if "[t]he noise, vibration and all other effects of aircraft operation on the Property exceeds 60 ldn."  But the court did not do so.  Instead, Rock Creek tried to use the same evidence — noise contours — to establish limitation events under both Limitation D and Limitation E.  Because Rock Creek did not offer evidence of noise other than the contours, the court observed, in analyzing Limitation E, that it had already addressed noise contours and concluded that "no further analysis [wa]s needed."  The court did not err by doing so.

¶ 47      In sum, we conclude that the court did not err by concluding that Limitation D was triggered only for those nine easements that,

according to the parties' stipulation, lay within the 60 Ldn noise

contour in the 2000 Master Plan.

### 3.    Limitation B

¶ 48    Rock Creek also contends that the district court

misinterpreted Limitation B.  We again disagree.

### a.    Additional Background

¶ 49    Limitation B occurs if

> The type and size of aircraft using the Airport
> as permitted under the Master Plan shall be
> changed or become inconsistent with such
> Master Plan, if there is an increase in
> passenger usage over that disclosed in the
> Master Plan, or the Airport is used for freight
> delivery.

¶ 50    The district court rejected Rock Creek's proposed

interpretation of Limitation B: that it contains three separate

limitation events, including any change in the type or size of aircraft

using the airport.  The court concluded that "the intent of

Limitation B [wa]s to address changes in Airport usage likely to

increase the impact of Airport activities on Rock Creek, which

would be likely in the event of an increase in passenger usage of the

Airport over that disclosed in the 1988 Master Plan or use of the

Airport for freight delivery."  The court therefore concluded that

Limitation B is triggered only if the type and size of aircraft using the Airport changes or becomes inconsistent with the 1988 Master Plan "either *as a result of* an increase in passenger usage over that disclosed in the 1988 Master Plan *or as a result of* the airport being used for freight delivery."  (Emphases added.)

¶ 51    Applying this interpretation to the evidence of freight delivery presented at trial, the court found that (1) aircraft operations at the time of the execution of the easements "would undoubtedly have involved some freight," like cargo on business jets; (2) the 2011 Master Plan states that the airport had such minimal air cargo operations that the airport had no buildings dedicated to cargo; and (3) Rock Creek had presented no evidence of any change in freight operations since the preparation of the 2011 Master Plan. Accordingly, the court concluded that the airport had "not been used for freight delivery as that term is used in Limitation B."

¶ 52    As to "passenger usage," the court noted that "the total number of annual operations was substantially less than the number of operations forecast by the 1988 Master Plan" — a peak of 191,533 operations in 2019 compared to a forecast of 286,000. But the court found that "passenger usage" of the airport had

increased over that disclosed in the 1988 Master Plan.  For example, (1) "commuter operations grew considerably starting in 1990"; (2) "air taxi operations" began to increase after 2000; and (3) in 2006, a nineteen-passenger plane began daily commercial flights to Grand Junction, Colorado.

¶ 53     The court then noted that, based on its interpretation of Limitation B, the increase in passenger usage triggered a limitation event only "if the type and size of aircraft using the Airport changed or became inconsistent with the 1988 Master Plan."  The court concluded that Limitation B's reference to "[t]he type and size of aircraft using the Airport" means "the physical characteristics of aircraft, not the purpose for which the aircraft are used, since it is the physical characteristics of the aircraft that are relevant to possible increases in impact on Rock Creek property owners."  But according to the court, "nothing in the 1988 Master Plan . . . could reasonably be read to restrict the operation of other types of aircraft at the Airport."  And though the court found "some increase in larger planes' use of the Airport, which would be consistent with the forecast presented in the 1988 Master Plan," it concluded that "the general character" of the airport's use had not changed.  The court

therefore concluded that, "notwithstanding the increase in passenger use at the Airport, the limitation events set forth in Limitation B ha[d] not occurred."

### b.    Discussion

¶ 54    Rock Creek asserts that the district court erred by interpreting Limitation B to include an introductory, conjunctive clause followed by two disjunctive clauses.  According to Rock Creek, this interpretation "is at odds with the [easements'] established intent" — "to terminate the easements in the event of changes outside the 1988 Master Plan," such as the increase in passenger usage that the court found.

¶ 55    Rock Creek argues that the better interpretation of Limitation B — the one the parties intended — is that it contains three independent, disjunctive clauses, "the violation of any of which creates a violation of the whole."  In support of this interpretation, Rock Creek points us to *Gatrell v. Kurtz*, 207 P.3d 916, 917 (Colo. App. 2009), in which the division interpreted a statute providing, "The contractor may remove an inmate from the general prison population during an emergency, before final resolution of a disciplinary hearing, or in response to an inmate's

request for assigned housing in protective custody." *See* § 17-1-203(1)(c), C.R.S. 2022.  The *Gatrell* division concluded that the legislature's "use of the term 'before' does not convert the clause 'before final resolution of a disciplinary hearing' into a subordinate clause modifying the phrase 'during an emergency.'  Rather, the commas, which separate several distinct actions, the last of which is preceded by the disjunctive 'or,' demarcate different categories." 207 P.3d at 918; *cf. Woellhaf v. People*, 105 P.3d 209, 216-17 (Colo. 2005) (a list separated by the disjunctive "or" at the end creates separate categories).  Rock Creek urges us to substitute the "before" at issue in *Gatrell* with the "if" in Limitation B and, applying the *Gatrell* division's reasoning, to conclude that each clause in Limitation B describes an independent limitation event.

¶ 56     In our view, however, Rock Creek's interpretation ignores the plain meaning of the word "if."  As the County notes, "[g]rammatically, 'if' is widely understood to introduce a conditional clause, which is a clause that 'state[s] a condition or action necessary for the truth or occurrence of the main statement of a sentence.'"  *United States v. Flores*, 664 F. App'x 395, 399 (5th Cir. 2016) (second alteration in original) (citations omitted).  We agree

with the County that the parties intended the word "if," placed after the first clause about the type and size of aircraft and before the conditional clauses about passenger usage and freight delivery, to qualify the first clause. This interpretation accords with the plain meaning of Limitation B. *See Hess*, ¶ 13; *Moeller*, ¶ 14. It also better reflects the parties' intent than does Rock Creek's interpretation, which, as the district court noted, "would cause the Easements to lapse if there was a reduction in the size of aircraft using the Airport or if a new type of aircraft used at the Airport caused less noise and fewer vibrations." *Cf. EnCana Oil & Gas (USA), Inc. v. Miller*, 2017 COA 112, ¶ 28 ("[A] contract should never be interpreted to yield an absurd result." (quoting *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 793 (Colo. App. 2001))); *see also Khalil v. Motwani*, 871 A.2d 96, 101 (N.J. Super Ct. App. Div. 2005) (refusing to interpret language in an easement that would "lead to absurd results").

¶ 57    Accordingly, we conclude that the district court did not err by finding that Limitation B had not occurred.[6]

### 4.    Limitation E

¶ 58    Last, Rock Creek argues that the district court misinterpreted Limitation E.  We discern no reversible error.

### a.    Additional Background

¶ 59    Limitation E occurs if "[t]he noise, vibration and all other effects of aircraft operation on the Property exceeds 60 ldn."

¶ 60    The district court concluded that, "[b]ecause Ldn is a noise calculation, . . . effects other than noise do not apply to Limitation E."  And because Rock Creek had presented no evidence of any noise measurements, the court found that "a limitation event under Limitation E" had not occurred.  To the extent that the noise contours could be considered noise measurements, the court noted that it had already addressed them in considering Limitation D and that "no further analysis [wa]s needed."

---

[6] Because we conclude that the district court correctly interpreted Limitation B, we need not address the County's alternative argument that the court erred by finding that "an increase in passenger usage over that disclosed in the Master Plan" had occurred.

### b.    Discussion

¶ 61    We will not disturb the court's judgment in a civil case unless its error affected the substantial rights of the parties.  *Bernache v. Brown*, 2020 COA 106, ¶ 26 (citing C.R.C.P. 61); *see also* C.A.R. 35(c).  An error affects a party's substantial right only if "it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself." *Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010) (quoting *Banek v. Thomas*, 733 P.2d 1171, 1178 (Colo. 1986)); *see also Laura A. Newman, LLC v. Roberts*, 2016 CO 9, ¶ 24.

¶ 62    Rock Creek acknowledges that any error in the court's interpretation of Limitation E "may be harmless."  It raised the issue only in case we chose to "nullify" the district court's ruling as to Limitation D.  Because, as discussed above, we conclude that the district court was correct to vacate nine of the avigation easements based on the occurrence of Limitation D, we agree with Rock Creek that any error in the court's interpretation of Limitation B was harmless.  We therefore decline to address the meaning of Limitation B.  *See* C.A.R. 35(c), *Roberts*, ¶ 24.

### III.    Disposition

¶ 63    We affirm the judgment of the district court.

JUDGE NAVARRO and JUDGE BROWN concur.