<table>
<tr><td>

DISTRICT COURT, COUNTY OF BOULDER
STATE OF COLORADO
1777 Sixth Street, Boulder, CO 80306
(303) 441-3750

</td><td>

DATE FILED: March 21, 2024 2:59 PM
FILING ID: 2D42092B7224A
CASE NUMBER: 2024CV30251

</td></tr>
</table>

|  |  |
|---|---|
| **Plaintiffs:** ANDREA LOCKHART; AMITABH AGRAWAL; LEAH M. ROWAN; SCOTT R. ROBERTSON; THE THOMAS A LA COUR REVOCABLE LIVING TRUST; THE LANEZ C LA COUR REVOCABLE LIVING TRUST; ANGELA TALIAFERRO; MICHAEL TALIAFERRO; YUNAN ZHANG; LINGLING LIU; HEIDI JAROS; JEFFREY NG; JENNIFER JENKINS; LON LICATA; AMY LICATA; WESLEY VO; NHU LE; THOMAS JAMES DAY; JULIA DAY; CHRISTOPHER R. MOYER; FRANCES M. MOYER; and LAURA A. SKLADZINSKI.<br><br>v.<br><br>**Defendant:** THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF JEFFERSON, COLORADO, as successor in interest to the Jefferson County Airport Authority. | ▲ COURT USE ONLY ▲<br><br>**Case No.**<br>**Div.** |
| *Attorneys for Plaintiffs*<br>John R. Sperber, #22073<br>Sean J. Metherell, #47438<br>Rebecca A.R. Smith, #52501<br>FAEGRE DRINKER BIDDLE & REATH LLP<br>1144 Fifteenth Street, Suite 3400<br>Denver, CO 80202<br>Telephone Number: (303) 607-3500<br>jack.sperber@faegredrinker.com<br>sean.metherell@faegredrinker.com<br>becca.smith@faegredrinker.com |  |
| **COMPLAINT AND JURY DEMAND** ||

Plaintiffs named in the caption and identified further below (collectively, "Homeowners"), by and through their attorneys, Faegre Drinker Biddle & Reath LLP, allege as follows:

**Introduction**

1.      This is an inverse condemnation lawsuit seeking just compensation for individual Homeowners who have been substantially deprived of the use and enjoyment of their homes and properties (collectively, "Properties") because of Defendant's ongoing airport operations.

2.      An inverse condemnation action is a special statutory proceeding that is to be tried as if it were an eminent domain proceeding, which concerns only issues relating to the just compensation owed for governmental use of private property and cannot address collateral issues that change the scope of the proceedings. *See Ossman v. Mountain States Tel. & Tel. Co.*, 520 P.2d 738, 742 (Colo. 1974); *Dep't of Transp. v. Auslaender*, 94 P.3d 1239, 1241 (Colo. App. 2004).

3.      Defendant, the Board of County Commissioners of the County of Jefferson, Colorado, as successor in interest to the Jefferson County Airport Authority (the "County"), owns and operates the Rocky Mountain Metropolitan Airport ("Airport").

4.      The Airport is the third-busiest airport in the state of Colorado. In 2022 (the most recent year for which such data is publicly available), on average, the Airport experienced a takeoff or landing every two minutes.

5.      Through its Airport, the County engages in flight operations through, over, and across the Properties (collectively, "Airport Operations") despite the County lacking avigation easements or any other property right permitting it to do so.

6.      The airspace above a property is included within the bundle of rights owned by landowners. For a property located in a rural area, landowners own the airspace up to 500 feet; in a congested area, they own the airspace up to 1,000 feet. Navigable airspace exists above those thresholds and is generally considered part of the public domain.

7.      Here, the Homeowners own the airspace up to 1,000 feet above the Properties ("Homeowners' Airspace").

8.      Easements allowing the County to use the Homeowners' Airspace for flights and other airplane-caused impacts on the Properties previously existed at one time. But an increase in Airport Operations overburdened these prior easements, and a Boulder County District Court determined that 9 of 29 prior easements were terminated according to their terms (the "Terminated Easements"). *See Rock Creek Master Homeowners Ass'n, Inc. v. Jefferson Cnty.*, 20CV30837, *order aff'd Rock Creek v. Jefferson*, 22CA602 (unpublished pursuant to C.A.R. 35(e)) on June 15, 2023).

9.      Despite that District Court order, the County has continued its Airport Operations as though the Terminated Easements were still in full legal force and effect. The County has not sought new easement rights from Homeowners or offered to pay them just compensation for the continued Airport Operations.

10.     In fact, the County has significantly increased the amount and intensity of its Airport Operations ever since the prior easements were terminated, including using the Airport for flight school training flights that include frequent low-flying airplanes engaging in "touch and go" takeoff and landing exercises with planes flying in a racetrack looping pattern through, over, and across the Properties and Homeowners' Airspace at all hours of the day and night.

11.     It is commonplace for the Airport Operations to include planes making 10-15 loops in a single training flight, and there can be multiple training flights in a pattern at once, resulting in significant invasions of Homeowners' Airspace. Some Homeowners have tracked 20-40 "touch and go" takeoffs and landings by a single plane during a training flight. Recently, one plane did 58 loops during a single training flight.

12.     These increased Airport Operations have caused excessive noise, vibrations, fuel pollution, and other airplane-created impacts (collectively, "Airport Impacts"), which directly and substantially interfere with the Homeowners' use and enjoyment of their Properties and that significantly affect the marketability and value of the Properties.

13.     The flights also drop lead particulates found in the aviation fuel used by small planes directly onto the Properties, causing an ongoing physical occupation of the Properties, raising serious health concerns, and again directly and substantially interfering with the Homeowners' use and enjoyment of their Properties and significantly affecting the marketability and value of the Properties.

14.     In addition to the physical invasions of the Homeowners' Airspace and Properties, the Properties also suffer from damaging impacts caused by the Airport Impacts described above, significantly affecting the marketability and value of the Properties.

15.     The County has continued its Airport Operations with full knowledge that it lacks property rights to invade the Homeowners' Airspace, homes, and land; and with full knowledge of the impacts such operations have on the Properties.

16.     Even though the Airport Operations are creating greater burdens now than when the prior easements were terminated, the Airport Operations are projected to continue increasing each year. The County has not sought new easements from Homeowners or offered to pay them just compensation for this further taking and damaging of Homeowners' Properties.

17.     Because the County is a governmental entity with eminent domain power and is operating the Airport for a purported public purpose, the Airport Operations and Airport Impacts constitute the taking and damaging of Homeowners' constitutionally protected property rights, which requires the payment of just compensation under the Colorado Constitution.

18.     Colo. Const. art. II, § 15 provides even greater protections to property owners than the U.S. Constitution, by allowing just compensation to be awarded to property owners for both the direct taking of their properties *and* for the damaging of their properties caused by public improvements and activities.

19.    The Homeowners accordingly file this Complaint and Jury Demand for inverse condemnation. They seek a ruling from the Court that interests in their Properties have been taken and damaged, as those terms are used under Colorado law; defining with particularity the scope of the rights that have been permanently or temporarily taken; and setting a valuation trial to a jury to determine the just compensation owed to the Homeowners. They also seek the award of their attorney fees, expert and other litigation costs, statutory interest as provided for by law, and other appropriate relief.

## **Parties**

20.    The following 2 pages identify the parties to this lawsuit. The factual allegations begin on page 6 of this Complaint.

21.    The County is now and, at all times relevant herein, was the owner and operator of the Airport, formerly the Jefferson County Airport until its name was changed in 2006.

22.    The County is the successor in interest to the Jefferson County Airport Authority ("County Authority"), which first opened the Airport in 1960 and owned and operated the airport until 1998.

23.    The following Plaintiffs' properties are in Zone 3 as depicted on the Town of Superior Development Map (attached as **Exhibit A**), and at one time were burdened by an Avigation Easement Agreement dated May 1, 1992, and recorded on May 4, 1992, in Jefferson County at reception number 92051546 (attached as **Exhibit B**):

(1)    Andrea Lockhart and Amitabh Agrawal own the property at 325 Edison Place, Superior, CO 80027;

(2)    Leah M. Rowan, Scott R. Robertson, The Thomas A La Cour Revocable Living Trust, and The Lanez C La Cour Revocable Living Trust own the property at 340 Edison Place, Superior, CO 80027; and

(3)    Angela Taliaferro and Michael Taliaferro own the property at 1580 Masters Court, Superior, CO 80027.

24.    The following Plaintiffs' properties are in Zone 10 as depicted on Exhibit A. The Avigation Easement Agreement labeled Exhibit B also burdened these properties at one time:

(1)    Yunan Zhang and Lingling Liu own the property at 2193 Imperial Lane, Superior, CO 80027.

25.     Intentionally left blank; **Exhibit C** also intentionally omitted.

26.     The following Plaintiffs' properties are in Zone 15 as depicted on Exhibit A, and at one time were burdened by an Avigation Easement Agreement dated July 29, 1993, and recorded on August 10, 1992, in Boulder County at reception number 01323785, and also recorded on July 30, 1993, in Jefferson County at reception number 93113570 (attached as **Exhibit D**):

       (1)     Heidi Jaros owns the property at 2315 Andrew Drive, Superior, CO 80027; and

       (2)     Jeffrey Ng and Jennifer Jenkins own the property at 1986 Dailey Lane, Superior, CO 80027.

27.     Intentionally left blank; **Exhibit E** also intentionally omitted.

28.     The following Plaintiffs' properties are in Zone 19 as depicted on Exhibit A, and at one time were burdened by an Avigation Easement Agreement dated September 27, 1995, and recorded on October 10, 1995, in Boulder County at reception number 01551661, and also recorded on October 19, 1995, in Boulder County at reception number 01556192 (attached as **Exhibit F**):

       (1)     Lon Licata and Amy Licata own the property at 2906 Silver Place, Superior, CO 80027; and

       (2)     Wesley Vo and Nhu Le own the property at 814 Topaz Street, Superior, CO 80027.

29.     The following Plaintiffs' properties are in Zone 21 as depicted on Exhibit A, and at one time were burdened by an Avigation Easement Agreement dated December 6, 1995, and recorded on December 7, 1995, in Boulder County at reception number 01567720 (attached as **Exhibit G**):

       (1)     Thomas James Day and Julia Day own the property at 948 Grays Peak Drive, Superior, CO 80027;

       (2)     Christopher R. Moyer and Frances M. Moyer own the property at 3132 Cimarron Place, Superior, CO 80027; and

       (3)     Laura A. Skladzinski previously owned the property at 3652 Castle Peak Avenue, Superior, CO 80027.

## <u>Venue</u>

30.     Venue is proper in the Boulder District Court because all of the Properties are located in Boulder County.

## Factual Allegations

31.     The following factual allegations are relevant to all Homeowners, Properties, and Homeowners' Airspace.

32.     The Properties are a part of Rock Creek Ranch, a planned unit development containing approximately 2,800 residential units located in the Town of Superior, Boulder County, Colorado ("Rock Creek").

33.     The Properties are generally located northwest of the Airport, following in a direct line from the runways at the Airport. The ends of these runways are visible in the bottom right corner of Exhibit A.

34.     The Airport is run by a staff of approximately 25 County employees responsible for the administration, operation, and maintenance of the airfield.

35.     The County has legal authority to exercise the power of eminent domain to acquire property for public use.

36.     The Airport uses federal monies to help fund some of its operations, development, and infrastructure, including multiple federal grants from the Federal Aviation Administration ("FAA").

37.     Because the Airport has this federal financial assistance, the Homeowners will be statutorily entitled to the reimbursement of their "reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees actually incurred" if the County is found liable for inverse condemnation through either a court order or a settlement. *See* Colo. Rev. Stat. § 24-56-116 (2023).

### *The Properties Were Previously Burdened by Limited Avigation Easements*

38.     When a developer sought to develop Rock Creek in the late 1980s, the County Authority requested that the developer be required to grant an avigation easement over the entirety of the development.

39.     The developer thereafter agreed, among other things and subject to the express limitations described below, "to grant an Avigation Easement over the entire Rock Creek Ranch boundary."

40.     Between 1991 and 1996, the developer and other property owners granted 29 avigation easements to the County Authority, covering the entire Rock Creek neighborhood.

41.     Each avigation easement was recorded separately and burdened discrete sections of land now containing numerous individual properties, but with otherwise identical terms. *See* Exhibits B–G (six of the prior easements that have since been terminated).

42.     In the now Terminated Easements, the County Authority secured the nonexclusive right to use the airspace above Rock Creek for the passage of aircraft, as well as the right to make noise and vibrations caused by operation of aircraft. *See id.*

43.     In return, the County Authority agreed to certain "limitation events" including, but not limited to, restrictions on the types of flights it would operate, passenger usage, noise contours, and vibration effects. *See id.*

44.     Each easement provided that it "shall remain in effect" unless and until any of these "limitation events" occurred. *See id.*

45.     After the easements were granted, the Rock Creek neighborhood was rezoned and developed with residential homes.

46.     Each of the Homeowners either currently owns or recently sold their property within the Rock Creek neighborhood.

### *A Division of this Court Terminated Nine of Twenty-Nine Easements*

47.     In October 2020, the Rock Creek Master Homeowners Association, Inc. (the "HOA") sued the County in Boulder County District Court (case number 2020CV30837).

48.     The HOA alleged there that one or more "limitation events" had occurred due to increased operations and noise at the Airport and that all 29 avigation easements encumbering Rock Creek had therefore been terminated.

49.     After a two-day bench trial to Senior District Court Judge Stephen Enderlin Howard the District Court issued its Bench Trial Order on December 23, 2021, attached as **Exhibit H**, in which it ruled that the Airport's conduct amounted to a "limitation event" that would result in the termination of at least some of the easements.

50.     Specifically, the District Court concluded that Limitation D had been triggered. Limitation D provided that such easements would terminate if "[t]he noise contours contained in the Master Plan are exceeded by the sustained operation of aircraft in the Airspace Easement."

51.     As provided in Exhibit H, the District Court found that the easements incorporated noise contour levels from an Airport Master Plan published in 1988 and recognized that "the Ldn 60[1] contour is usually regarded as the critical contour at general aviation airports." The District Court further found that the 1988 Master Plan provided that its contours represented the most severe conditions for both present and future development of the Airport, and it heard testimony that those contours were designed to represent noise levels that would never be exceeded.

---

[1] This Complaint provides information about Ldn measurements at paragraph 79 *infra*.

52.    The District Court further found that the 60 Ldn Contour included in the 1988 Master Plan did not cover any property in the Rock Creek neighborhood. However, a later Master Plan published in 2000 covered approximately 39 acres of residential property in the Rock Creek neighborhood.

53.    Accordingly, because the 60 Ldn Contour in the 2000 Master Plan exceeded the proposed future 60 Ldn Contour provided in the 1988 Master Plan, the District Court concluded that a "limiting event" had occurred, and that easements had terminated on at least some properties in the Rock Creek neighborhood, but that it lacked sufficient evidence to determine which of the easements had terminated.

54.    The parties thereafter submitted a stipulation identifying the easements that had terminated based on the findings and conclusions in the District Court's Bench Trial Order.

55.    The District Court issued a Supplemental Order and Final Judgment on March 24, 2022, attached at **Exhibit I**, terminating the following nine avigation easements:

| Associated Filing Number | Boulder Reception Number | Jeffco Reception Number |
|---|---|---|
| 3 | N/A | 92051546 |
| 10 | N/A | 92051546 |
| 13 | 01227934 | N/A |
| 15 | 01323785 | 93113570 |
| 17A | 01531880 | F0066440 |
| 18 | 01531881 | N/A |
| 19 | 01556192 & 01551661 | N/A |
| 20 | 01556193 & 01551662 | N/A |
| 21 | 01567720 | N/A |

Excerpt from p. 2 of Exhibit L.

56.    All of the Properties fall within these Terminated Easements.

57.    Both parties appealed the District Court's ruling on various grounds. The District Court's judgment was affirmed in its entirety on June 15, 2023, by a division of the Court of Appeals in an unpublished opinion, *Rock Creek Master Homeowners Ass'n, Inc. v. Jefferson Cnty.*, 22CA0602, attached as **Exhibit J**. No further appeals were taken.

58.    As a party to the HOA lawsuit, the County is aware that it no longer has any property right to operate flights through the Homeowners' Airspace following the Court of Appeals Opinion and the expiration of any further appeal period.

***The County has Continued and Increased its Airport Operations Without Easement Rights***

59.     The Airport has become appreciably busier in recent years, with takeoffs and landings jumping from 170,000 in 2018 to more than 260,000 in 2022, an increase of approximately 53% in only 4 years.

60.     Based on the 2022 numbers, on average, a flight took off or landed every two minutes at the Airport.

61.     Flights operate every day of the year, and the Airport operates 24 hours a day.

62.     The Airport serves commercial, private, military, and medical flights.

63.     The Airport Operations also include jet airplanes, including "public charter" services such as JSX, which began flying 30 passenger jets out of the Airport in the summer of 2022 and which has been steadily increasing its destinations and number of flights since that time. *See* JSX Public Air Charter Service, https://tinyurl.com/e3fhprw3 (last visited December 17, 2023).

64.     In addition to these flights, the Airport has contracted with four flight schools, whose pilots operate repeated training loops through the Homeowners' Airspace and conduct "touch and go" takeoff and landing training operations in a racetrack pattern over the Properties at all hours of the day and night.

65.     Flights from the Airport Operations have been tracked as low as 150-350 feet above the Properties, and Airport Operations routinely include flights within the Homeowners' Airspace.

***The Airport Operations Cause Lead Particulates from Aviation Fuel to Invade and Contaminate the Properties***

66.     The flight schools and at least some of the commercial, private, military, and medical flights operate piston-engine airplanes.

67.     According to the FAA, aviation gasoline is "the aviation fuel most commonly used in piston-engine aircraft" and "remains the only transportation fuel in the United States to contain lead." *See* Federal Aviation Administration, *Aviation Gasoline*, https://tinyurl.com/4448d8p8 (last visited December 17, 2023).

68.     These emissions cause lead particulates to directly invade the Properties, including the homes, windowsills, vegetable gardens, yards, and land.

69.     The Airport provides leaded fuel to airplanes and accepts incoming aircraft operating on leaded fuel coming from other destinations.

70.     The low-altitude flights from the Airport Operations result in leaded fuel emissions onto the Properties.

71.     Lead exposure causes health hazards, as lead toxicity can damage nearly every organ system in the human body. *See, e.g.*, Centers for Disease Control and Prevention, *Health Effects of Lead Exposure*, https://tinyurl.com/yc69ks8y (last visited December 17, 2023); Colorado Dept. of Public Health and Environment, *Lead in aviation gas*, https://tinyurl.com/5esfemja (last visited December 17, 2023).

72.     The EPA recently released a regulatory announcement on lead emissions from aircrafts: "Protecting children's health and reducing lead exposure are two of EPA's top priorities. The scientific evidence demonstrates that low levels of lead in children's blood can have harmful effects on cognitive function in children, including reduced IQ and decreased academic performance. There is no evidence of a threshold below which there are no harmful effects on cognition in children from lead exposure." EPA, *EPA Finalizes Endangerment Finding for Lead Emissions from Aircraft that Operate on Leaded Fuel* (October 2023), *available at* https://tinyurl.com/mrye2b46.

73.     The County is aware of the dangers of lead exposure and provides public information to its citizens about such dangers. *See, e.g.*, Jefferson County Public Health, *Lead Prevention*, https://tinyurl.com/3u2ryyyj (last visited December 17, 2023); Jefferson County Public Health, *Preventing Lead Exposure in Children*, https://tinyurl.com/bde3u2w7 (last visited December 17, 2023); Jefferson County Public Health, *What You Need to Know About Lead Poisoning¸* https://tinyurl.com/ytk6n36e (last visited December 17, 2023); Jefferson County Public Health, *Childhood Lead Screening A Guide for Health Professionals¸* https://tinyurl.com/495yxzm9 (last visited December 17, 2023).

74.     In October 2023, in recognition of the harm from lead exposure, the County announced that it intended to begin offering unleaded fuel in the fall of 2024 and entirely transition to unleaded fuel by 2027. *See* Daily Camera, *Jefferson County Airport Announces Full Shift to Unleaded Fuel by 2027*, John Aguilar (October 4, 2023), available at https://www.dailycamera.com/2023/10/04/rocky-mountain-airport-lead-gasoline-noise/. But it is not clear whether or when the County will be able to fully transition its fuel supply.

75.     Unless and until planes using leaded fuel stop operating at the Airport, leaded fuel particulates will continue to invade the Properties.

76.     According to an April 2023 letter from The Town of Superior Board of Trustees, "[r]ecently, nine members of the Superior community have had their homes tested for lead, and all 18 samples, two per household, have come back positive."

77.     Many Homeowners have avoided spending time outdoors because of concerns about lead exposure.

78.     Where a property has a risk of lead contamination, home values plummet. For example, in Flint, Michigan, according to a paper published in the *American Economic Journal: Economic Policy*, property values dropped by 20% or greater and did not recover even after the state spent over $400 million remediating the crisis.

### The Airport Operations Cause Excessive Noise and Vibrations

79.     "Day-night average sound level (DNL) means the 24–hour average sound level, in decibels, for the period from midnight to midnight, obtained after the addition of ten decibels to sound levels for the periods between midnight and 7 a.m., and between 10 p.m., and midnight, local time. The symbol for DNL is $L_{dn}$." 14 CFR § 150.7. Ldn is a noise metric developed by the FAA that purportedly attempts to reflect a person's cumulative exposure to sound over a 24-hour period. It takes into account both the amount of noise from each aircraft operation as measured by A-weighted decibels, ("db(A)"), as well as the total number of operations flying throughout the day and applies an additional 10dB weighting for flights between 10 p.m. and 7 a.m. This information is then used to develop noise contours reflecting cumulative exposure during an annual average day. As such, the Ldn does not measure the specific impact of any single noise event.

80.     An A-weighted decibel is a measure of the relative loudness of sounds as perceived by the human ear, taking into account the frequency of the sound. Decibel measurements are logarithmic, meaning that the sound impact doubles for every three decibels increased.

81.     Planes flying in and within the vicinity of the Homeowners' Airspace and Properties often exceed more than 90 and have exceeded 100 decibels; numerous flights create noise in excess of 60 decibels at ground level.

82.     In addition to the noise and vibrations caused by flights taken by commercial, private, military, and medical aircrafts, the flight schools put pilots on repetitive "touch-and-go" routes where airplanes engage in a looping takeoff and landing flight training, which can include multiple planes flying in the same racetrack pattern over the Properties.

83.     These "touch-and-go" training flights also operate overnight, with many flights occurring between midnight and 5:00 am and with noise exceeding 70-80 decibels at times. Airport Operations also routinely and dramatically increase starting at 5:00 am.

84.     Airport Operations cause Airport Impacts, including deafening, disturbing, and frightening noise and vibrations on the Properties day and night.

85.     Noise from these Airport Operations makes it difficult for Homeowners to sleep, work, study, converse, take work and personal phone calls, concentrate, entertain, spend time in their front or back yards, read, listen to radio or television, or otherwise peacefully enjoy and use their Properties.

86.     Noise from these Airport Operations significantly interferes with sleep and creates additional health risks. *See, e.g.*, N.Y. Times, *Noise Could Take Years Off Your Life. Here's How*

(June 9, 2023), https://www.nytimes.com/interactive/2023/06/09/health/noise-exposure-health-impacts.html; Harvard Medicine, *Noise and Health* (Spring 2022), https://magazine.hms.harvard.edu/articles/noise-and-health.

87.     The County is aware that it causes excessive noise and vibrations on the Properties from numerous sources, including, but not limited to, landowner noise complaints; the HOA litigation; correspondence from the Town of Superior; letters from U.S. Senators Michael Bennett and John Hickenlooper and from U.S. Representatives Joe Neguse and Brittany Pettersen.

88.     Through its continued Airport Operations, the County has effectively ignored these harms that it is causing, with Jefferson County Commissioner Tracy Kraft-Tharp saying, "An airport is like a highway—if there is a Harley-Davidson going down that road really loudly, you can't ban all Harley Davidsons."

89.     This may or may not be true for Harley Davidsons on highways—but highways are constructed only after a governmental entity acquires the necessary property rights to build and maintain that highway, which requires the payment of just compensation to landowners for the scope of the rights taken and for the damage caused to landowners' remaining property from motorcycles and other highway impacts.

90.     Here, the County does not own an avigation easement or other property right allowing airplanes to use or to cause noise and vibration on Homeowners' Properties.

***Airport Operations Have Significantly Affected the Value and Marketability of the Properties***

91.     The Airport Operations and Airport Impacts directly and substantially interfere with the Homeowners' use and enjoyment of their Properties, and significantly affect the marketability and value of the Properties.

92.     Some of the Homeowners and other neighbors in Rock Creek who have marketed their properties for sale have had difficulty selling their properties due to the Airport Operations and Airport Impacts.

93.     Properties offered for sale have been sitting on the market for longer than other similar properties not impacted by such activity; some potential buyers have not moved forward after visiting properties; and some properties have been sold below market value.

94.     Regardless of whether offered for sale or not, all of the Properties have diminished in value due to the Airport Operations and Airport Impacts on their Properties and other impacts, even if emanating from the navigable airspace or other nearby properties.

**First Claim for Relief**
**(Inverse Condemnation—Taking of an Avigation Easement)**

95.     All previous allegations are herein incorporated by reference.

96.     Pursuant to the prior easements, the County once had nonexclusive rights to use the Homeowners' Airspace as part of its Airport Operations and to cause on the Properties "all other effects that may be caused by the operation of aircraft landing at or taking off from or operating at or on the Airport," all subject to certain limiting conditions.

97.     Following the final determination on appeal affirming the District Court's decision that was entered on June 15, 2023, it became clear that the County's property rights to use the Homeowners' Airspace would not continue to exist, nor would the County have the right to cause other impacts to the Properties.

98.     The County knows that it has no property right to use the Homeowners' Airspace or to invade, occupy, or cause impacts on the Properties.

99.     Nonetheless, the County intentionally continues to use the Homeowners' Airspace and to otherwise burden the Properties as though the Terminated Easements were still in full force and effect.

100.    The County has also intentionally increased use of and burdens on Homeowners' Airspace and Properties even after the District Court and Court of Appeals rulings; the County is projected to further increase its Airport Operations each year.

101.    Each of the Homeowners has a constitutionally protected property interest in the Homeowners' Airspace and to use and enjoy their Properties free from unreasonable impacts and intrusions.

102.    The County has the power of eminent domain but has failed or refused to exercise that power to acquire an avigation easement or any other property right to use the Homeowners' Airspace or to invade or occupy the Properties.

103.    The County's development, operation, and maintenance of the Airport is a public improvement for a public use.

104.    The County's design, development, construction, installation, control, and operation of the Airport and the flights operating from it constitute a public use.

105.    The County's continued and consistent use of the Homeowners' Airspace and other impacts caused to the Properties by the Airport Operations substantially impair the Homeowners' use and enjoyment of their Properties and constitute the taking of an avigation easement over each Property.

13

106.    The taking of such avigation easement was accomplished without the payment of just compensation, in contravention of Colo. Const. art. II, § 15.

107.    The taking of such avigation easement was obtained without Homeowners' consent, for a public purpose, and without any compensation to Homeowners.

108.    Due to these unreasonable, unlawful, and adverse actions of the County, the Homeowners suffer and will continue to suffer damages resulting from the taking of their Properties, including, but not limited to, significant impacts to the marketability and value of their Properties.

109.    The Homeowners are entitled to just compensation for the value of the avigation easements taken, including, but not limited to, the fair market value of the rights taken; damages to their remainder property that result from that taking; remediation costs or other costs to cure; attorney fees, expert expenses, litigation costs, and interest as permitted by Colorado law; and all other relief that is just and proper.

110.    The Homeowners accordingly request that this Court find that the County has taken an avigation easement, define the scope of that avigation easement, and award just compensation and damages in an amount to be proven at a valuation trial.

**Second Claim for Relief**
**(Inverse Condemnation—Taking by Physical Occupation of the Homeowners' Airspace by Low Flights and of the Properties by Lead Contamination)**

111.    All previous allegations are herein incorporated by reference.

112.    Even if the County had never previously held avigation easements over the Properties and even if the Court does not directly find that the County has taken a new avigation easement, the County's ongoing and increasing Airport Operations are a physical invasion and occupation of the Homeowners' Airspace and Properties that constitute a taking without payment of just compensation.

113.    The County knows it has no property right to use the Homeowners' Airspace or to cause any Airport Impacts on the Properties due to the Airport Operations, including any right to operate flights within Homeowners' Airspace or to cause lead contamination to physically invade and occupy the Properties.

114.    Nonetheless, the County knowingly and intentionally operates flights that routinely invade the Homeowners' Airspace and cause noise, vibrations, and other Airport Impacts to the Properties.

115.    The County also knowingly and intentionally operates flights using leaded fuel through and above the Homeowners' Airspace, which directly result in leaded fuel particulates physically invading and occupying the Properties.

14

116.     Homeowners have a constitutionally protected property interest in the Homeowners' Airspace, which is owned by the Homeowners, as well as in keeping the surfaces of their Properties free from lead contamination and other physical occupations or invasions.

117.     The County has the power of eminent domain but has failed or refused to exercise that power to acquire an easement or other property right allowing it to use the Homeowners' Airspace or to cause any impacts on the Properties.

118.     The physical occupation of the Properties by airplanes invading the Homeowners' Airspace, as well as by lead particulates occupying the Properties, substantially impairs Homeowners' use and enjoyment of the Properties and constitutes a taking of property rights within the Properties.

119.     This taking was accomplished in contravention of Colo. Const. art. II, § 15.

120.     The County's taking of Homeowners' property rights was done without Homeowners' consent, for a public purpose, and without any compensation to Homeowners.

121.     Due to these unreasonable, unlawful, and adverse actions of the County, Homeowners suffer and will continue to suffer damages resulting from the taking of property rights within their Properties, including, but not limited to, significant impacts to the marketability and value of the Properties.

122.     The Homeowners are entitled to just compensation for the value of the property rights taken, including, but not limited to, the fair market value of the rights taken; damages to their remainder property that result from that taking; remediation costs or other costs to cure; attorney fees, expert expenses, litigation costs, and interest as permitted by Colorado law; and all other relief that is just and proper.

123.     The Homeowners accordingly request that this Court find that the County has taken property rights within the Properties and award just compensation and damages in an amount to be proven at a valuation trial.

**Third Claim for Relief**
**(Inverse Condemnation—Damaging of the Properties)**

124.     All previous allegations are herein incorporated by reference.

125.     Damages to the Homeowners' remaining interests in their Properties caused by Airport Impacts should be included as part of the just compensation owed for the taking of property interests in the Homeowners' Airspace and Properties as alleged above, because such damages are the direct and proximate result of those takings, and because the Airport Operations off of the Properties are integrated and inseparable from the Airport Operations on the Properties. Accordingly, the Homeowners are entitled to compensation for all such impacts, whether or not they are deemed "special" or "unique" as those terms are used in Colorado law.

126.    And, even if some of the impacts to the Properties are caused by Airport Operations that do not amount to a taking of property, the Homeowners still have a constitutionally protected interest in their Properties being free from Airport Impacts and to the reasonable use and enjoyment of their Properties.

127.    Colo. Const. art. II, § 15 provides greater protections to property owners than the U.S. Constitution by allowing just compensation to be awarded to property owners for both direct taking of their properties **and** for the damaging of their properties caused by public improvements and activities on other properties, even in circumstances where there is no taking of their own property.

128.    The Airport Impacts alleged above have caused physical harm to the Properties and the Homeowners and have caused substantial damages to the Properties by affecting rights and interests that are not shared with the public generally, and that are different in kind, not just degree from those suffered by other members of the public.

129.    The Airport Operations and Airport Impacts unreasonably interfere with the Homeowner's use of their Properties in so substantial of a way as to deprive the Homeowners of the practical enjoyment of their Properties.

130.    Such interferences are of sufficient directness, peculiarity, and magnitude that fairness and justice, as between the County and the Homeowners, requires the burden imposed to be borne by the public through the payment of just compensation.

131.    The allegations in paragraphs 126-130 are further supported by the following:

(1) Through its order identifying the Terminated Easements, Exhibit I, the District Court distinguished the Properties at issue in this litigation, where impacts from the Airport Operations were deemed significant enough to constitute a limiting condition causing those prior easement rights to revert back to the Homeowners. By contrast, other properties within Rock Creek remain encumbered by avigation easements. The noise levels on the Properties continue to be louder than the Terminated Easements once permitted.

(2) As explained above and in Exhibit H, the permissible noise levels from Airport Operations on the Properties exceed the scope of what was originally permitted by the easements that once burdened the Properties. The noise events experienced on the Properties routinely exceed 60 decibels, often exceed 90 decibels, and have exceeded 107 decibels. This causes difficulty for Homeowners to converse, study, work, take work and personal phone calls, concentrate, entertain, spend time in their front or back yards, read, listen to radio or television, and sleep. To guard against these noise events, Homeowners would need to undertake significant expenses, such as installing

16

soundproofing measures and other remediation measures, and even these measures would not fully mitigate the impacts of the noise events.

(3) Science has developed over the past two decades to show that consistent exposure to noise causes deleterious health effects. Noise and vibrations also negatively affect property values, including the value of the Properties.

(4) Likewise, as alleged above, the flights cause lead contamination on the Properties. Homeowners and their guests are limited in their ability to use and enjoy the outdoor spaces of their properties, such as front and back yards. Homeowners also fear that their kitchen gardens may be contaminated with lead. Lead and other forms of contamination also negatively affect property values, including the value of the Properties. To combat this contamination, Homeowners would need to take expensive measures, including, but not limited to, performing tests of their soil, home exteriors, and kitchen gardens, and to remediate the lead as possible.

132.    The noise, vibrations, and lead contamination caused by the Airport Operations and Airport Impacts substantially impairs and interferes with Homeowners' use and enjoyment of the Properties and constitutes a damaging of those Properties.

133.    The interference by the County with Homeowners' use and enjoyment of the Properties due to Airport Impacts including noise, vibration, and lead contamination is so substantial that it is offensive, inconvenient, and annoying to any reasonable person in the community.

134.    The interference by the County with Homeowners' use and enjoyment of the Properties due to Airport Impacts including noise, vibration, and lead contamination is negligent or intentional.

135.    The County knows that it has no property right to cause excessive noise and vibrations on the Properties and knows that the Airport Operations causes such Airport Impacts including noise and vibrations.

136.    Likewise, the County knows that it has no property right to cause lead contamination by lead particulates on the Properties and knows that the Airport Operations cause such lead contamination.

137.    Nonetheless, the County continues the Airport Operations.

138.    The Airport has the power of eminent domain but has failed or refused to exercise that power to acquire any rights to cause noise, vibrations, or lead contamination on the Properties.

139.    The Airport Operations and Airport Impacts constitute a damaging of the Properties in contravention of Colo. Const. art. II, § 15.

17

140.     The County's damage to the Properties is being done without Homeowners' consent as part of Airport Operations serving a public purpose, and without any compensation to Homeowners.

141.     Due to these unreasonable, unlawful, and adverse actions of the County, Homeowners suffer and will continue to suffer damages resulting from the damaging of their Properties, including, but not limited to, significant impacts to the marketability and value of the Properties.

142.     The Homeowners are entitled to just compensation for the damaging of their Properties, including, but not limited to, the diminution in value caused to the Properties; stigma effects; remediation costs or other costs to cure; attorney fees, expert expenses, litigation costs, and interest as permitted by Colorado law; and all other relief that is just and proper.

143.     Homeowners accordingly request this Court find that the Airport has caused a damaging of the Properties and award just compensation and damages in an amount to be proven at the valuation trial.

## Prayer for Relief

WHEREFORE, Homeowners respectfully request that this Court:

A.  Find and determine that a taking and damaging of the Properties has occurred, describing with particularity the date of such taking and damaging, and further describing with particularity the scope of the rights in the Properties that have been taken and damaged by the County.

B.  Require the County to pay just compensation to each Homeowner pursuant to the provisions of Colo. Const. art. II, § 15, C.R.S. § 24-56-116, and other applicable laws relating to the taking or damaging of property for public use.

C.  Require the County to pay interest as provided by law pursuant to the provisions of Article I, Title 38 of C.R.S and other applicable law.

D.  Require the County to pay all Homeowners' attorney fees and litigation costs incurred by the Homeowners in pursuing this proceeding to establish a taking and damaging of their Properties and to determine the just compensation they are owed as are appropriate under law including, but not limited to, all of Homeowners' court costs, deposition costs, witness fees, expert witness fees, consultant fees, appraisal costs, attorney fees, and any other litigation expenses which are otherwise appropriate for the County to pay Homeowners in eminent domain proceedings pursuant to C.R.S. § 24-56-116, and other applicable law.

E.  Grant such other and further relief that the Court deems appropriate.

## Jury Demand

If the Court determines that there has been a taking and/or damaging of Homeowners' Properties, Homeowners hereby elect a trial to a jury of six freeholders to determine the just compensation owed.

Respectfully submitted this 21st day of March 2024.

FAEGRE DRINKER BIDDLE & REATH LLP


*/s/ John R. Sperber*
John R. Sperber, No. 22073
Sean J. Metherell, No. 47438
Rebecca A.R. Smith, No. 52501

Attorneys for Plaintiffs


Addresses for Plaintiffs' respective property interests (pp. 4-5)
Please direct all correspondence to counsel at the following address:
Faegre Drinker Biddle & Reath LLP
1144 15th Street, Suite 3400
Denver, CO 80202


*In accordance with C.R.C.P. 121 §1-26(7) a printed or printable copy of this document with original, electronic, or scanned signatures is being maintained by the filing party and will be made available for inspection by other parties or the court upon request.*