EXHIBIT 1 - County's Trial Brief

| | |
|---|---|
| DISTRICT COURT, BOULDER COUNTY, COLORADO<br>1777 6th Street<br>Boulder, CO 80302 | DATE FILED: September 30, 2021 4:40 PM<br>FILING ID: F40AEC55E2DF3<br>CASE NUMBER: 2020CV30837 |
| **Plaintiff:** ROCK CREEK MASTER HOMEOWNERS ASSOCIATION, INC.<br><br>v.| ▲ **COURT USE ONLY** ▲ |
| **Defendant:** JEFFERSON COUNTY, COLORADO, as successor in interest to the Jefferson County Airport Authority | Case No: 2020CV30837<br><br>Division: 2 |
| *Attorneys for Jefferson County, Colorado:*<br>JEFFERSON COUNTY ATTORNEY'S OFFICE<br>Eric T. Butler, #29997<br>Deputy County Attorney<br>Jason W. Soronson, #50078<br>Assistant County Attorney<br>100 Jefferson County Parkway, #5500<br>Golden, CO 80419-5500<br>Phone: 303-271-8916<br>Fax: 303-271-8901<br>Email: ebutler@jeffco.us  | jsoronso@jeffco.us | |
| **JEFFERSON COUNTY'S TRIAL BRIEF** | |

Defendant Jefferson County, Colorado (the "County"), through counsel, submits this Trial Brief in anticipation of the trial in this matter.

## **INTRODUCTION**

Rock Creek Master Homeowners Association, Inc. ("Rock Creek") initiated this matter, seeking a declaration that a series of avigation easements in favor of Jefferson County, Colorado (the "County") have terminated.

Rock Creek overlays a residential community located northwest of the Rocky Mountain Metropolitan Airport (the "Airport"), which is owned and operated by the County. During the development of the area, Rock Creek's predecessor-in-interest granted a series of avigation

easements to the County purporting to allow airplanes to travel over Rock Creek. The avigation easements describe certain "limitation events" which, upon their occurrence, result in automatic termination of the easements. Rock Creek claims that one or more of the limitation events have occurred and the avigation easements are therefore terminated. Rock Creek initiated this suit and requests a Court order confirming that the avigation easements have terminated and removing the easements from the Rock Creek properties' chain of title.

Because none of the limitation events can reasonably be said to have occurred, Rock Creek's claim fails. Additionally, Rock Creek's interpretation of some of the limitation events is unreasonable and should be rejected.

## FACTUAL AND PROCEDURAL BACKGROUND

The County owns and operates the Airport, which is located on the northern boundary of Jefferson County, partly within Jefferson County partly within the City and County of Broomfield. The Airport has been in operation since 1960. Rock Creek is a community of single and multi-family homes located to the northwest of the Airport in the town of Superior, Boulder County. In 1987 the Town of Superior approved a change in zoning for the Rock Creek area from agricultural to planned development for residential uses as Rock Creek's processor in interest planned to develop the area into residential homes. As part of the approval, avigation easements were required to be provided to the County's predecessor (an airport authority). The avigation easements were provided to the airport authority as housing was constructed in the 1990s (more than 30 years after the Airport began operating).

From 1990 to 1996, the airport authority and Rock Creek's predecessor-in-interest (Richmond Homes) entered into a series of nearly two dozen avigation easements for areas over the Rock Creek community. Those avigation easements are filed with the Boulder County Clerk

and Recorder's Office.

The terms of the majority of the avigation easements are essentially identical. The avigation easements include the following language regarding limitation events:

2. <u>Limitations</u>. The Easement granted under Paragraph 1 shall remain in effect unless any of the following shall occur:

a. The Airport shall cease being used as a "General Aviation Reliever Airport" as those terms are defined, as of the date of this Agreement, by the Federal Aviation Administration Rules and Regulations or any rules or regulations which may later be enacted which are more strict than current rules and regulations.

b. The type and size of aircraft using the Airport as permitted under the Master Plan shall be changed or become inconsistent with such Master Plan, if there is an increase in passenger usage over that disclosed in the Master Plan, or the Airport is used for freight delivery.

c. The Authority shall lengthen the existing runways, build additional runways or increase the load capacity of such runways beyond the proposed limits currently contained in the Master Plan.

d. The noise contours contained in the Master Plan are exceeded by the sustained operation of aircraft in the Airspace Easement.

e. The noise, vibration and all other effects of aircraft operation on the Property exceeds 60 ldn.

If any of the above shall occur this Easement shall terminate without further notice.

Rock Creek contends that the limitation events were triggered because: (1) the type and size of aircraft used at the Airport exceeds that permitted by the Master Plan; (2) passenger usage has increased; (3) the Airport is used for freight delivery; (4) the load capacity of the Airport's runways has increased; and (5) the noise caused by the Airport's operations has exceeded both 60 dB Ldn and the contours in the Master Plan.

## DISCUSSION

A. <u>**The alleged limitation events have not occurred.**</u>

   i. **The Master Plan does not limit type and size of aircraft, and such limitation only applies if coupled with either an increase in passenger usage over that disclosed in the Master Plan or the Airport is used for freight delivery.**

Rock Creek relies on the condition, "[t]he type and size of aircraft using the Airport *as permitted under the Master Plan* shall be changed or become inconsistent with such Master Plan." (Emphasis added.) As an initial matter, it should be noted that this language refers to the physical characteristics of aircraft, not the purpose for which they are used. Whether the usage is personal or commercial is not relevant.

At numerous places, the Master Plan summarizes aircraft operations by providing totals for four types of aircraft: (1) single engine, (2) multi-engine, (3) turboprop, and (4) business jet. Plaintiff contends that because usage totals and estimates are given utilizing these four categories of aircraft, any usage of the airport by an aircraft that does not fit into one of those categories – such as a fighter jet, perhaps – triggers termination of the avigation easements.

Rock Creek's contention is fatally flawed because nowhere in the Master Plan is there language stating that only aircraft within those four categories will be "permitted." In fact, the Master Plan contains no prohibition on any type of aircraft. It is unclear why this language was included in the Easement, but to read such a condition in the manner proposed by Rock Creek is unreasonable. As just one example, the Master Plan mentions helicopter usage. Clearly, it was contemplated that helicopters would use the Airport, but they do not fit within the four types of aircraft that Rock Creek contends are the universe of permitted aircraft. It is also the case that – since prior to the date of the 1988 Master Plan – the Airport has hosted airshows including fighter jet aircraft, has frequently been used by fire tankers for forest fires, and had an NCAR P3 aircraft

4

based at the airport (later replaced by a similar sized C-130), both of which are of a similar size to a Boeing 737. The Master Plan cannot reasonably be read as excluding such aircraft.

It is also critical to note that, even if the Master Plan contained a limitation on permitted aircraft, that limitation is only triggered if one of two other circumstances exists. The full text of the applicable provision states:

> The type and size of aircraft using the Airport as permitted under the Master Plan shall be changed or become inconsistent with such Master Plan, *if* there is an increase in passenger usage over that disclosed in the Master Plan, or the Airport is used for freight delivery.

(Emphasis added). That is, use of the Airport by "unpermitted" aircraft only triggers the condition "if" there is also either (1) an increase in passenger usage over that disclosed in the Master Plan, "or" (2) the Airport is used for freight delivery. Even "unpermitted" aircraft do not trigger the provision without the additional occurrence of one of the two sub-conditions.

### ii. The Master Plan does not limit passengers, and any such limitation is only applicable when coupled with a change in type and size of aircraft.

As discussed above, an increase in passenger usage is not itself a triggering condition. Rather, it is expressed as a sub-condition of a change in type and size of aircraft from those permitted by the Master Plan.

An increase in passenger usage over that disclosed in the Master plan cannot occur. That is because nowhere in the Master Plan is there any quantification of passenger usage. There is no way that the Airport could comply with an unstated limit on passengers. This provision is possibly copied from another easement where there was such a disclosure.

### iii. Any limitation on freight delivery is only applicable when coupled with a change in type and size of aircraft.

As discussed above, freight delivery is not itself a triggering condition, but must be coupled with a change in type and size of aircraft from those permitted by the Master Plan.

5

The easements do not define what is meant by "freight delivery." It is unlikely that they were meant to disallow carrying cargo at any time, which is unrealistic as the majority of aircraft are likely to carry some cargo – business jets have operated out of the Airport since before the Easements were executed. A better interpretation is that they were meant to condition the Easements on the non-existence of commercial freight operations based at the airport such as FedEx and UPS, which would actually have some impact on traffic levels. There is no evidence such companies have operated out of the Airport.

### iv.     Load capacity is not limited by the Master Plan.

The easements refer specifically to increasing the load capacity of runways "beyond the *proposed* limits currently contained in the Master Plan." (Emphasis added.) The Master Plan proposes no limits, however. It does describe existing load capacities, but there is no attempt to propose limitations. It is possible that this language originally came from another easement that incorporated a document that did include propose capacity limits. Whatever the explanation, there is no "proposed limit" to exceed.

Even if such a limit existed, it is not reasonable to conclude that the County has exceeded it. The Court will learn at trial that the publicly reported load capacity of the primary runway has increased from that discussed in the 1988 Master Plan. It will also hear that the 2011 Master Plan recommended that the load capacity of the runway be increased. However, the 2014 construction that resulted in those changes was not for the purpose of increasing capacity. It simply involved removing three inches of failing, cracked asphalt and replacing it with three inches of new asphalt. The runway was not thickened, strengthened with soil preparation or underlying concrete, or other techniques designed to increase capacity. Rather, the load capacity was simply recalculated utilizing a revised technique for estimation required by the FAA.

6

### v. There is no admissible evidence of excessive noise.

Rock Creek bases its noise arguments on later updates to the Master Plan in 2000 and 2011. The updates contain graphics showing noise contours that are larger than those in the graphic from 1988.

There are two immediate responses to this argument. First, the purpose of the noise contours in the Master Plan is to help establish appropriate uses around the airport, not to accurately present actual conditions. The 1988 Master Plan makes this abundantly clear: "It is very likely that these conditions will never be achieved at the airport, but the reason for showing the most severe conditions is to aid in land use planning and control measures."

Second, to the extent that the Master Plan contours are presented in an attempt to establish actual noise levels, they constitute inadmissible hearsay, as previously described in the County's Motion in Limine. "Business records may contain statements made by third parties. Courts do not grant the same presumption of reliability to these statements because the third party does not have a duty to the business to report the information accurately." *People v. N.T.B.*, 457 P.3d 126, 132 (Colo. App. 2009). In considering similar circumstances under the substantially identical federal rules of evidence, courts "do not view the business record rule [] as overriding the rules governing opinion testimony" as it "would allow an expert to express his opinion in a report without being subject to cross-examination on the facts and data underlying that opinion." *Van Der AA Invs., Inc. v. Comm'r*, 125 T.C. 1, 6-7 (2005) (citing *Forward Commc'ns Corp. v. United States*, 608 F.2d 485, 510 (Ct. Cl. 1979)).; *see also*, *U.S. v. Gwathney*, 465 F.3d 1133, 1140 (10th Cir. 2006) ("Any information provided by another person, if an outsider to the business preparing the record, must itself fall within a hearsay exception to be admissible."); *Annett v. Univ. of Kansas*,

7

93 F. Supp. 2d 1135, 1139 (D. Kan. 2000) ("The memoranda are business records, but the declarations by [another] they contain are hearsay within hearsay.").

B. **Rock Creek's interpretation of the Easement is unreasonable and contrary to public policy.**

Colorado courts interpret easements pursuant to the Restatement of Servitudes, which provides:

> (1) A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, *or the circumstances surrounding creation of the servitude*, and to carry out the purpose for which it was created.
> (2) Unless the purpose for which the servitude is created violates public policy, and unless contrary to the intent of the parties, *a servitude should be interpreted to avoid violating public policy. Among reasonable interpretations, that which is more consonant with public policy should be preferred.*

Restatement (Third) of Property (Servitudes) § 4.1 (2000) (emphasis added); see also *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1235-36 (Colo. 1998), *as modified on denial of reh'g* (Oct. 19, 1998).

The County has received funding – tens of millions of dollars – from the federal government. Its predecessor first received such funds in 1959 and received its first "Airport Improvement Plan" (AIP) grant in 1982. When an airport applies for an FAA AIP grant, it is required to agree to certain grant assurances by federal regulation. 14 C.F.R. § 152.111(f)(9);[1] 14 C.F.R. § Pt. 152, App. D. The FAA grant assurances notably include:

> 22. Economic Nondiscrimination. a. It will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport.

The grant assurances have the following impacts:

---

[1] This regulation has existed since at least 1980; see Revision of Airport Aid Program Requirements, 45 Fed. Reg. 34,788 (May 22, 1980).

8

- Limit the County's ability to restrict certain types or sizes of aircraft from landing at the airport

- Limit the County's ability to restrict certain types of service, including freight and passenger services

- Limit the County's ability to require that aircraft follow a particular flight path, including overflight of Rock Creek

- Require the County to meet certain standards in construction or remediation of runways, including runway strength

These grant assurances have bound the County and the airport authority since before the time it entered into the Easements. It is therefore unreasonable to read the Easements in a way which would require the County to violate these federal requirements. Rock Creek is, in effect, asking the Court to interpret the Easements in a manner that would require the County to violate federal law by prohibiting certain classes of aircraft or types of commercial activity and refusing to modernize its facilities to accommodate aircraft.

Given these restrictions, it would be impracticable and a violation of public policy to require the airport to take any action to limit the types of occurrences upon which Rock Creek bases its claims.

C.   **Rock Creek unreasonably delayed enforcing its rights.**

The doctrine of laches equitably prevents a party from pursing its claims when there exists: "(1) full knowledge of the facts by the party against whom the defense is asserted; (2) unreasonable delay by that party in pursuing an available remedy; and (3) intervening reliance by and prejudice to the party asserting the defense." *In re Marriage of Kann & Kann*, 488 P.3d 245, 252 (2017).

9

The aircraft – and the noise they generate – have existed for decades in the open, traveling directly over Rock Creek every day. The County has made operational decisions based on, and in reliance on, those operations continuing. For Rock Creek to now – decades later – assert that the Easements do not provide for the type of operations that have existed for so long is inequitable and should not be allowed.

## CONCLUSION

The County respectfully asks that the Court deny Rock Creek's request to find that the Easements have expired by their terms.

Respectfully submitted this 30th day of September, 2021.

JEFFERSON COUNTY ATTORNEY'S OFFICE

By: *s/ Eric T. Butler*
Eric T. Butler, #29997
Jason W. Soronson, #50078
*Attorneys for Defendant Jefferson County, Colorado*

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2021, the foregoing was served via Colorado Courts E-Filing to the following:

Mark R. Davis, Esq.
Jachimiak Peterson, LLC
1819 Denver West Drive, Suite 265
Golden, CO 80401

*s/ Briana McCarten*
Briana McCarten, Paralegal