EXHIBIT 2 - County's Proposed Findings

| | |
|---|---|
| DISTRICT COURT, BOULDER COUNTY, COLORADO<br>1777 6th Street<br>Boulder, CO 80302 | DATE FILED: November 16, 2021 4:44 PM<br>FILING ID: 9B4D81DA731CB<br>CASE NUMBER: 2020CV30837 |
| **Plaintiff:** ROCK CREEK MASTER HOMEOWNERS ASSOCIATION, INC.<br><br>v.<br><br>**Defendant:** JEFFERSON COUNTY, COLORADO, as successor in interest to the Jefferson County Airport Authority | **▲ COURT USE ONLY ▲** |
| | Case No: 2020CV30837<br><br>Division: 2 |
| ***Attorneys for Jefferson County, Colorado:***<br>JEFFERSON COUNTY ATTORNEY'S OFFICE<br>Eric T. Butler, #29997<br>Deputy County Attorney<br>Jason W. Soronson, #50078<br>Assistant County Attorney<br>100 Jefferson County Parkway, #5500<br>Golden, CO 80419-5500<br>Phone: 303-271-8916<br>Fax: 303-271-8901<br>Email: ebutler@jeffco.us | jsoronso@jeffco.us | |
| **JEFFERSON COUNTY'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER AND JUDGMENT** | |

Trial was held in this matter on October 25 and 26, 2021. The Court has heard the testimony of the witnesses, reviewed the exhibits admitted at trial, reviewed the pleadings on file with this Court, and finding that venue is proper and being fully advised in the premises makes the following findings of fact, conclusions of law, and order and judgment:

## FINDINGS OF FACT

### Establishment of the Airport

1.      The Jefferson County Airport, now known as the Rocky Mountain Metropolitan Airport (the "Airport"), began operations in 1960. (Ex. H at JEFFCO 4998.)

2.      The Airport is primarily located at the northern edge of Jefferson County, with

portions of the Airport located in the City and County of Broomfield. (Ex. H at JEFFCO 5054.)

3.  From 1960 until 1998, the Airport was owned and operated by the Jefferson County Airport Authority (the "Authority").

4.  In 1998, Defendant Jefferson County took over ownership and operation of the Airport. (Ex. 30.)

5.  The Airport has three runways: 12L/30R, formerly designated 11L/29R (the "Primary Runway"); 12R/30L, formerly designated 11R/29L (the "Secondary Runway"); and 03/21, formerly designated 02/20 (the "Crosswind Runway"). (Ex. H at JEFFCO 4961.)

## Establishment of Rock Creek

6.  In 1987, the Town of Superior ("Superior") granted a rezoning request to rezone an area referred to as the "Rock Creek Ranch Planned Unit Development" from agricultural zoning. (Ex. D at JEFFCO. 848, 850.)

7.  Rock Creek Ranch is located northwest of the Airport. The eastern edge of Rock Creek is located approximately one mile from the primary runway of the Airport.

8.  During consideration of the rezoning application, the Authority's Airport Manager, David Gordon, sent correspondence to Superior (Ex. B). The letter stated that the Rock Creek site "lies totally within the Airport Influence Area," and requested that Superior require the developer to grant an Avigation Easement to the Airport "over all of the property." *Id.* p. 1. Mr. Gordon gave as reasons for requiring an easement:

> This easement will better inform future dwelling owners of the noise, vibration levels, nuisance and safety hazard that they can expect during the day and night from the overflight of aircraft. This will also help to protect the Town of Superior as well as the Airport from complaints regarding the same.

*Id.*

9.  On January 6, 1987, Superior approved Ordinance No. 648, granting the rezoning

of Rock Creek from agricultural zoning and approving the Final Development Plan for Rock Creek Ranch Planned Unit Development. (Ex. D.)

10.     The rezoning allowed for various commercial and residential uses.

11.     The Final Development Plan for Rock Creek Ranch required, "The Master Developer agrees to grant an Avigation Easement over the entire Rock Creek Ranch boundary within 14 months after recordation of the Final Development Plan." (Ex. E, Section 11.0(3).)

### The Easements

12.     Richmond Homes, Inc., I and other property owners ("Owners") granted over 20 avigation easements ("Easements") to the Authority between 1991 and 1996 covering various geographic areas. (Ex. 6.)[1] Representatives of both Owners and the Authority signed the Easements. *Id.* Those Easements are filed with the Boulder County Clerk and Recorder's Office. *Id.* The evidence at trial did not indicate the particular location of any of the Easements.

13.     Airport records indicate that there was at least one in-person meeting between representatives of Richmond Homes and the Authority regarding the Easements on August 28, 1990. (Ex. 27 at JEFFCO 6185.)

14.     The terms of the majority of the Easements are essentially identical. The Easements, at paragraph 2, include the following language regarding limitation events:

> <u>Limitations</u>. The Easement granted under Paragraph 1 shall remain in effect unless any of the following shall occur:
>
> a.   The Airport shall cease being used as a "General Aviation Reliever Airport" as those terms are defined, as of the date of this Agreement, by the Federal Aviation Administration Rules and Regulations or any rules or regulations which may later be enacted which are more strict than current rules and regulations.

---

[1] Although the majority of the Easements were granted by Richmond Homes, Inc. I, some of the Easements were granted by Richmond Homes, Inc. II, 88th Street Limited Liability Company, and/or various individuals.

b. The type and size of aircraft using the Airport as permitted under the Master Plan shall be changed or become inconsistent with such Master Plan, if there is an increase in passenger usage over that disclosed in the Master Plan, or the Airport is used for freight delivery.

c. The Authority shall lengthen the existing runways, build additional runways or increase the load capacity of such runways beyond the proposed limits currently contained in the Master Plan.

d. The noise contours contained in the Master Plan are exceeded by the sustained operation of aircraft in the Airspace Easement.

e. The noise, vibration and all other effects of aircraft operation on the Property exceeds 60 ldn.

If any of the above shall occur this Easement shall terminate without further notice.

(*See, e.g.,* Ex. 1, pp. 1-2.)

15.     No individual with personal knowledge of the discussions regarding development of the Easements testified at trial.

**Master Plans**

16.     The limitation events in the Easements refer to a "Master Plan," described in the Easements as "a master plan for the Airport dated January 1988, such plan having been prepared by Barnard Dunkelberg & Company URS Engineers." (Ex. 1, p. 1.) The 1988 Master Plan was admitted at trial as Exhibit F.

17.     A Master Plan is a guiding document for an airport, typically for a period of up to 20 years.

18.     The Master Plan serves a variety of purposes, including making recommendations for development of the airport and of properties surrounding the airport.

19.     Having a master plan is also an important step toward obtaining Federal Aviation Administration ("FAA") grant monies.

20.     The Airport's Master Plan was updated in 2000 (Ex. G) and 2011 (Ex. H).

21.     Each of the Master Plans admitted into evidence contains a diagram with noise contours. One purpose of these contours is to provide information to surrounding communities as they make planning decisions. (Ex. F at JEFFCO 4833-34.)

22.     For the 1988 Master Plan, the Authority's consultant, Barnard Dunkelberg, showed contours that are labeled 60, 65, and 70 "LDN." (Ex. F. at JEFFCO 4837-41.)

23.     LDN is an abbreviation for day-night sound level. (Ex. F. at JEFFCO 4831.) It is basically a method of measuring noise levels over time. *Id.* at 4831-32.

24.     The 1988 Master Plan indicates that the contours were modeled using the FAA's Integrated Noise Model Version 3.8. *Id.* at 4832. A variety of types of data were input including runway coordinates, airport altitude, temperature, aircraft mix, flight tracks, approach profiles, departure profiles, approach parameters, and aircraft noise curves. *Id.* at 4832-33. The Court was not presented with evidence of what data was used for these inputs.

25.     The 2000 Master Plan included contours modeled with a different software, Integrated Noise Model Version 6.0. (Ex. G at JEFFCO 7155.) The contours were apparently based on 1998 conditions. *Id.* at 7156. Inputs included runway end coordinates, displaced thresholds, airport altitude, temperature, aircraft mix and flight tracks, approach and departure profiles, approach and departure procedures, and aircraft noise curves. *Id.* at 7155. The Court was not presented with evidence of what data was used for these inputs.

26.     The 2011 Master Plan included a contour diagram dated 2009 (Ex. H at JEFFCO 4938) but provides no explanation of what software was used to model it or what data was input to create the diagram.

**Grant Assurances**

27.     Over the years, the Airport, both when run by the Authority and since the County

took over as owner in 1998, has received tens of millions of dollars in grants from the FAA.

28.     The Airport first received federal grant money in 1959. (Ex. H at JEFFCO 5005.) Grants have been received by the Airport both when run by the Authority and when run by the County many times since then, including Airport Improvement Program ("AIP") funds beginning in 1982. *Id.* at JEFFCO 5005-07.

29.     When an airport applies for an FAA grant, it is required to agree to certain grant assurances by federal regulation. 14 C.F.R. § 152.111(f)(9); 14 C.F.R. § Pt. 152, App. D.

30.     One grant assurance requires the Airport to agree that:

> It will make the airport available as an airport for **public use** on reasonable terms and without unjust discrimination to **all types, kinds and classes of aeronautical activities, including commercial aeronautical activities** offering services to the public at the airport.

(Ex. J at ¶ 22.a, JEFFCO 5974) (emphasis added).

31.     The above language is similar to that found in the regulatory FAA grant assurances:

> 18. Conditions and limitations on airport use. The Sponsor will operate the Airport as such for the use and benefit of the public. In furtherance of this covenant (but without limiting its general applicability and effect), the Sponsor specifically agrees that it will keep the Airport **open to all types, kinds, and classes of aeronautical use on fair and reasonable terms without discrimination between such types, kinds, and classes**. *Provided*, that the sponsor may establish such fair, equal, and not unjustly discriminatory conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the Airport; and *Provided further*, That the Sponsor may prohibit or limit any given type, kind, or class of aeronautical use of the Airport if such action is necessary for the safe operation of the Airport or necessary to serve the civil aviation needs of the public.

14 C.F.R. § Pt. 152, App. D (emphasis added). [2]

**Airport Operations**

32.     The 1988 Master Plan anticipated that aircraft operations would grow dramatically

---

[2] This regulation has existed since at least 1980; see Revision of Airport Aid Program Requirements, 45 Fed. Reg. 34,788 (May 22, 1980).

in future years, reaching 286,000 by 2007. (Ex. F at JEFFCO 4818.) FAA records indicate aircraft operations at the Airport have never come remotely close to that 1988 estimate, with a peak of just 191,533 in 2019. (Ex. 36.)

33. Passenger usage was not quantified or estimated in the 1988 Master Plan. However, the 2011 Master Plan estimated that enplanements would grow to 3,600 by 2020. (Ex. H at JEFFCO 5068.) FAA records show that enplanements peaked as just 669 in 2017. (Ex. 37.)[3]

34. Former Airport employee Troy Stover, who worked at the Airport beginning in 1987, testified that since prior to the date of the 1988 Master Plan the Airport has had a wide variety of aircraft operations, including:

- Business Jets

- Helicopters

- Flight Schools

- Large fire tankers, including C-130 aircraft that are larger than a Boeing 737

- An NCAR P3 aircraft based at the Airport, which is similar in size to a Boeing 737

- Periodic airshows featuring military jets

35. The FAA has reported "air carrier" operations at the Airport. Although there are a handful of charter flights each year with itinerant[4] aircraft the size of an air carrier[5], testimony at trial established that the vast majority of the flights included in the FAA totals are fire tankers fighting forest fires. Additionally, testimony from Colorado Springs Airport Assistant Director of Aviation Troy Stover established that, beginning in 2020, the FAA began including overflights in

---

[3] However, the 2011 Master Plan states that there were 2,700 enplanements in 2008, as contrasted with 1 enplanement reported by the FAA for that year. No explanation was provided at trial for this discrepancy.

[4] Itinerant operations involve aircraft that are not based at the Airport.

[5] An "air carrier" is defined in Airport documents as an aircraft that has more than 60 seats or a cargo payload capacity of more than 18,000 pounds and carries passengers or cargo for hire or compensation. (Ex. H at JEFFCO 5061.) See further discussion below.

the air carrier totals when the aircraft flying over an airport contacted the local tower, even if the aircraft did not land or take off at the airport.

36.     The Airport has had chartered flights throughout its history. For a few years, ending in 2017, the Airport had scheduled service from a company called Denver Air Connection. The Aircraft used had a capacity of just 19 passengers. Denver Air Connection would be classified as a "commuter carrier."[6]

### Load Capacity

37.     The 1988 Master Plan lists no proposed limits for load capacity for the Airport runways.  However, it listed the following existing information for the three runways:

- Primary Runway: 9,000 feet in length, single-wheel gross weight bearing capacity of 45,000 pounds, dual-wheel gross weight bearing capacity of 70,000 pounds
- Secondary Runway: 4,000 feet in length, single-wheel gross weight bearing capacity of 12,000 pounds
- Crosswind Runway: 3,601 feet in length, single-wheel gross weight bearing capacity of 40,000 pounds

(Ex. F., JEFFCO 4787.)

38.     The 2011 Master Plain indicates that the "critical aircraft" was expected to change to a larger aircraft – the Gulfstream 550 – by 2015. (Ex. 5 at 005.) The critical aircraft is the largest aircraft with 500 annual operations at the Airport. *Id.* As a result, the plan recommended strengthening the Primary Runway's dual wheel capacity to 100,000 pounds. (Ex. 5 at 006.)

39.     The Airport applied to the FAA for a "Categorical Exclusion" from an environmental assessment for the recommended project on September 3, 2013, which was approved by the FAA on September 19, 2013. (Ex. 33, at JEFFCO 3067.) At that time, the Airport described the purpose of the project as "to rehabilitate the runway to extend its useful life and

---

[6] A "commuter carrier" is distinguished from an "air carrier" as "scheduled commercial flights for aircraft with 60 seats or fewer or a cargo payload capacity of 18,000 pounds or less, and includes air taxi operations, which are nonscheduled. (Ex. H at JEFFCO 5061.)

provide adequate runway pavement strength of 100,000 lbs dual wheel gear…the Airport needs to improve its runway strength to 100,000 lbs dual wheel gear to meet existing aircraft demand." (*Id.* at JEFFCO 3398-99.) The Airport described the project as consisting of "removing **1.5 Inches** of existing asphalt and replacing it with **2 to 5.5 inches** of new asphalt." (*Id.* at 3398 (emphasis added.)

40.     The Scope of Work for the project dated March 21, 2014 (revision 1) – a little over 6 months after the Categorical Exclusion – stated, "The existing surface of Runway 11L/29R is a heavily worn asphalt pavement with signs of severe cracking, rutting, and raveling." (Ex. R at JEFFCO 3551.) In contrast to the early Categorical Exclusion, the Scope of Work described the project as consisting "of milling off 3-inches (nominal) of existing asphalt and replacing with 3-inches of new asphalt pavement on Runway 11L/29R…." *Id.* The Scope of Work does not mention strengthening as an intended goal. *Id.*

41.     The FAA's Advisory Circular regarding the "Standardized Method of Reporting Airport Pavement Strength – PCN," dated August 14, 2014, indicates that the method for reporting pavement strength for pavements with bearing strengths of 12,5000 or greater had changed by 2014. (*See* Exhibit O, JEFFCO 8773, second bullet under "Purpose:" "The method of reporting pavement strength for pavements of less than 12,500 pounds (5 700 kg) bearing strength remains unchanged"). Although the Advisory Circular is highly technical, it generally provides that the International Civil Aviation Organization (ICAO) had adopted a single international method of reporting pavement strength – the "Aircraft Classification Number – Pavement Classification Number (CAN-PCN) method." *Id.* at JEFFCO 8781.

42.     Brian Bishop testified that the strength of the Primary Runway was recalculated in 2016 independently of the rehabilitation project in 2014 and at the new Airport Director's (Bryan

Johnson's) request.

43.     Brian Bishop testified that the Secondary Runway had been rehabilitated in 2016 in a similar manner to the Primary Runway – with no increase in the thickness of asphalt, simply a removal and replacement of three inches of asphalt.

44.     Both the Primary Runway and the Secondary Runway are constructed in exactly the same manner, with the same thickness and materials, as before the rehabilitation projects.

45.     The current Master Record from the FAA, which was the most recent listing of load capacity of the runways presented at trial, lists different capacities for the Primary and Secondary Runways, and the same capacity for the Crosswind Runway, as those listed in the 1988 Master Plan:

- Primary Runway: single-wheel gross capacity of 65,000 pounds and dual-wheel gross capacity of 105,000 pounds
- Secondary Runway: single-wheel gross capacity of 47,000 pounds
- Crosswind Runway: single-wheel gross capacity of 40,000 pounds

(Ex. 38.)

46.     The increase is the result of recalculation of the load capacity under a new procedure required by the FAA, rather than an actual increase in load capacity.

## CONCLUSIONS OF LAW

Rock Creek contends that the limitation events were triggered because: (1) the type and size of aircraft used at the Airport exceeds that permitted by the Master Plan; (2) passenger usage has increased; (3) the Airport is used for freight delivery; (4) the load capacity of the Airport's runways has increased; and (5) the noise caused by the Airport's operations has exceeded both 60 decibels ldn and the contours in the Master Plan. Each of these issues is addressed below.

In interpreting the Easement, the Court is guided by several principles. The Court can look to external evidence of the circumstances surrounding the creation of the easements to determine

the parties' intent:

> (1) A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, **or the circumstances surrounding creation of the servitude**, and to carry out the purpose for which it was created.

Restatement (Third) of Property (Servitudes) § 4.1 (2000) (emphasis added); *accord Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1237 (Colo. 1998), *as modified on denial of reh'g* (Oct. 19, 1998).

Easements should generally be interpreted consistent with public policy goals:

> (2) Unless the purpose for which the servitude is created violates public policy, and unless contrary to the intent of the parties, a servitude should be interpreted to avoid violating public policy. **Among reasonable interpretations, that which is more consonant with public policy should be preferred.**

Restatement (Third) of Property (Servitudes) § 4.1 (2000) (emphasis added).

"In resolving conflicts among the parties to servitudes, the public policy favoring socially productive use of land generally leads to striking a balance that maximizes the aggregate utility of the servitude beneficiary and the servient estate." *Cielo Vista Ranch I, LLC v. Alire*, 433 P.3d 596, 621 (2018) (quoting Restatement (Third) of Property (Servitudes) § 4.10 cmt. b).

### A. Aircraft, Passengers, and Freight Delivery

As an initial matter, the Court must interpret the meaning of the following provision:

> The type and size of aircraft using the Airport as permitted under the Master Plan shall be changed or become inconsistent with such Master Plan, if there is an increase in passenger usage over that disclosed in the Master Plan, or the Airport is used for freight delivery.

Rock Creek contends that the provision contains three separate and independent limitation events:

- The type and size of aircraft using the Airport as permitted under the Master Plan shall be changed or become inconsistent with such Master Plan;

- There is an increase in passenger usage over that disclosed in the Master Plan; and

- The Airport is used for freight delivery.

In contrast, the County contends that the presence of the word "if" before the mention of an increase in passenger usage and freight delivery is meant to qualify the condition regarding type and size of aircraft. That is, the County contends that this provision constitutes a single limitation event that is only met when "[t]he type and size of aircraft using the Airport as permitted under the Master Plan shall be changed or become inconsistent with such Master Plan" and either (1) there is an increase in passenger usage over that disclosed in the Master Plan or (2) the Airport is used for freight delivery.

The County's position is the most appropriate reading of the provision in question. The word "if" is used conditionally. Specifically, it conditions the effectiveness of the "type or size of aircraft" clause on the occurrence of the passenger "or" freight delivery clause. Here is the limitation event quoted with appropriate emphasis for clarity:

- The type and size of aircraft using the Airport as permitted under the Master Plan shall be changed or become inconsistent with such Master Plan, **if**
  - there is an increase in passenger usage over that disclosed in the Master Plan, **or**
  - the Airport is used for freight delivery.

(Ex. 1, p 2, bullets and bold added). This reading of the limitation event is buttressed by the fact that the word "if" is not used in any of the other limitation events, including those that list multiple bases for termination. Rock Creek's proposed interpretation would effectively ignore the condition term "if." The Court cannot do so.

i. **There has been no change in Aircraft.**

As an initial matter, the Court finds that the language referring to "[t]he type and size of aircraft using the Airport" refers to the physical characteristics of aircraft, not the purpose for which they are used. Whether the usage is personal or commercial, scheduled or unscheduled, is not relevant to determinizing the "type and size" of an aircraft.

The Court also finds that the Master Plan does not either "permit" or prohibit any type or size of aircraft. Although the 1988 Master Plan does generally categorize aircraft into four categories - (1) single engine, (2) multi-engine, (3) turboprop, and (4) business jet (*See, e.g.,* Ex. F at JEFFCO 4813) – nowhere is this list described as exclusive.

Additionally, given that many types and sizes of aircraft have used the Airport since before the 1988 Master Plan or the Easements were created, it would be unreasonable to limit aircraft to these four categories. As just one example, the Master Plan describes helicopter activity in a section immediately preceded by a list summarizing totals for the four categories referred to above. (Ex. F at JEFFCO 4816.). Clearly, it was contemplated that helicopters would use the Airport, but they do not fit within the four types of aircraft listed. It is also the case that – since prior to the date of the 1988 Master Plan – the Airport has hosted airshows including fighter jet aircraft, has frequently been used by fire tankers fighting forest fires, and had an NCAR P3 aircraft based at the airport (later replaced by a similar sized C-130), both of which are of a similar size or larger than a Boeing 737. The Master Plan cannot reasonably be read as excluding such aircraft when they were operating at the Airport at the time the Master Plan was created. This is particularly true given the Airport's grant assurance requiring it to generally be open to "all types, kinds, and classes of aeronautical use."

Rock Creek argues that this limitation has been triggered because of air carrier operations. The 1988 Master Plan states that "no air carrier service [is] contemplated in the planning period."

13

(Ex. F at JEFFCO 4828.)

"Air carrier service" is not defined in the 1988 Master Plan. However, the 2011 Master Plan states:

> An air carrier operation involves an aircraft with a seating capacity of more than 60 seats or a cargo payload capacity of more than 18,000 pounds. Further, the aircraft must be carrying passengers or cargo for hire or compensation.

(Ex. H at JEFFCO 5061.)

Rock Creek's argument fails for at least three reasons. First, the limitation event refers to types and sizes of aircraft as "permitted." Although the 1988 Master Plan states that air carrier service was not contemplated during the planning period, it does not prohibit such service.

Second, the planning period referred to above was to end in 2007. *Id.* at JEFFCO 4831. Any carrier operation after that is not addressed at all by the 1988 Master Plan.

Third, as discussed above, the limitation event refers to physical characteristics of an aircraft, while an air carrier is defined both by physical characteristics and by service (carrying passengers or cargo for hire).[7]

Additionally, the Grant Assurances that bind the Airport required the Airport to be "open to all types, kinds, and classes of aeronautical use on fair and reasonable terms without discrimination between such types, kinds, and classes." This grant assurance language restricts prohibitions on air carriers. Rock Creek's interpretation also conflicts with the general principle that as a matter of public policy easements should be interpreted where possible to maximize the aggregate utility of the servitude. *See Cielo Vista Ranch, supra,* 433 P.3d at 621.

It is not known whether the limitation event language was borrowed from another

---

[7]   At trial, Rock Creek pointed out that FAA records show a dramatic jump in the number of air carrier operations in recent years, particularly 2020. Even if accurate, this fact is not relevant, as the limitation event is not tied to the number of operations by a particular type or size of aircraft. Further, the evidence at trial indicated that the majority of such air carriers were either fire tankers or overflights that did not operate at the Airport.

easement, nor what the drafters intended by it, but to read such a condition in the manner proposed by Rock Creek is unreasonable.

Finally, the Court reiterates that, even if aircraft of a type and size not permitted by the Master Plan had operated from the Airport, the limitation is only triggered if one of two conditional circumstances exists. As discussed below, neither circumstance has been shown to exist.

### ii. The Master Plan does not limit passengers, and any such limitation is only applicable when coupled with a change in type and size of aircraft.

As discussed above, an increase in passenger usage is not itself a triggering condition. Rather, it is expressed as a sub-condition of a change in type and size of aircraft from those permitted by the Master Plan. Because no type or size of aircraft not permitted by the 1988 Master Plan has operated at the Airport, the applicable limitation event has not been shown to have occurred. However, the Court concludes that even if passenger usage was an independent basis for terminating the Easements, Rock Creek has not demonstrated that "an increase in passenger usage over that disclosed in the Master Plan" has occurred.

As an initial matter, the Court finds that the 1988 Master Plan contains no quantification of number of passengers, either existing levels or anticipated future levels. This is unusual. The FAA's guidance on master plans contemplates that enplanement data be gathered. (Ex. K at JEFFCO 8124.) The 2011 Master Plan contains such information. (Ex. H at JEFFCO 5068.) However, there is no such forecast in the 1988 Master Plan, and there is no way that the Airport could comply with an unstated limit on passengers. There is no showing by Rock Creek that the Airport has exceeded a passenger expectation.[8] Reading such a restriction into the Easements without a clearly enforceable guideline would both impact the Airport's grant assurance obligation to make the Airport available for public use to commercial aeronautical activities (*see* Ex. J) and

---

[8] In fact, enplanements have fallen far short of the expectations set forth in the 2011 Master Plan.

conflict with the general principle that as a matter of public policy easements should be interpreted where possible to maximize the aggregate utility of the servitude (*see Cielo Vista Ranch, supra,* 433 P.3d at 621).

### iii. The limitation on freight delivery is only applicable when coupled with a change in type and size of aircraft.

As discussed above, freight delivery is not itself a triggering condition, but must be coupled with a change in type and size of aircraft from those permitted by the Master Plan (which condition has not occurred). Therefore, the applicable limitation event has not been shown to have occurred. However, the Court concludes that even if "freight delivery" was an independent basis for terminating the Easements, Rock Creek has not demonstrated that it has occurred.

The 1988 Master Plan does not use the term "freight delivery." Rock Creek pointed out at trial that later Airport documents briefly discuss "cargo." This is true, although the level of cargo is minimal. The 2011 Master Plan states, "Presently the Airport has minimal air cargo operations. Cargo operations and operators are such a minimal part of the airport that there are not buildings dedicated for cargo operations." (Ex. 5 at 031.) The Plan elaborates:

> Since the Airport does not have any dedicated/scheduled cargo operators, a ground lease with any cargo operators, or any buildings dedicated for cargo operations, no new air cargo facilities are required. However, occasionally small items are shipped via cargo through the airport. These items are moved to and from off-airport cargo facilities via truck directly to aircraft on the ramp adjacent to the terminal building. Therefore, for planning purpose an area of ramp should be reserved adjacent to the terminal building to allow for air cargo operations….[I]t is recommended that 3,600 square feet of aircraft space be reserved adjacent to the terminal building for air cargo operations.

(Ex. 5 at 020-21.) Mr. Bishop testified that no such area had been reserved for cargo by the Airport.

The Easements, however, do not refer to "cargo." Rather, they refer to "freight delivery." The Easements do not define what is meant by "freight delivery." The 1988 Master Plan does not use the term "freight delivery." It is unlikely that the Easements were meant to disallow carrying

cargo at any time, which is unrealistic as the majority of aircraft are likely to carry some cargo. Business jets have operated out of the Airport since before the Easements were executed. A better interpretation is that they were meant to condition the Easements on the non-existence of commercial freight operations based at the airport, such as FedEx and UPS, which would actually have some impact on traffic levels. Mr. Bishop testified that such companies do not operate out of the Airport.

This reading is most consistent with the principles mentioned above – it limits the impact on the Airport's grant assurance obligation to make the Airport available for public use to commercial aeronautical activities (*see* Ex. J) and coincides with the general principle that as a matter of public policy easements should be interpreted where possible to maximize the aggregate utility of the servitude (*see Cielo Vista Ranch, supra,* 433 P.3d at 621). Therefore, the Court concludes that there is no evidence that freight delivery has occurred at the Airport.

### B. Increase in Load Capacity

Rock Creek argues that changes in the published load capacity of runways at the Airport have triggered the following limitation event:

> *c. The Authority shall lengthen the existing runways, build additional runways or increase the load capacity of such runways beyond the proposed limits currently contained in the Master Plan.*

The 1988 Master Plan listed the following information for the three runways:

- Primary Runway: 9,000 feet in length, single-wheel gross weight bearing capacity of 45,000 pounds, dual-wheel gross weight bearing capacity of 70,000 pounds
- Secondary Runway: 4,000 feet in length, single-wheel gross weight bearing capacity of 12,000 pounds
- Crosswind Runway: 3,601 feet in length, single-wheel gross weight bearing capacity of 40,000 pounds

(Ex. F., JEFFCO 4787.)

The current Master Record from the FAA, which was the most recent listing of load

capacity of the runways presented at trial, lists different capacities for the Primary and Secondary Runways, and the same capacity for the Crosswind Runway:

- Primary Runway: single-wheel gross capacity of 65,000 pounds and dual-wheel gross capacity of 105,000 pounds
- Secondary Runway: single-wheel gross capacity of 47,000 pounds
- Crosswind Runway: single-wheel gross capacity of 40,000 pounds

(Ex. 38.)

There is some evidence of intermediate changes in strength, as well. The 2011 Master Plan mentions that the dual wheel capacity of the Primary Runway was 75,000 pounds. (Ex. 5 at 015.) It also states that the single wheel capacity of the Primary Runway was 55,000 pounds and that the single wheel capacity of the Secondary Runway was 12,500 pounds.

As an initial matter, the Court must determine the meaning of the language in the limitation event that limits expanding the number, length, or strength of runways "beyond the proposed limits currently contained in the Master Plan." Specifically, were the stated existing capacities of the runways in the 1988 Master Plan "proposed limits," or only existing conditions that did not limit any future strengthening?

The 1988 Master Plan did address proposed limits for both the number and length of runways. For instance, it specifically states that "runway extensions beyond 9,000 feet are not being recommended." (Ex. F at JEFFCO 4825.) In the "Development Plan" section, the Plan describes six different alternatives:

- Alternative One – extending the Secondary Runway to 7,000 feet in length with the Primary and Crosswind Runways remaining at their present length
- Alternative Two – constructing a new replacement Secondary Runway 6,000 feet in length and 2,500 feet west of the Primary Runway, with the Primary and Crosswind Runways remaining at their present length
- Alternative Three – constructing a new replacement Secondary Runway 7,000 feet in length and 2,500 feet west of the Primary Runway, extending the Crosswind Runway by 1,300 feet, with the Primary Runway remaining at its present length
- Alternative Four – constructing a new replacement Secondary Runway 6,000 feet in

length and 3,100 feet west of the Primary Runway, with the Primary and Crosswind Runways remaining at their present length

- Alternative Five – constructing a new replacement Secondary Runway 7,000 feet in length and 825 feet west of the Primary Runway, constructing an additional runway 6,000 feet in length and 3,100 feet west of the Primary Runway, with the Primary and Crosswind Runways remaining at their present length

- Alternative Six - constructing a new replacement Secondary Runway 7,000 feet in length and 2,500 feet west of the Primary Runway but with its northwest end just 500 feet from State Highway 128, with the Primary and Crosswind Runways remaining at their present length

(Ex. F at JEFFCO 4844-59.)

These "proposed limits" on both number and length of runways are clearly explained and measurable. Noticeably absent is any description of the proposed load capacity of the runways. It is not satisfactory to assume that the existing load capacities should be treated as "proposed" load capacities, both because (1) they are not described as limits in the Master Plan and (2) the various proposals above contemplate entirely new runways for which no load capacity is described or existed at the time.

The Court also notes that it heard no testimony from any individual involved in the negotiation of the easements in question and received no exhibits referencing negotiations regarding load capacity. This is unsurprising, given the fact that the language in the Easement language was created 31 years ago. It is not possible to determine, for instance, whether the parties may have borrowed language from an already-existing easement to create the limitation in question or been under the impression that the development alternatives did contain a discussion of load capacity. Whatever the reason, in the absence of any language in the 1988 Master Plan proposing limits on load capacity, the Court concludes that an increase in load capacity of the runways cannot trigger the limitation event in question.

Even if the existing load capacities listed in the 1988 Master Plan were treated as "proposed limits," however, the Court finds that this limitation event has not occurred because there is

insufficient evidence that the actual strength of any runway has increased. Conceptually, the limitation event in question appears to be intended to limit increasing the actual capacity of the Airport, whether through additional runways, longer runways, or more robust runways capable of handling heavier loads. The evidence at trial indicated that no structural change has been made to the runways and that the strength of the runways has not been increased.

At trial, Rock Creek presented evidence that the "critical aircraft" was expected to change to a larger aircraft – the Gulfstream 550 – by 2015. (Ex. 5 at 005.) The critical aircraft is the largest aircraft with 500 annual operations at the Airport. *Id.* As a result, the plan recommended strengthening the Primary Runway's dual wheel capacity to 100,000 pounds. (Ex. 5 at 006.)

Apparently in response to this recommendation, the Airport applied to the FAA for a "Categorical Exclusion" from an environmental assessment for the project on September 3, 2013, which was approved by the FAA on September 19, 2013. (Ex. 33, at JEFFCO 3067.) At that time, the Airport described the purpose of the project as "to rehabilitate the runway to extend its useful life and provide adequate runway pavement strength of 100,000 lbs dual wheel gear…the Airport needs to improve its runway strength to 100,000 lbs dual wheel gear to meet existing aircraft demand." (*Id.* at JEFFCO 3398-99.)

Importantly, at that time the Airport described the project as consisting of "removing **1.5 Inches** of existing asphalt and replacing it with **2 to 5.5 inches** of new asphalt." (*Id.* at 3398 (emphasis added).) The Court concludes that such an increase in the thickness of asphalt would have had the effect of strengthening the Primary Runway.

However, by the time the Airport issued a purchase order for the project, the Scope of Work had changed. The Scope of Work dated March 21, 2014 (revision 1) – a little over 6 months after the Categorical Exclusion – stated, "The existing surface of Runway 11L/29R is a heavily worn

asphalt pavement with signs of severe cracking, rutting, and raveling." (Ex. R at JEFFCO 3551.) It described the project as consisting "of milling off 3-inches (nominal) of existing asphalt and replacing with 3-inches of new asphalt pavement on Runway 11L/29R…." *Id.* The Scope of Work does not mention strengthening as an intended goal. *Id.* The Court concludes that such a replacement of asphalt would not substantially increase the load capacity of the Primary Runway.

Although the reported load capacity of the runway did increase – by at least 40% - after this project, that level of increase is highly unlikely as a result of replacement of asphalt at the same thickness. In fact, Brian Bishop testified that the strength was recalculated in 2016 independently of the rehabilitation project in 2014 and at the new Airport Director's (Bryan Johnson's) request.

The increase in reported strength is more reasonably explained as a result of intervening changes in the strength calculation methodology. The FAA's Advisory Circular regarding the "Standardized Method of Reporting Airport Pavement Strength – PCN," dated August 14, 2014, indicates that the method for reporting pavement strength for pavements with bearing strengths of 12,5000 or greater had changed. (*See* Exhibit O, JEFFCO 8773, second bullet under "Purpose:" "The method of reporting pavement strength for pavements of less than 12,500 pounds (5 700 kg) bearing strength remains unchanged"). Although the Advisory Circular is highly technical, it generally provides that the International Civil Aviation Organization (ICAO) had adopted a single international method of reporting pavement strength: the "Aircraft Classification Number – Pavement Classification Number (CAN-PCN) method." *Id.* at JEFFCO 8781. "ACN is a number that expresses the relative effect of an aircraft at a given configuration on a pavement structure for a specified standard subgrade strength." *Id.* "PCN is a number that expresses the load-carrying capacity of a pavement for unrestricted operations." *Id.* The methods of calculation provided in

the Advisory Circular are mandatory for projects funded with Federal grants through the AIP program. *Id.* at JEFFCO 8773. The County did accept AIP funds for the 2014 project, which, incidentally, was described as a project to "Rehabilitate" the Primary Runway, not one to strengthen it. (Ex. S, p. 1.)

In further support of this conclusion, Brian Bishop testified that the Secondary Runway had been rehabilitated in 2016 in a similar manner to the Primary Runway – with no increase in the thickness of asphalt, simply a removal and replacement of three inches of asphalt. The Airport's most recently reported strength numbers show a "PCN" number for the Primary and Secondary runways, indicating that they have been recalculated under the new ICAO methodology. (Ex. 38.) Both exceed the published strength numbers in the 1988 Master Plan.[9] The Crosswind Runway, which has not been recently rehabilitated, lists no PCN number and lists the same strength as the 1988 Master Plan. *Id.*

The Court concludes that when, as here, a runway is simply rehabilitated, rather than purposefully strengthened, the action does not trigger the easement limitation in question. This reading is most consistent with the principles mentioned above – it limits the impact on the Airport's grant assurance obligation to make the Airport available for public use to commercial aeronautical activities (*see* Ex. J) and coincides with the general principle that as a matter of public policy easements should be interpreted where possible to maximize the aggregate utility of the servitude (*see Cielo Vista Ranch, supra,* 433 P.3d at 621). There is insufficient evidence to conclude that this limitation has been triggered.

## C. Noise Contours

---

[9] The load capacity for the Secondary Runway was listed as 12,500 pounds single gear wheel in 2011. (Ex. H at JEFFCO 4928.) It is now listed as over 47,000 pounds. (Ex. 38.) The Court finds that it is highly unlikely that removal of three inches of asphalt and replacement with the same three inches of asphalt would nearly quadruple the actual weight-bearing capacity of a runway.

Another limitation event relied upon by Rock Creek provides:

*d. The noise contours contained in the Master Plan are exceeded by the sustained operation of aircraft in the Airspace Easement.*

Rock Creek asks the Court to rely on a comparison of the contour diagrams in the 2000 and 2011 Master Plans to those in the 1988 Master Plan in order to determine if this limitation event has occurred. The County objected before and during trial to the admissibility of the Master Plan contours for purposes of determining noise levels on the bases that they constitute inadmissible hearsay and expert testimony in violation of C.R.E 705. As an initial matter, the Court must decide whether the contours are admissible for purposes of establishing actual noise levels.

**i. The contours are inadmissible under the Colorado Rules of Evidence.**

Each of the Airport Master Plans contours were developed by third parties – Barnard Dunkelberg & Company as to the 1988 and 2000 plans, and Reynolds, Smith and Hills, Inc. as to the 2011 plan. (Ex. F at JEFFCO 4837-41; Ex. G at JEFFCO 7156-57; Ex. H at JEFFCO 4938.) Accordingly, the noise contours on which Mr. Sneddon relies are all inadmissible hearsay – that is, out-of-court statements made by someone other than the declarant and offered to prove the truth of the matter asserted – unless they fall within the definition of "nonhearsay" or within a hearsay exception. *See* C.R.E. 801(c).

**a.   The contours are hearsay**

The Court must first determine whether the contours constitute non-hearsay. Pursuant to C.R.E. 801 (d)(2), an admission of a party-opponent is not hearsay if:

The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a co-conspirator of a party during the course and in furtherance of the

conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

Most relevant to the Court's inquiry are (C) and (D): were the engineering firms that created the 2000 and 2011 Master Plans either authorized by the County to make a statement or did those firms make those contours regarding matters within the scope of an agency or employment relationship?

Colorado courts do not appear to have addressed the issue of when a party is authorized to make statements for another. However, courts have differentiated (1) a request by a party that another company prepare materials for it from (2) authorizing a company to actually make a statement on behalf of the party. In interpreting the same provision of evidentiary law for Nebraska, the Nebraska Supreme Court held:

We adopt the rule laid down *in U.S. v. United Shoe Machinery Corp.*, 89 F. Supp. 349, 352 (D. Mass. 1950):

Where the agent makes a report to the principal or to another agent, and all that appears is that the principal had authorized the agent to make such a report, a statement in the report is not the principal's and is not an extrajudicial admission of the principal … Authority merely to report to a principal or a fellow agent is not authority to commit the principal.

*Kliment v. National Farms, Inc.*, 514 N.W.2d 315, 318 (1994).

In this case, the evidence is that engineering firms prepared the contours in question and provided them to the airport. For instance, an unexecuted Services Agreement admitted into evidence at trial provides that and reports and information prepared by the consultant for the 2000 Master Plan "are confidential and shall not be made available to any individual or organization by the CONSULTANT with the prior written approval of the sponsor." (Ex. 21 at JEFFCO 6435.) The engineering firms did not publish the contours, and there is no evidence that they were

authorized to make any statement committing the Airport. Consequently, the Court concludes that the contours do not constitute "a statement by a person authorized by the party to make a statement concerning the subject."

Similarly, Colorado courts do not appear to have carefully interpreted Rule 801(d)(2)(D); however, the Tenth Circuit has with respect to the corollary federal rule:

> The use of the terms "agent" or "servant" without definition evidences Congress' intent to describe the traditional master-servant relationship as understood by common law agency doctrine.

*Boren v. Sable*, 887 F.2d 1032, 1038 (10th Cir. 1989).

Colorado has described this common law doctrine. Regarding agents:

> [T]he distinguishing characteristic of the *agent* is that he represents his principal contractually. If properly authorized he makes contracts or other negotiations of a business nature on behalf of his principal and by which his principal is bound.

*Grease Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 472 (Colo. 1995), *quoting* Floyd R. Mechem, *Outlines of the Law of Agency* § 12(A) (4th ed. 1952) (emphasis in original). Regarding servants:

> "[A] servant is one who works *physically* for another, subject to the control of that other, who is called the master. The statement that the servant is subject to the control of the master does not mean that the master must stand by constantly and observe and supervise the work; it means merely that the relation presupposes a right on the part of the master to have the work performed in such manner as he directs and a correlative duty on the part of the servant to perform in the manner directed, expressly or by implication, by the master.

*Grease Monkey* at 472, *quoting Outlines of the Law of Agency* at § 13(B) (emphasis in original).

Here, there is no evidence that the engineering firms were authorized to make contracts or other business negotiations as an agent of the Airport. Nor is there evidence that the Airport directed the manner in which the work – particularly the contours – were performed. To the

contrary, the unexecuted professional services agreement for the 2000 Master Plan expressly stated:

> CONSULTANT represents that he has or will secure at his own expense all personnel required in performing the services under this contract. Such personnel shall not be employees of the SPONSOR. All services required hereunder will be performed by the CONSULTANT or under his supervision….

(Ex. 21 at JEFFCO 6433.) In fact, the testimony of Brian Bishop was that no one at the Airport would know how to model a contour. Therefore, the Court concludes that the contours are a not a statement of the County's agent or servant.

Rock Creek also contends that the contours are not hearsay because they are computer generated output, and as such they cannot be considered a "statement" made by a "person." In some circumstances, computer generated information may be admissible if the information was "generated instantaneously by the computer *without the assistance or input of a person*." *United States v. Hamilton*, 413 F.3d 1138, 1142 (10th Cir. 2005) (emphasis added). "A computer-generated record constitutes hearsay, however, when its creation involves human input or interpretation." *People v. Hamilton*, 452 P.3d 184, 193 (Colo. App. 2019), *reh'g denied* (Aug. 15, 2019); *see also*, *U.S. v. Cestnik*, 36 F.3d 904, 909–10 (10th Cir. 1994).

The noise contours at issue were created using Integrated Noise Model (INM) and/or the Airport Environmental Design Tool (AEDT) software. The software relies on an extensive amount of input provided by the people using the software. Mr. Sneddon, Rock Creek's noise expert, testified at trial regarding the many inputs required.

Additionally, the County master plan documents at issue in this case briefly describe the inputs required. The 1988 Master Plan describes a requirement for input "of the physical and operation characteristic of the airport" including runway coordinates, airport altitude, temperature, aircraft mix, flight tracks, and approach profiles, as well as optional departure profiles, approach

parameters, and aircraft noise curves. (Ex. F at JEFFCO 4832-33.) Although the document does not describe how, the 1988 plan states, "All of these options were incorporated." *Id.* The 2000 Master Plan contains similar statements. (Ex. G at JEFFCO 7155.)

In light of these facts, the contours are hearsay. *See Hamilton*, 452 P.3d at 193.

### b. The contours do not fall within an exception to the hearsay exclusion rule.

Next is the question of whether the contours may qualify under an exception to the general rule stated in C.R.E. 802 precluding hearsay. The County does not contest that the Master Plans may be generally regarded as business records admissible under the exception found in C.R.E. 803(6). However, the County contends that the contours are inadmissible as hearsay within hearsay. "When a statement…contains multiple layers of hearsay, the trial court must analyze each layer separately to determine whether a recognized exception applies." *Bernache v. Brown*, 471 P.3d 1234, 1238 (2020), citing CRE 805.

"Business records may contain statements made by third parties. Courts do not grant the same presumption of reliability to these statements because the third party does not have a duty to the business to report the information accurately." *People v. N.T.B.*, 457 P.3d 126, 132 (Colo. App. 2009). In considering similar circumstances under the substantially identical federal rules of evidence, courts "do not view the business record rule [ ] as overriding the rules governing opinion testimony" as it "would allow an expert to express his opinion in a report without being subject to cross-examination on the facts and data underlying that opinion." *Van Der AA Invs., Inc. v. Comm'r*, 125 T.C. 1, 6–7 (2005) (citing *Forward Commc'ns Corp. v. United States*, 608 F.2d 485, 510 (Ct. Cl. 1979)).; *see also*, *U.S. v. Gwathney*, 465 F.3d 1133, 1140 (10th Cir. 2006) ("Any information provided by another person, if an outsider to the business preparing the record, must itself fall within a hearsay exception to be admissible"); *Annett v. Univ. of Kansas*, 93 F. Supp. 2d

1135, 1139 (D. Kan. 2000) ("The memoranda are business records, but the declarations by [another] they contain are hearsay within hearsay").

The Court finds that the contours contained in the 1988, 2000, and 2011 Master Plans are inadmissible as hearsay to the extent offered to demonstrate actual noise levels at the Airport.

### c. The contours are inadmissible under rules governing expert testimony.

Even if the hearsay rules do not preclude the contours from being presented, the rules regarding expert testimony preclude their use. As the United States Court of Claims discussed with regard to appraisal reports:

> Rule 802 states that hearsay is not admissible, and Rule 803(6) merely provides that the documents described therein, which may include opinions are not excluded by the hearsay rule. Nothing in Rule 803 says that they may not be excluded by some other rule. …In other words, unless Rule 803(6) is deemed to override the opinion rules, it should not be construed to allow the introduction of expert opinions without opportunity to ascertain the qualifications of the maker, the extent of his study or for other reasons to cross-examine him. Otherwise, the report of every appraiser would be admissible upon the mere showing that the preparer was in the business of making such appraisals, without more.

*Forward Commc'ns Corp. v. United States*, 608 F.2d 485, 510 (Ct. Cl. 1979). The Court went on to emphasize, "[R]eports which are prepared to state or to support expert opinions are not admissible without the preparer being present in court to testify as to his qualifications as an expert and to be cross-examined on the substance, pursuant to Rules 702 and 705." *Id.* at 511.

Other courts have accepted the reasoning of *Forward Communications*. "[W]e do not view the business record rule found in Fed.R.Evid. 803(6) as overriding the rules governing opinion testimony. If Fed.R.Evid. 803(6) were deemed to override the rules governing opinion testimony, it would allow the introduction of opinion testimony by lay witnesses in the form of a report as to scientific, technical, or other specialized matters and would allow an expert to express his opinion in a report without being subject to cross-examination on the facts and data underlying that

opinion." *Van Der AA Invs., Inc. v. Comm'r*, 125 T.C. 1, 6–7 (2005) (regarding a valuation report). *See also Gould Elecs. Inc. v. Livingston Cty. Rd. Comm'n*, No. 17-11130, 2020 WL 6793335, at *10 (E.D. Mich. Nov. 19, 2020) (even if reports qualified as business records under Rule 803(6), "they are nevertheless inadmissible under Rules 702 and 705 because their preparer did not testify and was unavailable for cross-examination regarding his qualifications and the substance of the reports").

Given that the contours are not admissible to show actual noise levels, there is no evidence upon which the Court could determine that the noise contours shown in the 1988 Master Plan were exceeded. No expert testimony was received regarding whether the contours have been exceeded; the only evidence admitted was the diagrams in the Master Plans.

### ii. Even if the contours are admissible, Rock Creek has not demonstrated that the limitation event occurred.

Further, even if the contours were admissible to establish actual noise levels, they cannot establish that the contours laid out in the 1988 Master Plan have been exceeded "by the *sustained* operation of aircraft in the Airspace Easement" (emphasis added). They only provide an estimate at a particular point in time in the distant past (1998 and 2009), without any evidence that such noise levels have been sustained over time. (In fact, a comparison of the contours shown in the 2000 and 2011 Master Plans, if admissible, would seem to indicate that the contours diminished in size.)

Additionally, the purpose of the noise contours in the Master Plan is to help establish appropriate uses around the airport, not to accurately present actual conditions. The 1988 Master Plan states: "It is very likely that these conditions will never be achieved at the airport, but the reason for showing the most severe conditions is to aid in land use planning and control measures." (Ex. F, JEFFCO 4831.) It goes on to state that "this information can act as a guide to the city for

land use planning and control." *Id.* at JEFFCO 4833.

Finally, and critically, even if the Court were to find that the contours contained in the 2000 or 2011 Master Plan are admissible and that they demonstrate that the noise contours contained in the 1988 Master Plan were exceeded by the sustained operation of aircraft, the Court was not presented with evidence to determine which, if any, of the Easements are affected. The requirement of the limitation event in question is that the noise contours be exceeded "by the sustained operation of aircraft **in the Airspace Easement**." (Ex. 1, p. 2) (emphasis added). The "Airspace Easement" is described in each Easement as existing "above the Property." (Ex. 1, p. 1.) The "Property," in turn, is described in each Easement in an attached Exhibit A. (*See, e.g.,* Ex. 1, pp. 1, 5.) There was no evidence at trial regarding which, if any, of the Easements regard "Property" that is located within the geographic territory of any of the contours shown in any of the Master Plans. Without such evidence, the Court cannot conclude that the "noise contours contained in the Master Plan are exceeded by the sustained operation of aircraft **in the Airspace Easement**" associated with any particular Easement.

### D. 60 ldn Noise Limit

The Court reaches a similar conclusion to that regarding the noise contours as to the final provision relied upon by Rock Creek:

> *e. The noise, vibration and all other effects of aircraft operation on the Property exceeds 60 ldn.*

No testimony was received at trial that noise levels exceeded 60 ldn anywhere in Rock Creek. Rather, Rock Creek relies entirely on the contours shown in the 2000 Master Plan in an attempt to establish that areas of Rock Creek were within the 60 ldn contour shown in that plan.

For the reasons discussed in the preceding section of this order, the contours in the 2000 Master Plan are not admissible to establish the actual noise levels in Rock Creek.

Further, each of the Easements requires that the noise from aircraft operation exceed 60 ldn "on the Property."  (Ex. 1 p. 2.) The "Property," in turn, is described in each Easement in an attached Exhibit A. (*See, e.g.,* Ex. 1 at pp. 1, 5.) There was no evidence at trial regarding which, if any, of the Easements regard "Property" that is located within the geographic territory of any of the contours shown in any of the Master Plans, including the 60 ldn contour in the 2000 Master Plan. Without such evidence, the Court cannot conclude that the 60 ldn limitation has occurred as to any particular Easement.

## **ORDER AND JUDGMENT**

IT IS THEREFORE ORDERED: Judgment is entered in favor of Defendant Jefferson County, Colorado and against Plaintiff Rock Creek Master Homeowners Association, Inc.

DONE AND SIGNED_____, 2021.

BY THE COURT:


_____
District Court Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2021, the foregoing was served via Colorado Courts E-Filing to the following:

Mark R. Davis, Esq.
Jachimiak Peterson, LLC
1819 Denver West Drive, Suite 265
Golden, CO 80401

*s/ Teri Garrod*
Teri Garrod, Paralegal
